# EXHIBIT J

JOURNAL OF
EMPIRICAL LEGAL STUDIES

*Journal of Empirical Legal Studies*
Volume 7, Issue 2, 248–281, June 2010

# Attorney Fees and Expenses in Class Action Settlements: 1993–2008

*Theodore Eisenberg and Geoffrey P. Miller\**

We report on a comprehensive database of 18 years of available opinions (1993–2008, inclusive) on settlements in class action and shareholder derivative cases in state and federal courts. An earlier study, covering 1993–2002, revealed a remarkable relationship between attorney fees and class recovery size: regardless of the methodology for calculating fees ostensibly employed by the courts, the class recovery size was the overwhelmingly important determinant of the fee. The present study, which nearly doubles the number of cases in the database, confirms that relationship. Fees display the same relationship to class recoveries in both data sets and neither fees nor recoveries materially increased over time. Although the size of the class recovery dwarfs other influences, significant associations exist between the fee amount and both the fee method used and the riskiness of the case. We found no robust evidence of significant differences between federal and state courts. The strong association between fee and class recovery persists in cases with recoveries of $100 million or more, as do the significant associations between fee level and fee method and risk. Fees were not significantly affected by the existence of a settlement class, the presence of objectors, or opt outs from the class. Courts granted the requested fee in over 70 percent of the cases, with the Second Circuit granting the requested amount least often. In cases denying the requested fee, the mean fee was 68 percent of the requested amount. Fees and costs exhibit scale effects with the percent of each decreasing as the class recovery amount increased. Costs are strongly associated with hours expended on the case.

## I. Introduction and Background

Class actions and their close cousins, shareholder derivative lawsuits, are vital mechanisms by which the legal system copes with mass harms—similar injuries to a large number of people. Long a feature of the U.S. landscape, class actions have recently begun to spread across the world.[1]

-----

*Address correspondence to Theodore Eisenberg, Cornell Law School, Myron Taylor Hall, Ithaca, NY 14853; email ted-eisenberg@lawschool.cornell.edu. Eisenberg is Henry Allen Mark Professor of Law & Adjunct Professor of Statistical Sciences, Cornell Law School; Miller is Stuyvesant P. Comfort Professor of Law, New York University Law School.

We have from time to time acted as expert witnesses or consultants on the issue of attorney fees in class action cases. We thank participants at the International Conference on Empirical Legal Studies, Tel Aviv University and Kevin Clermont for comments, and Thomas P. Eisenberg, Nicholas Germain, and Erica Miller for excellent research assistance.

[1]See, e.g., Samuel Issacharoff & Geoffrey Miller, Will Aggregate Litigation Come to Europe? 62 Vanderbilt L. Rev. 179 (2009).

A crucial issue for all class and derivative litigation is the matter of compensating counsel. Unless class counsel are adequately compensated, class and derivative litigation will be undersupplied in the legal market. On the other hand, if class action attorneys are overcompensated they may bring too many of these lawsuits and receive an excessive share of the settlement value in cases that are brought.

In normal litigation the attorney compensation can be set by private agreement between lawyer and client, but private agreement does not work in the case of class action and derivative litigation: in these contexts there is no client capable of negotiating with the attorney. In class actions, the clients are disorganized and, prior to notice of certification, usually do not even know that a lawsuit has been filed on their behalf. Except perhaps in the case of private securities litigation, the representative plaintiff cannot effectively negotiate with the attorneys over fees and costs: he or she has only a minority stake in the matter (in consumer cases, often a miniscule one), is often unsophisticated, and may be strongly influenced by the attorney's advice. In derivative cases, the ostensible client—the corporation—is usually managed by defendants in the lawsuits and therefore is unwilling to pay any fee to incentivize an attorney to bring the lawsuit. In both settings, therefore, the court must independently determine the appropriate attorney fee award.

Where can the court look for information on this question? No private stakeholder is a reliable source of information. The class attorneys' suggested fee is not impartial since, at the time of the settlement, their interest is to seek the largest possible award. Nor can the court rely on the defendant's recommendations. Settlement agreements often contain "clear-sailing" clauses under which defendants agree not to object to a fee request up to a certain amount. However, clear-sailing agreements are of little value when the defendant is not paying the fee—indeed, it is not clear that the defendant has any "skin in the game" when the fee will be paid out of the class recovery. Even when the defendant does pay the fee—as in the typical consumer class action—the clear-sailing agreement has limited pro-bative value unless the parties have deferred fee negotiations until after achieving a definite agreement on the merits. Otherwise, there is reason for concern that the defendant may have agreed to pay class counsel a premium in exchange for reductions in the amount going to the class. The reaction of the class to the settlement and proposed fee is also not a reliable guide. Empirical research suggests that the vast majority of class members are rationally indifferent to class action settlements; their failure to opt out of a settlement does not indicate approval of the proposed fee.[2] Nor can the court rely on objectors to the settlement. Few objectors appear at class action fairness hearings,[3] and those who show up may not object to the fee. Even if objectors do complain about the fee, they have only a small amount at stake and thus lack the incentive to thoroughly research the fee question.

Lacking reliable guidance from class counsel, the defendant, class members, or objectors, the judge has no alternative but to make an independent investigation. Where, however, should the judge look for information pertinent to the task of setting fees? Among

_____

[2]See Theodore Eisenberg & Geoffrey Miller, The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt L. Rev. 1529 (2004).

[3]Id.

250    Eisenberg and Miller

the factors that judges typically examine in setting fees, the most important is probably that of "awards in similar cases."[4] Precedents of fees awarded by other courts should, in theory, be relatively reliable guides because the prior courts were presumably exercising the requisite rigorous scrutiny and judicial independence when they set the fees, and because class counsel will have presumably considered the relevant case law in calculating whether to take on the litigation in the case at bar. But even this approach is not problem-free. In the typical class action settlement, the fee is taken from the common fund generated on behalf of the class. No party, in this case, has the right incentives to vigorously research the precedents running contrary to counsel's fee request. Unless the judge does his or her own research, he or she may not have access to unbiased information about fees in similar cases.

The present empirical study is intended to assist courts in the task of fee setting—and counsel in the task of identifying appropriate fees to request—by supplying an account of compensation practices in courts across the country, studied over an extended period of time, and conducted in an academic setting outside the fires of litigation. The information provided in this article is the best data on "awards in similar cases" from cases with available opinions. If used effectively, our study may be of material assistance in further rationalizing the compensation of class counsel.

We find, regardless of the methodology for calculating fees ostensibly employed by the courts, that the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class. Fees display the same relationship to class recoveries in data sets spanning both 1993 to 2002 and 2003 to 2008. Neither fees nor recoveries materially increased over time. Although the size of the class recovery dwarfs other influences, significant associations exist between the fee amount and both the fee method used and the riskiness of the case. We found no robust evidence of significant differences between federal and state courts. The strong association between fee and class recovery persists in cases with recoveries of $100 million or more, as do the significant associations between fee level and fee method and risk.

Courts granted the requested fee in over 70 percent of the cases, with courts in the Second Circuit granting the requested amount least often. In cases in which the requested fee was not awarded, the mean fee was 68 percent of the requested amount. Costs are modest, with both means and median costs comprising less than 3 percent of the class recovery. Fees and costs both exhibit scale effects, with the percent of each decreasing as the class recovery amount increased. Costs are strongly associated with hours expended on the case. Fees were not significantly affected by the existence of a settlement class, the presence of objectors, or opt outs from the class.

Section II of this article describes the data gathering and coding. Section III presents the relation between fee amount and class recovery and fee percent and class recovery over time, and by locale (including state and federal courts), and by case category. It also explores the relation between the fee and risk, settlement class, and the presence of opt outs and objectors. Section IV assesses the relation between the fee and the method used to compute

––––––

4See, e.g., Thompson v. Connick, 553 F.3d 836 (5th Cir. 2008); Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000); Spell v. McDaniel, 824 F.2d 1380, 1402 n.18 (4th Cir. 1987).

the fee, as well as the pattern of multipliers used in connection with lodestar fees. Section V reports on the pattern of costs and expenses. Section VI presents multivariate results that confirm our core findings. Section VII discusses the results and Section VIII concludes.

## II. Methodology

The results reported here were gathered in two segments. The first segment covered cases reported from 1993 to 2002 and its results are reported in previous work.[5] That study also described the motivation for the variables used in this study. The basis for believing that the variables studied might relate to fee awards is reasonably self-evident and need not be repeated here.

As previously reported, we searched in the WESTLAW™ "AllCases" database using the search "settlement & 'class action' & attorney! w/2 fee! & date(=[1993–2002])". This search's results were checked against a search of the LEXIS™ "Mega" database using equivalent search terms. We also compiled lists of citations in the cases found by these search requests and included any additional cases meeting the basic search criteria. We further checked the list against the CCH™ Federal Securities and Trade Regulation Reporters. Once cases had been identified by this method, we sometimes gathered additional information about case characteristics from other sources—for example, information on the Internet or docket entries in the U.S. Courts PACER system. The second segment covered the period 2003 to 2008, inclusive. We replicated the WESTLAW search (expanded to include the term "derivative" to make doubly sure we picked up all derivative settlements) and checked the results, in many cases, against information available on the Internet or in PACER.

The present study focuses solely on common fund cases and does not assess cases in which a court applied a statutory fee-shifting statute to assess fees. Our searches and exclusion criteria yielded recovery and fee information for a total sample of 689 common fund cases. Relatively more cases come from the later period (301 cases for six years from 2003 to 2008 compared with 388 cases for the preceding 10 years). This was principally due to the significantly expanded coverage of the PACER system in the later period, and also to our inclusion of cases in which fee-shifting statutes could have been applied but the fee was not determined by formally applying the fee-shifting statute.

We used the following conventions for coding in both searches. If the court stated a range of value (e.g., for the amount of class recovery), we used the midpoint. If there was no better estimate available but a maximum recovery value could be ascertained, we used the maximum possible recovery. If the court estimated the relief at "over" or "more than" a sum, the sum that was the minimum was used. Where the settlement amount included post- or prejudgment interest, we included that in the amount of the settlement. We collected only the number of attorney hours, thus excluding, where possible, the (usually minor) hours reported for paralegals or law clerks.

———

[5]For our prior empirical study of class action attorney fees, see Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004).

To code the court's fee calculation method, we tracked whether the court engaged in a lodestar calculation and, if so, the purity of the lodestar approach. This generated the following fee method categories: (1) percentage method cases in which no lodestar calculation exists, (2) cases in which both the lodestar calculation and the percentage approach were used (usually with the lodestar being employed as a "cross-check" on the percentage fee), and (3) pure lodestar cases in which the lodestar method was the exclusive method used. If the lodestar amount was not specified, but could be estimated with reasonable accuracy, we included it. We used plaintiffs' own estimates of their lodestar only when these estimates were not contested by the court. In some cases, the court simply reported a fee without explaining its methodology; these we recorded as missing or as "negotiated" if the approved fee was the one negotiated by the parties.

The coding of variables related to fee shifting was somewhat subtle. Many class action cases are brought under numerous claims for relief, some of which authorize the court to award fees to the prevailing plaintiff or prevailing party. When these cases settle, the courts often set fees without reference to the fee-shifting statute. Even when fee-shifting statutes are potentially available, the fee is often awarded out of the class recovery. Our "fee-shifting" variable codes whether the fee *could* have been calculated under a fee-shifting statute had the case progressed to a litigated judgment, regardless of whether the court actually invoked the fee-shifting statute as a basis for awarding the fee. For the later cases (2003–2008), we kept track of whether the court had actually used the fee-shifting statute as a basis for awarding the fee. In that period, a fee-shifting statute was available in 177 cases but was used as the basis for awarding the fee in only 21 cases, 11.9 percent. We included as common fund cases the 156 cases in which fee-shifting statutes were available but were not used. Preliminary regression models indicated no significant difference in fee awards between these cases and "purer" common fund cases.

For many other variables, coding was reasonably straightforward. In employment discrimination and civil rights cases, two prominent categories of fee-shifting statute cases, the amount of the relief to the class, as expected, often was difficult to quantify because an important element of relief in such cases was often injunctive. For civil rights cases involving only injunctive relief, the cost to the defendant was used as a measure of the value of the relief for the class when this was available. In some fee-shifting cases, the court awarded attorney fees but it was impossible to estimate the amount of class damages. These fee and recovery coding conventions led to usable values for the fee amount and the client recovery, two of our core variables, in the 689 cases studied here.

We also coded cases for risk. Where the court addressed the question of risk, we coded according to our best estimate of the court's evaluation. In many cases, however, the court did not explicitly address the risk of the litigation. Coding therefore depended on assuming that risk was not prominent in cases in which courts did not mention it. We divided the cases into three risk categories. If nothing was said about risk or if the court's discussion suggested a normal degree of risk, the case was coded as being medium risk. If the court affirmatively indicated the existence of substantial risk, or if exceptional risk was evident from the facts or procedural history of the case, we coded the case as having high risk. If the court indicated or the facts otherwise suggested that the case was very likely to generate a substantial recovery for the class at the time it was brought (e.g., if the case grew

out of a prior government prosecution that had resulted in fines or convictions), we coded the case as low risk.

As in our earlier work, two caveats about using published opinions are in order. First, our data include only opinions that were published in some readily available form. Obviously, therefore, we have not included the full universe of cases in our data set. Although published opinions are not necessarily representative of the universe of all cases, they can lead to important insights. For judges seeking to inform their fee decisions with knowledge of other cases, published opinions are the prime source of data. Further, the present study expands on the published opinion data by delving into unpublished materials available on PACER when these could supply information missing from the published case reports.

A second caveat about the published opinion data is that this methodology over-weights federal cases. Opinions of state trial court judges are published less frequently than opinions of federal district courts; and since fee awards are typically reported in the court of first instance, we found many more federal than state opinions responsive to our search request. Further, the PACER system allowed us to "dig" for more information in the case of federal opinions. There is no state analog to PACER, and therefore we could only rarely discover information about fees and related issues when a state opinion on a class action or derivative case failed to report the necessary data.

## III. Bivariate Results: Fee Amount and Fee Percent

We first examine bivariate results—that is, the relation between either the fee amount or the fee percent and one of the other variables coded in our data. We outline the persistent regular relationship between fees and recovery in both data sets (1993–2002 and 2003–2008). We then examine the pattern of fees across other dimensions such as time, locale, case category, risk, settlement class status, and the presence of opt outs and objectors. All amounts are in 2008 inflation-adjusted dollars.

### A. The Persistent Relation Between Fee and Recovery

The relation between fee amount and class recovery has remained consistent over time. Figure 1 shows scatterplots of the fee amount and class recovery for each of the two time periods (Figures 1a and 1b), for the time periods combined (Figure 1c), and for cases with recoveries greater than or equal to $100 million (Figure 1d). The scales have been transformed into log10 units to address the bunching of cases at the lower end of the recovery scale that would occur in a linear dollar scale. Units of log10 can easily be interpreted because the log10 scale is simply based on powers of 10 (e.g., a value of 9 on a log10 scale is equal to $1 billion, or one followed by nine zeros).

Figures 1a and 1b show that the pattern is virtually unchanged over time. The associations between fee and recovery are striking and large. The linear correlation between fee and recovery exceeds 0.94 for each time period and the slope of the relation-ships appears constant for the two time periods. In a regression model with a dummy

*Figure 1:*   Fees as a function of recovery.



variable for time period and an interaction term consisting of the product of the time period dummy variable and the class recovery size, one cannot reject the hypothesis that the dummy variable and the interaction term coefficients are jointly zero, thus confirming the consistency of the pattern. The relation between fees and class recoveries is also observed when the data are combined, as shown in Figure 1c. In both the separate and combined data sets, the size of the class recovery swamps all other influences on the size of the fee, as shown in regression models in Section VI of this article.[6] Figure 1d, which is limited to large cases, also shows a strong linear relation between fee and recovery. For these 109 cases, the linear correlation coefficient is 0.77 ($p < 0.0001$). The decreased slope for the high end of case recoveries is consistent with the scaling effect discussed in Section III.B.4 of this article.

Figure 2 further supports the primacy of the recovery as the explanation for the fee award. For ease of comparison, Figure 2a reproduces the combined time period data from Figure 1c. Figures 2b and 2c show that neither the hours claimed nor the age of a case are as strongly associated with the fee amount as is the class recovery amount.

With six additional years of data, we can extend our prior analysis of the pattern of fees and class recoveries over time. One notable earlier finding was the absence of

---

[6]Figure 1b shows the later time period with more low-recovery cases (less than $100,000). This is likely attributable to our inclusion in the non-fee-shifting sample cases in which a fee-shifting statute existed but was not used, as well as to the information about smaller cases now available on PACER See Section II.

*Figure 2:*   Fee as a function of recovery, hours, and age, 2003–2008.



increases in class recoveries or fees over time,[7] a finding that heartened opponents of attempts to reform the class action system via the Class Action Fairness Act of 2005 (CAFA)[8] and prompted a response from a noted Yale Law School professor.[9] The newer data reveal that the level of both class recoveries and attorney fees has not varied substantially over time. As Figure 3 shows, these amounts have shown no distinct time trend for most of 16 years. Inflation-adjusted recoveries and fees through 2007 were at levels not significantly different from levels in 1993 and in fact are lower in inflation-adjusted dollars. In 2008, a noticeable drop in mean and median recoveries and fees occurred. The difference in class recovery medians between 2008 and all earlier years combined is statistically significant at $p = 0.002$, and the difference in fees between 2008 and earlier years is significant at $p = 0.0003$. The difference in the median ratio of fee to recovery (ratio of the logs) did not significantly differ between 2008 and earlier years

-------

[7]Eisenberg & Miller, supra note 5.

[8]Class Action Fairness Act, Pub. L. No. 109-2, 119 Stat. 4 (2005). See 149 Cong. Rec. S1299902 (Oct. 22, 2003) (remarks of Senator Feingold); 151 Cong. Rec. S1086-02 (Feb. 8, 2005) (remarks of Senator Feingold).

[9]George L. Priest, What We Know and What We Don't Know About Modern Class Actions: A Review of the Eisenberg-Miller Study (Feb. 2005, Manhattan Inst.).

256    *Eisenberg and Miller*

*Figure 3:*   Class recovery and attorney fee over time, mean and median.



Sources:  Westlaw, LexisNexis, PACER.

($p = 0.517$).[10] We therefore do not view the changes in 2008 as necessarily indicating anything significant about longer-term fee patterns.

### B. Locales, Case Categories, and Other Factors

Table 1 shows the distribution of cases by locale. It combines all 25 federal appellate opinions into one category, "Appeal," and all 75 state cases into one category, "State." Federal district court cases dominate the sample, accounting for approximately 85 percent of the cases. The federal class action cases cluster by districts. The Southern District of New York accounted for 103 of 589 federal district court cases, and the Eastern District of Pennsylvania accounted for 70 such cases. They are the only two districts to account for 10 percent or more of the federal trial court portion of the sample and together accounted for 25 percent of all cases in the sample. Two other districts accounted for more than 5 percent of the federal court portion of the sample: the Northern District of California had 47 cases

---

[10]This pattern of average and median fees in more recent years may be partly due to the increase in smaller cases that we were able to code by accessing the PACER database and to inclusion in the later period of cases in which fee-shifting statutes were theoretically available but not used to set the fee. We investigated whether a changing mix of cases explained the pattern by separately assessing, for the two time periods, cases with recoveries greater than or equal to $5 million and recoveries less than $5 million. For both recovery size groups, the difference in recovery across the two time periods was not statistically significantly different. The difference over time in medians for cases with recoveries greater than or equal to $5 million was significant at $p = 0.590$; for cases with recoveries less than $5 million, the difference in medians was significant at $p = 0.749$. But the smaller cases were more prevalent in the later period. Cases with recoveries of less than $5 million comprised 33 percent of the later period cases compared to 24 percent of the earlier period cases, a difference statistically significant at $p = 0.022$. Thus the decreasing recovery amount over time is attributable to a different mix of cases in our sample, and not to differences in treatment of similar cases over time. Thus, throughout more than a decade of civil litigation reform efforts based on claims of increasing awards and fees, the pattern in available opinions, which tend to include the largest cases, has not significantly changed.

Table 1:   Frequency of Class Action Fee Opinions, by Court, 1993–2008

| *Locale* | N | *% of Cases* |
|---|---|---|
| Other | 161 | 23.37 |
| SDNY | 103 | 14.95 |
| State | 75 | 10.89 |
| EDPA | 70 | 10.16 |
| NDCA | 47 | 6.82 |
| DNJ | 35 | 5.08 |
| NDIL | 29 | 4.21 |
| EDNY | 26 | 3.77 |
| APPEAL | 25 | 3.63 |
| DDC | 18 | 2.61 |
| EDMI | 17 | 2.47 |
| DMN | 16 | 2.32 |
| EDLA | 13 | 1.89 |
| MDFL | 12 | 1.74 |
| EDCA | 12 | 1.74 |
| CDCA | 10 | 1.45 |
| DMA | 10 | 1.45 |
| SDCA | 10 | 1.45 |
| Total | 689 | 100.00 |

Sources: Westlaw, LexisNexis, PACER.

and the District of New Jersey 35 cases. The Northern District of Illinois had just under 5 percent of the federal district cases. Together, these five districts accounted for over 50 percent of the federal district court opinions.

These results suggest that class action litigation in the federal system is heavily concentrated in a few jurisdictions. Of the 94 federal district courts, nearly half of all class actions in our data set occurred in five courts. Even adjusting for population (the popular class action districts also tend to be ones with large populations), the concentration ratio remains striking. We take this as evidence that certain jurisdictions offer advantages for class action litigation, either in the form of experienced judges who can handle these cases in a fair and expeditious manner, faster dockets, a sense on the part of plaintiffs' attorneys that the courts in these districts are reasonably well-inclined toward class action litigation, or a concentration of class action attorneys specializing in the practice.

We also investigated whether different federal courts appear to specialize in different types of cases. Table 2 shows the breakdown of the four largest case types, plus the residual case type, "Other," in the federal district courts with the largest number of class action settlements in our data (those listed in Table 1). For each case category, one column shows the percent of cases in each district and a second column shows the number of cases. For example, the Southern District of New York accounted for 70 of 253 securities cases, 28 percent of that category. Thus, the Southern District of New York tends to dominate securities class actions, whereas the Eastern District of Pennsylvania is the leader in antitrust

*258    Eisenberg and Miller*

Table 2:   Class Action Case Categories by Locale, 1993–2008

| District | *Antitrust* | | *Consumer* | | *Employment* | | *Securities* | | *Other* | | *Total* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | N | % | N | % | N | % | N | % | N | % | N |
| Other | 16 | 10 | 35 | 34 | 30 | 15 | 21 | 52 | 38 | 49 | 27 | 160 |
| SDNY | 7 | 4 | 1 | 1 | 10 | 5 | 28 | 70 | 18 | 23 | 18 | 103 |
| EDPA | 20 | 12 | 14 | 13 | 2 | 1 | 14 | 36 | 6 | 8 | 12 | 70 |
| NDCA | 7 | 4 | 7 | 7 | 14 | 7 | 8 | 19 | 8 | 10 | 8 | 47 |
| DNJ | 8 | 5 | 7 | 7 | 2 | 1 | 6 | 15 | 5 | 7 | 6 | 35 |
| NDIL | 10 | 6 | 7 | 7 | 4 | 2 | 5 | 12 | 2 | 2 | 5 | 29 |
| EDNY | 5 | 3 | 7 | 7 | 2 | 1 | 6 | 14 | 1 | 1 | 4 | 26 |
| DDC | 16 | 10 | 1 | 1 | 0 | 0 | 1 | 2 | 4 | 5 | 3 | 18 |
| EDMI | 3 | 2 | 0 | 0 | 0 | 0 | 2 | 6 | 7 | 9 | 3 | 17 |
| DMN | 5 | 3 | 3 | 3 | 4 | 2 | 2 | 6 | 2 | 2 | 3 | 16 |
| EDLA | 0 | 0 | 3 | 3 | 4 | 2 | 2 | 4 | 3 | 4 | 2 | 13 |
| EDCA | 0 | 0 | 2 | 2 | 16 | 8 | 0 | 0 | 2 | 2 | 2 | 12 |
| MDFL | 2 | 1 | 2 | 2 | 2 | 1 | 3 | 7 | 1 | 1 | 2 | 12 |
| CDCA | 0 | 0 | 2 | 2 | 6 | 3 | 1 | 3 | 2 | 2 | 2 | 10 |
| DMA | 2 | 1 | 5 | 5 | 0 | 0 | 1 | 2 | 2 | 2 | 2 | 10 |
| SDCA | 0 | 0 | 2 | 2 | 4 | 2 | 2 | 5 | 1 | 1 | 2 | 10 |
| Total | 100 | 61 | 100 | 96 | 100 | 50 | 100 | 253 | 100 | 128 | 100 | 588 |

NOTE:  Table includes only federal district court cases.

SOURCES:  Westlaw, LexisNexis, PACER.

and consumer cases. The Northern and Eastern Districts of California are the leaders in employment cases. Table 2 shows that the SDNY's dominance is almost completely attributable to its large role in securities cases.

1.  Fees Across Locales

Table 3 shows summary statistics about fees and recoveries by locale. The mean fee to recovery ratio was 0.23, or 23 percent of the class award, but this percent varies by recovery size, as shown in Figure 5 and Table 7. The mean fee was $12.8 million and the median was $2.3 million. The mean class recovery was $116.0 million and the median was $12.5 million.

　　　Some bankruptcy case fee studies[11] and other studies of case outcomes show notable interdistrict variation. Like these studies, we find significant variation across federal districts. For the 16 federal districts with at least 10 cases with necessary information in the

---

[11]See Lynn M. LoPucki & Joseph W. Doherty, The Determinants of Professional Fees in Large Bankruptcy Reorganization Cases, 1 J. Empirical Legal Stud. 111, 114, 136 (2004) (showing significant fee request reduction variation across Delaware and the Southern District of New York); Stephen J. Lubben, Corporate Reorganization and Professional Fees, 82 Am. Bankr. L.J. 82 (2008) (showing some significant Delaware and Southern District of New York effects). But see Lynn M. LoPucki & Joseph W. Doherty, Professional Overcharging in Large Bankruptcy Reorganization Cases, 5 J. Empirical Legal Stud. 983, 1010 (2008) (tbl. 5, showing insignificant Delaware and Southern District of New York effects).

Table 3:   Fee and Class Recoveries, by Locale, 1993–2008

| | *Mean Ratio* | *Median Ratio* | *Mean Fee* | *Median Fee* | *Mean Gross Recovery* | *Median Gross Recovery* | *Number of Cases* |
|---|---|---|---|---|---|---|---|
| APPEAL | 0.19 | 0.20 | 5.89 | 2.15 | 57.86 | 13.37 | 25 |
| CDCA | 0.25 | 0.25 | 3.93 | 2.75 | 16.30 | 19.90 | 10 |
| DDC | 0.22 | 0.22 | 16.69 | 2.14 | 134.79 | 13.00 | 18 |
| DMA | 0.16 | 0.15 | 11.50 | 7.00 | 118.55 | 81.00 | 10 |
| DMN | 0.25 | 0.27 | 8.77 | 4.75 | 40.99 | 14.25 | 16 |
| DNJ | 0.21 | 0.22 | 32.26 | 7.80 | 503.42 | 36.88 | 35 |
| EDCA | 0.26 | 0.25 | 0.40 | 0.12 | 3.26 | 0.54 | 12 |
| EDLA | 0.26 | 0.23 | 7.79 | 1.77 | 43.53 | 8.61 | 13 |
| EDMI | 0.22 | 0.20 | 6.56 | 1.34 | 34.80 | 11.75 | 17 |
| EDNY | 0.32 | 0.25 | 11.33 | 2.38 | 142.42 | 9.03 | 26 |
| EDPA | 0.28 | 0.29 | 12.66 | 1.51 | 75.79 | 6.88 | 70 |
| MDFL | 0.21 | 0.21 | 3.64 | 2.66 | 18.23 | 14.87 | 12 |
| NDCA | 0.26 | 0.25 | 4.44 | 2.00 | 24.06 | 9.25 | 47 |
| NDIL | 0.24 | 0.24 | 12.14 | 2.75 | 51.45 | 12.50 | 29 |
| Other | 0.24 | 0.25 | 20.47 | 3.25 | 154.98 | 16.38 | 161 |
| SDCA | 0.26 | 0.25 | 4.66 | 1.14 | 63.12 | 4.90 | 10 |
| SDNY | 0.22 | 0.22 | 11.54 | 2.13 | 127.97 | 12.85 | 103 |
| State | 0.20 | 0.20 | 5.94 | 2.00 | 61.61 | 12.32 | 75 |
| Total | 0.23 | 0.24 | 12.84 | 2.33 | 116.01 | 12.50 | 689 |

Note: Dollar amounts are in millions of 2008 dollars.
Sources: Westlaw, LexisNexis, PACER.

sample (including "Other" as a district), a test of the hypothesis that the median ratio of fee to class recovery does not differ significantly can be rejected, with a Mann-Whitney test yielding a significance level of $p = 0.014$. Given the strong association between fee and class recovery, we explored these initial interdistrict differences by accounting for recovery level and case category in regression models. The district dummy variables were collectively statistically significant ($p = 0.035$), indicating that when the size of class recoveries and case categories are accounted for, one can reject the hypothesis of no statistically significant interdistrict differences. Table 3's first two numerical columns suggest that interdistrict differences can be nontrivial but are not dramatic. With one exception, the District of Massachusetts, the median ratio always ranges from 0.20 to 0.29.

In federal courts, attorney fee doctrine is dictated at the circuit court level if the appeals court has issued an opinion on point (the Supreme Court has never offered definitive guidance on this issue). The Ninth Circuit has a 25 percent benchmark fee in common fund cases but allows departures based on individual case factors,[12] and the Eleventh Circuit has indicated that its district courts view 25 percent as a benchmark.[13]

---

[12]E.g., Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

[13]Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 775 (11th Cir. 1991).

Table 4:   Fee and Class Recoveries, by Federal Circuit, 1993–2008

| Circuit | Mean Ratio | Median Ratio | Mean Fee | Median Fee | Mean Gross Recovery | Median Gross Recovery | Number of Cases |
|---|---|---|---|---|---|---|---|
| 1st | 0.20 | 0.20 | 31.83 | 3.50 | 227.41 | 19.32 | 21 |
| 2nd | 0.23 | 0.24 | 10.58 | 2.13 | 119.06 | 11.63 | 145 |
| 3rd | 0.26 | 0.26 | 17.38 | 3.00 | 193.50 | 13.38 | 120 |
| 4th | 0.20 | 0.21 | 29.27 | 1.89 | 320.07 | 13.55 | 8 |
| 5th | 0.24 | 0.23 | 42.39 | 2.63 | 368.34 | 15.65 | 26 |
| 6th | 0.23 | 0.23 | 10.42 | 3.33 | 94.65 | 15.50 | 42 |
| 7th | 0.26 | 0.24 | 8.79 | 2.15 | 38.37 | 10.07 | 42 |
| 8th | 0.25 | 0.30 | 11.21 | 4.18 | 68.35 | 14.70 | 29 |
| 9th | 0.25 | 0.25 | 4.53 | 1.80 | 32.97 | 9.50 | 101 |
| 10th | 0.22 | 0.23 | 12.46 | 7.42 | 63.96 | 32.00 | 22 |
| 11th | 0.21 | 0.22 | 17.35 | 4.22 | 87.09 | 26.85 | 34 |
| DC | 0.21 | 0.22 | 15.17 | 1.94 | 122.04 | 11.00 | 20 |
| Total | 0.24 | 0.25 | 13.74 | 2.40 | 123.12 | 12.50 | 610 |

NOTE:  Three Federal Circuit cases and all state court cases are omitted. Dollar amounts are in millions of 2008 dollars.
SOURCES:  Westlaw, LexisNexis, PACER.

The Eleventh and D.C. Circuits mandate the percentage methodexclusively, while other circuits allow percentage or lodestar methods.[14] The Second Circuit's *Goldberger* decision rejected the use of benchmarks and mandated a fact-specific inquiry.[15]

Table 4 explores intercircuit variation, showing summary statistics about fees and recoveries by circuit, and excludes state court cases. The median and mean fee to recovery ratios were 0.24 and 0.25, respectively. In regression models of the ratio, circuit dummy variables were not collectively statistically significant ($p = 0.124$), indicating that when the size of class recoveries and case categories are accounted for, one cannot reject the hypothesis of no statistically significant intercircuit differences. We also explored differences between particular circuits and all other circuits based on announced benchmarks and methods. In regression models using dummy variables for individual circuits, and controlling for case category and recovery size, none of the individual circuit effects were statistically significant. Nor were differences within the Second Circuit significantly different pre- and post-*Goldberger*.[16]

———

[14]Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993); Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991).

[15]Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).

[16]Nor was the variance in fee percent significantly different between the Ninth or Eleventh Circuits and other circuits. For a more in-depth exploration of the effect (or lack of effect) of the *Goldberger* decision, see Theodore Eisenberg, Geoffrey Miller & Michael Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After *Goldberger v. Integrated Resources, Inc.*, 29 Wash. U. J. Law & Policy 5 (2009).

Case 3:10-cv-01284-GPC-BGS   Document 60-12   Filed 06/20/12   PageID.478   Page 15 of 35

## 2. State-Federal Differences

We hypothesized that the fee percent would tend to be higher in class actions in state court than in federal court.[17] Beliefs in differences in how federal and state courts process class actions were cited as reasons for enactment of CAFA.[18] The Congress that enacted CAFA intended to route interstate class actions to federal court, "with the expressed intent of defeating the plaintiffs' bar's manipulation of state courts."[19] President George W. Bush declared that it "marks a critical step toward ending the lawsuit culture in our country."[20] Empirical support for CAFA was almost entirely lacking, however, with both Federal Judicial Center (FJC) research[21] and our own prior work[22] suggesting little in the way of significant state-federal defferences.

Table 3 shows that the mean fee to class recovery ratio for state court cases was 0.20, lower than the overall mean ratio of 0.24. Regression models of the fee (log 10) or the ratio (of logs) as a function of the case category and the class recovery size indicate that the federal-state difference was sometimes statistically significant in the direction suggested by Table 3—namely, that state courts award lower percentage fees.[23] The direction of the effect is surprising if one believes federal courts are less receptive to class actions than are state courts. A lower fee to recovery ratio suggests somewhat less encouragement of class action activity by state courts compared to federal courts.

## 3. Case Categories

Table 5 summarizes fees, recoveries, and their ratios by case categories. Mean fees ranged from 11 percent of the class recovery in tax cases to 27 percent in employment cases. In the

---

[17] Eisenberg & Miller, supra note 5.

[18] Pub. L. No. 109-2, 119 Stat. 4 (2005) (codified in scattered sections of 28 U.S.C.). See generally Kevin M. Clermont & Theodore Eisenberg, CAFA Judicata: A Tale of Waste and Politics, 156 U. Pa. L. Rev. 1553 (2008); Georgene M. Vairo, Class Action Fairness Act of 2005 (2005).

[19] Clermont & Eisenberg, supra note 18, at 1554–55.

[20] Remarks on Signing the Class Action Fairness Act of 2005, 41 Weekly Comp. Pres. Doc. 265, 265 (Feb. 18, 2005); see also Edward A. Purcell, Jr., The Class Action Fairness Act in Perspective: The Old and the New in Federal Jurisdictional Reform, 156 U. Pa. L. Rev. 1823 (2008) (stressing partisan support for CAFA).

[21] Thomas E. Willging & Shannon R. Wheatman, Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make? 81 Notre Dame L. Rev. 591, 645, 652–54 (2006) (finding insignificant differences in state court and federal court treatment of class actions, and observing that "[a]ttorney perceptions of judicial predispositions toward their clients' interests show little or no relationship to the judicial rulings in the surveyed [state and federal class action] cases"). See also Section VII.

[22] Eisenberg & Miller, supra note 5.

[23] The state court effect was significant in multilevel models with a random intercept for case category. The effect was insignificant in models with dummy variables for case category.

Table 5:   Fee and Class Recoveries, by Case Category, 1993–2008

| | Mean Ratio | Median Ratio | Mean Fee | Median Fee | Mean Gross Recovery | Median Gross Recovery | Number of Cases |
|---|---|---|---|---|---|---|---|
| Antitrust | 0.22 | 0.23 | 21.02 | 9.15 | 163.48 | 39.36 | 71 |
| Civil rights | 0.24 | 0.23 | 4.10 | 1.52 | 16.53 | 7.48 | 18 |
| Consumer | 0.25 | 0.20 | 10.04 | 1.70 | 128.42 | 9.33 | 125 |
| Corporate | 0.21 | 0.19 | 3.35 | 1.12 | 16.51 | 9.86 | 30 |
| Employment | 0.27 | 0.25 | 2.43 | 0.75 | 12.28 | 3.00 | 55 |
| ERISA | 0.23 | 0.25 | 6.61 | 3.46 | 29.54 | 14.00 | 43 |
| Securities | 0.23 | 0.25 | 14.78 | 2.52 | 141.96 | 12.50 | 268 |
| Tax refund/tax | 0.11 | 0.06 | 12.96 | 5.50 | 188.01 | 60.07 | 8 |
| Tort | 0.21 | 0.20 | 30.15 | 6.33 | 254.60 | 25.86 | 29 |
| Other | 0.23 | 0.25 | 13.59 | 2.00 | 61.86 | 10.75 | 42 |
| Total | 0.23 | 0.24 | 12.84 | 2.33 | 116.01 | 12.50 | 689 |

NOTE:  Dollar amounts are in millions of 2008 dollars.
SOURCES:  Westlaw, LexisNexis, PACER.

Table 6:   Frequency of Case Categories, by Time Period

| | Non-Fee-Shifting Cases | | | |
|---|---|---|---|---|
| | 1993–2002 | | 2003–2008 | |
| | N | % of Cases in Period | N | % of Cases in Period |
| Antitrust | 36 | 11.9 | 35 | 9.1 |
| Civil rights | 2 | 0.7 | 16 | 4.2 |
| Consumer | 52 | 17.2 | 73 | 18.9 |
| Corporate | 15 | 5.0 | 15 | 3.9 |
| Employment | 7 | 2.3 | 48 | 12.4 |
| ERISA | 7 | 2.3 | 36 | 9.3 |
| Securities | 142 | 46.9 | 126 | 32.6 |
| Tax refund/tax | 6 | 2.0 | 2 | 0.5 |
| Tort | 17 | 5.6 | 12 | 3.1 |
| Other | 19 | 6.3 | 23 | 6.0 |
| Total | 303 | 100 | 386 | 100 |

SOURCES:  Westlaw, LexisNexis, PACER.

larger case categories, fees ranged from 21 percent to 27 percent of recoveries. A test of the hypothesis that the median ratio of fees to recoveries is the same across case categories can be rejected at $p < 0.022$, if one includes the small civil rights and tax categories. But the effect becomes statistically insignificant if one excludes the two smallest categories ($p = 0.222$).

The case category makeup of the samples varied over time. Table 6 shows the case category breakdown for the time period of our prior study and the years 2003 to 2008, added for purposes of this study. In each time period, securities cases were the dominant case category, but they declined as a proportion of the sample in the later time period. This

*Figure 4:*   Fee and recovery by case category, 1993–2008.



SOURCES:  Westlaw, LexisNexis, PACER.

is due to the increase in the proportion of civil rights, employment, and ERISA cases, which likely increased because of the change in coding, discussed above, to allow inclusion with common fund cases, cases subject to a fee-shifting statute but in which the fee was not determined pursuant to the statute, as well as to increased availability of information through the PACER database.

Figure 4 explores whether the core relation between fee amount and class recovery varies by case category. It shows that relation through separate scatterplots for 10 case categories. The consistency of the pattern across category is striking. Every category shows the same basic relation between fee and recovery.

## 4. Scaling Effect

The existence of a scaling effect—the fee percent decreases as class recovery increases—is central to justifying aggregate litigation such as class actions. Plaintiffs' ability to aggregate into classes that reduce the percentage of recovery devoted to fees should be a hallmark of a well-functioning class action system.[24] As Figure 5 shows, a substantial scaling effect existed

_____

[24]Eisenberg & Miller, supra note 5.

264    *Eisenberg and Miller*

*Figure 5:*  Fee as a percent of recovery for two time periods.



Sources:  Westlaw, LexisNexis, PACER.

in the 2003–2008 period, as well as in the earlier 1993–2002 period. The linear correlation coefficient for 2003–2008 was −0.57 and for 1993–2002 was −0.50, both statistically significant at $p < 0.0001$. The lines in the figure show the best-fitting regression line for each data subset.

Table 7 presents additional information about the scale effect. For purposes of this table, we divided the range of class recoveries into deciles of about 69 cases each. Table 7's first column shows the bounds on the deciles, starting with the lowest decile of class recoveries. Thus the table's first numerical row includes cases with class recoveries in the first decile, those recoveries less than or equal to $1.1 million. The table's last row includes cases in the highest decile, those with recoveries greater than $175.5 million. The table's columns show, within each decile range, the mean, median, and standard deviation of the fee percent for the row decile. Thus, for the 69 cases with class recoveries of less than $1.1 million, the mean fee percent award was 37.9 percent in 69 cases, the median fee percent award was 32.3 percent, and the standard deviation was 19.6 percent. Although there is some fluctuation in the scale effect trend across the middle deciles, the overall trend is clear, with the highest decile having less than one-third of the median and mean percentage fee of the lowest decile.

Table 7:   Mean, Median, and Standard Deviation of Fee Percent, Controlling for Class Recovery Amount, 1993–2008

| Range of Class Recovery (Millions) Decile | Mean | Median | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery > 1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery > 2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery > 5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery > 8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery > 14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery > 22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery > 38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery > 69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery > 175.5 | 12.0 | 10.2 | 7.9 | 68 |

SOURCES:  Westlaw, LexisNexis, PACER.

Table 8:   Fee Percent, by Risk Level

| | High Risk | | Low/Medium Risk | |
|---|---|---|---|---|
| | N | Fee % | N | Fee % |
| Antitrust | 9 | 20.1 | 62 | 22.2 |
| Civil rights | 4 | 29.3 | 13 | 23.2 |
| Consumer | 14 | 31.3 | 110 | 24.7 |
| Corporate | 4 | 23.4 | 26 | 20.8 |
| Employment | 4 | 35.1 | 51 | 26.2 |
| ERISA | 5 | 24.6 | 38 | 23.2 |
| Securities | 45 | 26.4 | 217 | 22.7 |
| Tax refund/tax | — | — | 8 | 10.8 |
| Tort | 8 | 25.1 | 21 | 19.0 |
| Other | 13 | 22.1 | 29 | 23.9 |
| Total | 106 | 26.1 | 575 | 23.1 |

SOURCES:  Westlaw, LexisNexis, PACER.

## 5.  Risk

Standards applied to attorney fees uniformly indicate that greater risk warrants an increased fee.[25] Table 8 reports, by case category, the mean fee percent separately for high risk and other cases. It confirms that courts systematically reward risk. For every case category except antitrust and "other," mean fee percents were higher in high-risk cases than in other cases. The difference within a case category between high-risk cases and other cases

[25]E.g., Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000).

Table 9:  Fee  Percent  and  Settlement  Classes,  Opt Outs, Objectors

|  | | *Period*<br>*2003–2008* |
|---|---|---|
|  | N | *Fee %* |
| A.  Settlement Class Status | | |
| Settlement class | 208 | 24.4% |
| Not a settlement class | 160 | 25.4% |
| B.  Presence of Objectors | | |
| Any objector | 142 | 23.4% |
| No objector | 123 | 28.6% |
| C.  Number of Opt Outs | | |
| No opt outs | 28 | 34.6% |
| One opt out | 20 | 37.2% |
| >One opt out | 116 | 23.6% |

Sources:  Westlaw, LexisNexis, PACER.

was statistically significant only for the large securities category ($t$ test significance level, $p = 0.006$).

6.  Settlement Classes, Opt Outs, and Objectors

Table 9 reports the relation between the fee percent and three class action case characteristics: settlement class status (Panel A),[26] whether any objection was filed (Panel B), and the number of class members opting out of the class (Panel C). We collected useful data on these issues only for the later time period (2003–2008). No significant difference in fee percent for settlement class cases compared to nonsettlement class cases emerged. There were significant differences in the fee percent for cases with and without objectors. Cases with objectors tended to have lower fee percents than cases without objectors. Cases with more than one opting-out class member tended to have lower fee percents than cases with zero or one opting-out class member. But, in regression models that supplement those reported in Table 17, the objector and opt-out variables were found not to be significant once one controlled for recovery size.

## IV.  Bivariate Results: Fee Methods and Multipliers

The dominant method used to calculate fees in class actions has evolved from considering multiple factors[27] to the dominance of two other methods, the lodestar and percentage

――――

[26]A settlement class is a case in which a class was certified for settlement purposes only.

[27]The factors include the time and labor required, the customary fee, whether the fee is fixed or contingent, the amount involved and the results obtained, the experience, reputation, and ability of the attorneys, awards in similar

Table 10:   Frequency of Method Used, by Time Period

|  | *1993–2002* | | *2003–2008* | |
|---|---|---|---|---|
|  | N | *% of Cases in Period* | N | *% of Cases in Period* |
| Lodestar | 38 | 13.6 | 37 | 9.6 |
| Percent | 158 | 56.4 | 146 | 37.8 |
| Both (usually % with LS check) | 68 | 24.3 | 165 | 42.8 |
| Other | 16 | 5.7 | 38 | 9.8 |
| Total | 280 | 100 | 386 | 100 |

NOTE:  LS = lodestar method.
SOURCES:  Westlaw, LexisNexis, PACER.

methods. Under the lodestar method, courts multiply the reasonable number of hours expended by counsel by a reasonable hourly rate and then adjust the product for various factors.[28] Under the percentage method, the court multiplies the amount recovered on behalf of the class by a percentage factor. Some courts adopt a blended approach that checks the percentage method for reasonableness against a lodestar calculation.[29] We explore here the rates at which courts use the fee calculation methods, the relation between those methods and fees, the rates at which courts granted requested fees, and the use of multipliers in cases using the lodestar method.

*A. Lodestar*

1. Frequency of Use of Lodestar Versus Percent

Table 10 reports the rate of use of competing methods of computing a fee award. One result is the decline in the use of the lodestar method. From 1993 to 2002, 13.6 percent of cases used a pure lodestar method. From 2003 to 2008, only 9.6 percent of cases used the lodestar method, a notable but not statistically significant reduction ($p = 0.136$). This is likely due to the relatively few cases using the lodestar method exclusively.

   Table 10 also suggests a reduction in use of the pure percent method, from 56.4 percent to 37.8 percent, but this understates the dominance of the percent method. For the 1993 to 2002 period, we coded which method was primary and which was used as a check. In non-fee-shifting cases in this period, 61 cases used the percent method with a lodestar

───────

cases, the nature and length of the professional relationship with the client, the time limitations imposed by the client or the circumstances, the preclusion of other employment by the attorney due to acceptance of the case, the novelty and difficulty of the questions, the skill needed to perform the legal services, and the "undesirability" of the case. The leading precedent outlining this multifactor approach is Johnson v. Georgia Highway Express, 488 F.2d 714, 717–19 (5th Cir. 1974).

[28]E.g., Gisbrecht v. Barnhart, 535 U.S. 789 (2002). See Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Tex. L. Rev. 865 (1992); Charles Silver, Due Process and the Lodestar Method: You Can't Get There from Here, 74 Tulane L. Rev. 1809 (2000).

[29]See notes 12–15 supra for circuit level case law addressing the fee method to be used.

268    *Eisenberg and Miller*

*Figure 6:*  Pure lodestar use over time.



check compared with three cases that used the lodestar method with the percent method as a check. The 68 cases shown as using "both" methods in the earlier period included an additional four cases that used both methods without indicating which was dominant. So cases coded as using "both" methods were almost always percent method cases with a lodestar check. We used less detailed coding of the method in the second period. If a case used both methods, we simply coded it as "both." Nevertheless, it is reasonable to assume that the "both" cases in the second period are similar to those in the earlier period and are dominated by the percent method with the lodestar as a check. So our best estimate is that the percent method is the overwhelmingly dominant method of computing fees, either as the sole method or as the primary method with the lodestar as a check. Figure 6 shows the rate of pure lodestar use over time, with a separate line for the large subset of securities class actions. Figure 1's strong linear correlation between fee and recovery supports this assessment as a lodestar-dominated system would likely show a less strong association between fee and class recovery.

Table 11 limits the sample to federal cases and shows the fee method used broken down by circuit. As suggested by Table 10, the use of the percent method, combined with the use of the percent method with a lodestar check, dominates. Table 11 shows that this is the pattern in every circuit, regardless of formal fee method doctrine. The lodestar method peaks at 21 percent of cases in the Sixth Circuit and only the Second Circuit combines nontrivial lodestar use with a substantial number of cases. The table slightly overstates the more recent federal rate of lodestar use, which totaled only 9 percent in cases from 2003 to 2008.

Table 11:   Fee Method by Circuit, Federal Cases, 1993–2008

| *Circuit* | *Lodestar* | | *Percent* | | *Both* | | *Other* | | *Total* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | N | % | N | % | N | % | N | % | N |
| 1st | 5 | 1 | 60 | 12 | 35 | 7 | 0 | 0 | 100 | 20 |
| 2nd | 19 | 26 | 37 | 51 | 40 | 55 | 5 | 7 | 100 | 139 |
| 3rd | 5 | 6 | 37 | 43 | 56 | 65 | 3 | 3 | 100 | 117 |
| 4th | 13 | 1 | 50 | 4 | 38 | 3 | 0 | 0 | 100 | 8 |
| 5th | 20 | 5 | 40 | 10 | 36 | 9 | 4 | 1 | 100 | 25 |
| 6th | 21 | 8 | 62 | 24 | 13 | 5 | 5 | 2 | 100 | 39 |
| 7th | 10 | 4 | 61 | 25 | 17 | 7 | 12 | 5 | 100 | 41 |
| 8th | 0 | 0 | 59 | 17 | 34 | 10 | 7 | 2 | 100 | 29 |
| 9th | 9 | 9 | 48 | 48 | 30 | 30 | 13 | 13 | 100 | 100 |
| 10th | 9 | 2 | 41 | 9 | 45 | 10 | 5 | 1 | 100 | 22 |
| 11th | 3 | 1 | 52 | 17 | 36 | 12 | 9 | 3 | 100 | 33 |
| D.C. | 0 | 0 | 50 | 10 | 35 | 7 | 15 | 3 | 100 | 20 |
| Federal Circuit | 0 | 0 | 100 | 3 | 0 | 0 | 0 | 0 | 100 | 3 |
| Total | 11 | 63 | 46 | 273 | 37 | 220 | 7 | 40 | 100 | 596 |

Sources: Westlaw, LexisNexis, PACER.

Table 12:   Fee Percent by Method Used, by Time Period

| | *1993–2002* | | *2003–2008* | |
|---|---|---|---|---|
| | N | *Mean Fee % of Recovery* | N | *Mean Fee % of Recovery* |
| Lodestar | 38 | 17.2 | 37 | 31.6 |
| Percent | 158 | 23.4 | 146 | 25.3 |
| Both (usually % with LS check) | 68 | 22.9 | 165 | 21.9 |
| Other | 16 | 11.4 | 38 | 28.7 |
| Total | 280 | 21.7 | 386 | 24.8 |

Note: LS = lodestar method.
Sources: Westlaw, LexisNexis, PACER.

## 2.  Is Use of the Lodestar Method Associated with Lower Fee Awards?

Table 12 explores the relation between fee method and fee percent. Although the table's first row suggests a substantial increase in fee percents in lodestar cases over time, the higher fee percents in recent lodestar cases are an artifact of case category. Consumer cases comprise 37 percent of the lodestar category and the difference between percent and lodestar methods vanishes if one excludes consumer cases. The consumer case category percent of cases changed for the two periods in our sample. Consumer cases were 59.5 percent of the lodestar cases in the later period compared to 15.8 percent of the lodestar cases in the earlier period. The lodestar method was used at a higher rate, 23.0 percent, in consumer cases than in any case category other than the small tax category. These high-percent consumer cases (see Table 8) are the source of the change in mean lodestar fee percents over time. The increased prominence of consumer cases in the later period

sample is likely attributable to our including as common fund cases those in which a fee-shifting statute was theoretically available but was not in fact used. In regression models, reported below (see Table 18), the percent and "both" fee methods have positive and statistically significant coefficients compared to the lodestar method once case category is controlled for.

For the period 2003 to 2008, we coded the hours worked by attorneys in cases with opinions reporting that information. The lower lodestar awards appear to be a consequence of fewer hours worked, or at least fewer hours claimed in court filings. Fewer hours were worked, on average, in lodestar method cases than in other cases and fewer hours were worked in consumer cases than in any other case category. As in regressions of the fee amount, regression of hours worked that controlled for fee method, case category, and circuit yielded coefficients for the percent and "both" method dummy variables that are statistically significant and positive compared to lodestar cases.

### B. Fee Grant Rates

Fee requests were generally granted in the amount requested, with 72.5 percent of requests granted in full, as shown in Table 13's last row (Panel A). Our data for the rate of grants is limited to the 2003 to 2008 period because requested amounts were not recorded for the earlier time period. Table 13 shows that strong intercircuit differences ($p = 0.012$, excluding the two Federal Circuit cases) in the grant rate existed, with the Second Circuit granting the requested amount statistically significantly less often than the Third Circuit or the Ninth Circuit. These intercircuit differences remain significant in logistic regression models that control for case category and recovery amount, and in models that exclude securities cases. The table also shows that state courts tended to grant award requests at a lower rate than federal courts. The difference between federal and state grant rates was only statistically significant at $p = 0.148$.

Fee requests were not granted in full in 100 of 363 cases. In those cases, the mean fee grant was 68 percent of the request and the median was 74 percent. The mean grant of 61 percent in state court cases was lower than the 69 percent in federal court cases and the median of 66 percent in state court cases was also lower than the median of 75 percent in federal court cases. However, only nine of the 100 cases with less than full grants were state court cases.

Table 13, Panel B, shows the rate at which requested fees were granted in relation to the range of class of recovery, using the same decile ranges as Table 7. It shows a declining grant rate as the class recovery increases. The grant rate for the lowest recovery decile was 83 percent compared to 56 percent for the highest recovery decile. We interpret this as indicating that judges tend to scrutinize fee requests in large cases more closely than they do for smaller cases. Panel C shows the grant rate in relation to the percent of class recovery requested as fees. Instead of using class recovery deciles, it uses deciles of the percent of recovery requested, which range from the lowest decile of requests up to 11.8 percent of the recovery to the highest decile of requests over 35.7 percent. It shows a trend of decreasing grant rates as the percent of the recovery requested increased. Attorneys requesting the lowest percents received requested amounts

Table 13:   Rates at Which Requested Fees Were Given, 2003–2008

*A. By Locale*

| Locale | Proportion of Fee Requests Granted in the Amount Requested | N |
|---|---|---|
| 1st | 0.70 | 10 |
| 2nd | 0.54 | 74 |
| 3rd | 0.83 | 64 |
| 4th | 0.60 | 5 |
| 5th | 0.69 | 13 |
| 6th | 0.79 | 24 |
| 7th | 0.79 | 14 |
| 8th | 0.83 | 18 |
| 9th | 0.83 | 72 |
| 10th | 0.77 | 13 |
| 11th | 0.64 | 22 |
| D.C. | 0.80 | 10 |
| Federal Circuit | 0.50 | 2 |
| State court | 0.59 | 22 |
| Total | 0.72 | 363 |

*B. By Range of Class Recovery (Millions)*

| Range of Class Recovery (Millions) Decile | Rate Granted | N |
|---|---|---|
| Recovery <= 1.1 | 0.83 | 52 |
| Recovery > 1.1 <= 2.8 | 0.75 | 36 |
| Recovery > 2.8 <= 5.3 | 0.82 | 38 |
| Recovery > 5.3 <= 8.7 | 0.67 | 33 |
| Recovery > 8.7 <= 14.3 | 0.77 | 35 |
| Recovery > 14.3 <= 22.8 | 0.68 | 34 |
| Recovery > 22.8 <= 38.3 | 0.76 | 33 |
| Recovery > 38.3 <= 69.6 | 0.68 | 34 |
| Recovery > 69.6 <= 175.5 | 0.67 | 36 |
| Recovery > 175.5 | 0.56 | 32 |

*C. By Range of Class Recovery Percent Requested Decile*

| | Rate Granted | N |
|---|---|---|
| Percent of recovery requested <= 11.8% | 0.81 | 36 |
| Percent of recovery requested > 11.8% <= 17.8% | 0.86 | 36 |
| Percent of recovery requested > 17.8% <= 21.9% | 0.62 | 37 |
| Percent of recovery requested > 21.9% <= 25% | 0.76 | 75 |
| Percent of recovery requested > 25.0% <= 30.0% | 0.72 | 72 |
| Percent of recovery requested > 30.0% <= 33.3% | 0.71 | 35 |
| Percent of recovery requested > 33.3% <= 35.7% | 0.67 | 36 |
| Percent of recovery requested > 35.7% | 0.61 | 36 |

NOTE: In Panel C, the number of observations in the fourth and fifth rows reflects the bunching of fee requests at 25 percent and 30 percent. They each occupy approximately two deciles of fee requests.
SOURCES: Westlaw, LexisNexis, PACER.

Table 14:   Mean Multiplier by Circuit and
Case Category

|  | *Mean Multiplier* | N |
|---|---|---|
| A.  Circuit |  |  |
| 1st | 2.10 | 15 |
| 2nd | 1.58 | 97 |
| 3rd | 2.01 | 87 |
| 4th | 2.43 | 7 |
| 5th | 2.07 | 15 |
| 6th | 1.97 | 22 |
| 7th | 1.85 | 16 |
| 8th | 2.30 | 14 |
| 9th | 1.54 | 50 |
| 10th | 1.91 | 14 |
| 11th | 1.19 | 19 |
| D.C. | 2.23 | 11 |
| Federal | 1.54 | 1 |
| Total | 1.81 | 368 |
| B.  Case Category |  |  |
| Antitrust | 2.24 | 38 |
| Civil rights | 1.99 | 11 |
| Consumer | 1.82 | 60 |
| Corporate | 1.94 | 7 |
| Employment | 1.24 | 21 |
| ERISA | 1.58 | 29 |
| Securities | 1.75 | 177 |
| Tort | 1.83 | 11 |
| Other | 2.35 | 14 |
| Total | 1.81 | 368 |

Sources:  Westlaw, LexisNexis, PACER.

in 81 percent of cases compared to 61 percent for attorneys requesting the highest percents. This result suggests that attorneys who make more modest fee requests have a greater chance of having their requests granted.

We explored the effects of the class recovery amount, percent of recovery requested, circuit, and type of case in logistic regression models in which whether the requested fee was granted was a dichotomous dependent variable. The class recovery amount and the percent of recovery requested were highly statistically significant (each $p < 0.001$), the circuit dummy variables were jointly significant at $p = 0.005$, and the case type dummy variables were not statistically significant ($p = 0.262$).

*C. Multipliers*

Courts often check the percentage-based attorney fee against the lodestar award. If the percentage fee grossly exceeds the lodestar amount, the fee may be deemed excessive, and the courts can adjust the fee downward to a more reasonable range. Table 14 reports, for

*Figure 7:*   Relation between multipliers and fee percent, recovery, and hours, 2003–2008.



SOURCES: Westlaw, LexisNexis, PACER.

federal cases, the mean multiplier applied by circuit and by case category. The sample is limited to those cases that reported a multiplier that was not equal to 1.

The mean multiplier ranged from 1.19 in the Eleventh Circuit to 2.43 in the Fourth Circuit. Across case categories, the mean multiplier ranged from 2.35 in "other" to 1.24 in employment cases. But, in regression models of the multiplier (log) as a function of circuits and case categories, neither the dummy variables for circuits nor for case categories were collectively significant. We therefore cannot reject the hypotheses that multipliers are similar across circuits and case categories.

We do, however, find significantly different multipliers used in cases in which fee-shifting statutes were available and cases in which they were not. With no statute in the background, multipliers averaged 1.96 in 161 cases with necessary data. If a fee-shifting statute was available, multipliers averaged 1.38 in 66 cases. The difference in medians was significant at $p = 0.021$.

Figure 7 shows the relation between the fee outcomes, class recovery amount, and multipliers (Figures 7a and 7b), and between multiplier and hours reported (Figure 7c).

Since a suspected fee windfall is most likely to occur when the percentage method would yield what is perceived to be too high a fee, we expect the multiplier to tend to bring high percentage fee cases into a more moderate range. We therefore predicted and found, in our prior study, a strong negative correlation between the lodestar multiplier (fee award

Table 15:   Mean, Median, and Standard Deviation of Multiplier, Controlling for Class Recovery Amount, 1993–2008

| Range of Class Recovery (Millions) Decile | Mean | Median | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 0.88 | 0.74 | 0.45 | 33 |
| Recovery > 1.1 <= 2.8 | 0.95 | 0.77 | 0.67 | 40 |
| Recovery > 2.8 <= 5.3 | 1.44 | 1.25 | 0.74 | 32 |
| Recovery > 5.3 <= 8.7 | 1.59 | 1.25 | 1.32 | 34 |
| Recovery > 8.7 <= 14.3 | 1.49 | 1.45 | 0.87 | 37 |
| Recovery > 14.3 <= 22.8 | 1.68 | 1.51 | 0.85 | 38 |
| Recovery > 22.8 <= 38.3 | 1.83 | 1.44 | 1.44 | 33 |
| Recovery > 38.3 <= 69.6 | 1.98 | 1.75 | 1.00 | 38 |
| Recovery > 69.6 <= 175.5 | 2.70 | 2.09 | 2.43 | 43 |
| Recovery > 175.5 | 3.18 | 2.60 | 1.99 | 40 |

Sources:  Westlaw, LexisNexis, PACER.

divided by the lodestar) and the percentage fee awarded.[30] A similar relation exists for 2003–2008, as shown in Figure 7a.

Higher multipliers should, in general, lead to higher recoveries, a result shown in Figure 7b. Increased multipliers do not appear to be being used a reward for hours worked. Figure 7c shows no clear positive association between mutlipliers and hours.

Table 15 presents more detailed information about the relation between class recovery and multipliers. It uses the recovery deciles reported in Table 7, but Table 15 includes fewer observations because the sample is limited to cases with multipliers not equal to 1. The table reports the mean, median, and standard deviation for each recovery decile. The pattern for the mean and median multiplier confirms that suggested by Figure 7b. As the recovery decile increases, the multiplier also tends to increase, with the multiplier in the highest recovery decile more than triple that of the multiplier in the lowest recovery decile.

## V. Costs and Expenses

Costs and expenses (collectively "costs") tended to be a small percentage of the class recovery and have remained a fairly constant percentage over time. For the 232 cases from 1993 to 2002 for which cost data were available, mean costs were 2.8 percent of the recovery and median costs were 1.7 percent. For the 304 cases with necessary data from 2003 to 2008, mean costs were 2.7 percent of the recovery and median costs remained at 1.7 percent. As before, we found no evidence that the cost percent increased over time.[31]

---

[30]Eisenberg & Miller, supra note 5.

[31]Id.

*Figure 8:*  Costs as a function of recovery, fees, hours, and age, non-fee-shifting cases, 2003–2008.



NOTE: Cases with age greater than 10 years old are coded as 10 years old.
SOURCES:  Westlaw, LexisNexis, PACER.

We further explored costs as a function of four variables: (1) the class recovery, (2) the fee, (3) the hours reported in the court's opinion, and (4) the age of the case in years. We only coded hours billed and case age beginning with the 2003 to 2008 data. Figure 8 shows the relation between costs and the four factors and limits the sample to cases in which hours were reported in opinions and costs were at least $100. All four factors are positively associated with costs. The figure also suggests that the strongest association is between costs and hours.

Table 16 shows the correlation coefficients between costs and the four factors in Figure 8. The first four numerical columns cover the period 2003–2008, for which hours data were recorded. The last two numerical columns show the correlation between costs and fee and recovery for the period 1993–2002. The correlations between costs and recovery and fee for either period do not reach the strength of association of hours and costs in the later period. The weaker correlation between costs and age may be in part a function of age being coded only in whole years and therefore providing a less continuous measure of that factor.

A regression model, not reported here, of costs as a percent of recovery controls for case category and other factors. It shows that costs, like fees, have a scale effect: their percent of recovery significantly declines as the size of the recovery increases. The cost

Table 16:   Correlations Between Costs and Four Factors

|  | Fee (Log10) | Recovery (Log10) | Hours (Log) | Age in Years | Fee (Log10) | Recovery (Log10) |
|---|---|---|---|---|---|---|
|  | | | *Period = 2003–2008* | | *Period = 1993–2002* | |
| Correlation Coeff. | 0.86 | 0.85 | 0.91 | 0.34 | 0.77 | 0.71 |
| Significance | <0.0001 | <0.0001 | <0.0001 | <0.0001 | <0.0001 | <0.0001 |
| *N* | 167 | 167 | 167 | 167 | 232 | 232 |

Sources: Westlaw, LexisNexis, PACER.

percent significantly increases with hours. In a model with both case age and hours as explanatory variables, only hours were statistically significant.

## VI. Multivariate Results

Some of the above results are so strong and robust that no further analysis is needed to support their credibility. The strong correlation between fees and class recovery and the scale effect survive any reasonable analysis, are reasonably represented by Figures 1 and 5, and are confirmed in regression models reported below. Other key results consist of factors associated with the level of the fee award. These include:

1. The tendency of state courts to award a lower percent of recovery as a fee,
2. The relation between case category and fee percent,
3. The tendency of high-risk cases to receive a higher percent of the class recovery as a fee, and
4. The tendency of lodestar awards in non-fee-shifting cases to be lower than percent-method awards.

This section first explores the robustness of these results to simultaneous control for recovery level and then reports regression models.

### A. The Relation Between the Fee Award and State Court Status, Risk, and the Lodestar Method

As Figure 1 and our earlier work suggest, for most explanatory variables, the size of the class recovery is the most important potential confounding factor in assessing the relation between other covariates and the fee award. From Figures 1 and 5, we know that: (1) the fee award increased with class recovery, and (2) the fee award was a declining percent of the class recovery as the class recovery increased. Regression models assessing nonrecovery covariates thus require both a dummy variable for the covariate, and an interaction term between the covariate and the class recovery. That is, the covariate may influence both the intercept and the slope of the line representing the relation between the covariate and the fee award. The use of class recovery, a dummy covariate, and an interaction term raises problems of multicollinearity in the regression model, which preliminary analysis confirmed. The problems arose even when a single covariate and interaction term were

Table 17:  Influence of Locale, Risk, and Lodestar Method on Percent Fee Award, Controlling for Class Recovery Amount, 1993–2008

| | *Federal-State* | | *Risk* | | *Lodestar* | |
|---|---|---|---|---|---|---|
| *Range of Class Recovery (Millions) Decile* | *Federal Case* | *State Case* | *Low-/Medium-Risk Case* | *High-Risk Case* | *Other Methods* | *Pure Lodestar* |
| Recovery <= 1.1 | 38.7 | 27.2 | 37.1 | 48.4 | 32.3 | 58.0 |
| *N* | 64 | 5 | 64 | 5 | 53 | 15 |
| Recovery > 1.1 <= 2.8 | 26.8 | 30.4 | 26.7 | 29.5 | 26.6 | 33.4 |
| *N* | 63 | 6 | 60 | 9 | 64 | 5 |
| Recovery > 2.8 <= 5.3 | 27.0 | 23.2 | 26.0 | 29.3 | 26.8 | 17.9 |
| *N* | 58 | 11 | 61 | 8 | 65 | 2 |
| Recovery > 5.3 <= 8.7 | 22.7 | 23.2 | 21.8 | 26.8 | 23.3 | 20.5 |
| *N* | 61 | 8 | 55 | 14 | 54 | 9 |
| Recovery > 8.7 <= 14.3 | 24.1 | 21.4 | 23.3 | 26.8 | 24.8 | 19.0 |
| *N* | 61 | 8 | 58 | 11 | 56 | 11 |
| Recovery > 14.3 <= 22.8 | 23.3 | 15.6 | 22.7 | 23.0 | 23.3 | 16.3 |
| *N* | 62 | 6 | 63 | 6 | 61 | 6 |
| Recovery > 22.8 <= 38.3 | 22.3 | 20.8 | 20.9 | 29.2 | 24.0 | 11.7 |
| *N* | 58 | 10 | 58 | 10 | 53 | 11 |
| Recovery > 38.3 <= 69.6 | 21.2 | 15.7 | 19.9 | 24.6 | 21.6 | 9.8 |
| *N* | 61 | 9 | 62 | 8 | 61 | 7 |
| Recovery > 69.6 <= 175.5 | 19.6 | 16.0 | 17.3 | 24.7 | 20.0 | 10.0 |
| *N* | 64 | 5 | 50 | 19 | 62 | 4 |
| Recovery > 175.5 | 12.6 | 6.5 | 10.6 | 16.5 | 12.7 | 4.3 |
| *N* | 61 | 7 | 52 | 16 | 62 | 5 |

Sources:  Westlaw, LexisNexis, PACER.

included in regression models, and were magnified when multiple covariates and interaction terms were used. Rather than simply report possibly questionable regression models, we first used a simpler technique to explore the possible influence of certain covariates on the fee award while simultaneously accounting for the class recovery.

Table 17 expands on Section III's tables by reporting in more detail, for non-fee-shifting cases, the relation between the fee awarded and three key covariates—state court status, risk, and use of the lodestar method—while controlling for the size of the class recovery. As was done for Tables 7, 13, and 15, we divided the range of class recoveries into deciles. Table 17's first column shows the bounds on the deciles, starting with the lowest decile of class recoveries. Each decile's statistics are reported in two rows; the first shows the fee percent and the second row shows the number of cases included in the fee percent calculation. Thus the table's first two numerical rows include cases with class recoveries in the first decile, those recoveries less than or equal to $1.1 million. The table's last two rows include cases in the highest decile, those with recoveries greater than $175.5 million. The table's second and third columns show, within each decile range, the mean fee percent award and the number of cases, divided by federal court versus state court status. Thus, for the 69 cases with class recoveries of less than $1.1 million, the mean federal case fee percent award was 38.7 percent in 64 cases and the mean state case fee percent award was 27.2

percent in five cases. The table's fourth and fifth columns show the same information, but now divided by high-risk case status versus low-/medium-risk case status. The table's sixth and seventh columns show the same information divided by use of the pure lodestar method versus use of all other methods.

With respect to federal versus state court status, the mean state case fee percent is lower than the mean federal percent for every recovery decile except the second and fourth. Thus, after controlling for class recovery size, state courts tend to award lower fees than federal courts but not overwhelmingly so. The pattern is even more consistent with respect to risk. For every recovery decile, the fee percent is higher in high-risk cases than in low-/medium-risk cases. The lodestar effect follows the same trend, with every class recovery decile except the lowest two showing a lower fee percent in pure lodestar cases than in other cases. In the low recovery deciles, of course, the lodestar method can compensate attorneys for substantial efforts that a percent fee award may not fully reflect. Section III's results for these three covariates therefore survive analysis that controls for the key potential confounder, the class recovery size.

### B. Regression Models

Table 18 reports ordinary least squares regression models that confirm our core results. Model 1 shows that over 90 percent of the variance in the fee is explained by the size of the

Table 18:   Regression Models of Fees

|  | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
|  | *Dependent Variable = Fee (Log10)* | | | | |
| Gross recovery (log10) | 0.850 | 0.850 | 0.846 | 0.833 | 0.827 |
|  | (74.37)** | (73.79)** | (73.32)** | (62.21)** | (61.35)** |
| State court case |  | −0.088 | −0.083 | −0.040 | 0.003 |
|  |  | (8.25)** | (8.15)** | (3.13)** | (0.15) |
| High-risk case |  |  | 0.111 | 0.102 | 0.098 |
|  |  |  | (7.16)** | (6.06)** | (5.06)** |
| Lodestar = reference category |  |  |  |  |  |
| Percent method |  |  |  | 0.188 | 0.169 |
|  |  |  |  | (4.76)** | (4.22)** |
| Both methods |  |  |  | 0.181 | 0.158 |
|  |  |  |  | (4.82)** | (4.15)** |
| Other methods |  |  |  | 0.032 | 0.028 |
|  |  |  |  | (0.62) | (0.51) |
| Constant | 0.374 | 0.382 | 0.395 | 0.331 | 0.440 |
|  | (4.91)** | (4.69)** | (4.92)** | (3.28)** | (3.64)** |
| Case category dummies | No | No | No | No | Yes |
| Observations | 689 | 688 | 681 | 663 | 663 |
| $R^2$ | 0.92 | 0.92 | 0.92 | 0.93 | 0.93 |

Notes: Robust $t$ statistics in parentheses; *significant at 5 percent; **significant at 1 percent; standard errors are clustered by locale.
Sources: Westlaw, LexisNexis, PACER.

recovery. None of the other models add materially to the explanatory power of this simple model. Nevertheless, it is noteworthy that the model with the largest set of explanatory variables, Model 5, shows no statistically significant difference between state and federal courts. The models also consistently confirm that fee methods other than the pure lodestar method tend to have higher fees. The models confirm the association between greater risk and increased fees.[32] In Model 5, a test of the hypothesis that the case category dummy variables are jointly equal to zero can be rejected at $p = 0.0003$. Their significance persists if one omits the two small cases categories, civil rights and tax, but the significance level increases to $p = 0.012$. The significance of the results in Table 18 persists if one limits the sample to the 106 cases with recoveries of $100 million or more but the sizes of the coefficients do change. The percent of variance explained then ranges from 72 percent to 77 percent, depending on the model.

We also tested whether the use of a lodestar "cross-check" generated a different pattern of fees than when fees were calculated according to the percentage method alone. A regression analysis not reported here does not find any statistically significant difference between fees calculated by the percentage method alone and those calculated by the percentage method with the lodestar cross-check. This result may raise questions about the utility of the lodestar cross-check, which can involve a time-consuming analysis of the reasonableness of the attorneys' hours and hourly rates.

## VII. Discussion

The data support several major conclusions.

*Strength of Relation and Dominance of Method.* The percentage fee method is overwhelmingly the method used by courts in awarding fees in class actions. It is so widely used and so consistently employed that other information about cases adds little explanatory power to study of the fee award. The amount of the class recovery dwarfs all other effects. Even in circuits that eschew the percentage method, it appears to be the dominant de facto method used and best explains the pattern of awards. The consistent pattern may help attorneys to calibrate their fee requests and lead to courts usually approving the requested fee amount.

*Scale Effect and Aggregate Litigation.* The pattern of class action awards continues to exhibit a strong scale effect. Attorneys receive a smaller proportion of the recovery as the size of the recovery increases. Aggregation of claims thus appears to have produced the kind of efficiency hoped for. This characteristic of aggregate litigation should be considered when evaluating devices designed to preclude or discourage aggregate litigation or arbitration, such as prohibitions on class arbitration.[33]

———

[32]Multilevel models, using random intercepts for locale and case category, do not yield materially different results.

[33]For a study suggesting possible efforts to discourage aggregate litigation, see Theodore Eisenberg, Geoffrey P. Miller & Emily Sherwin, Mandatory Arbitration for Customers But Not for Peers: A Study of Arbitration Clauses in Consumer

*The Scope and Nature of Our Sample.* Some perspective on the scope of our sample relative to the universe of class action cases comes from a study of class actions against insurers from 1993 through 2002. The RAND Institute for Civil Justice surveyed 269 property and casualty insurers and 207 life and health insurers, received responses from 205 companies, and obtained usable information from 199 insurers.[34] Of 564 attempted class actions, 12 percent led to a class settlement.[35] In 32 cases, the respondents provided information about the aggregate pool of funds offered to settle the case and its associated expenses. The amounts ranged from $360,000 to $150 million, with a mean fund size of $12.8 million and a median size of $2.6 million. Almost two-thirds of the cases, 62.5 percent, resulted in a common fund of less than $5 million.[36] In 48 cases, the respondents supplied information about the award to class counsel for fees and expenses. Fees and expenses ranged from $50,000 to $50,000,000, with a mean of $3.4 million and a median of $554,000.[37] The overall median fee and expense ratio from the pooled data was thus about 21 percent ($554,000 divided by $2.6 million). This compares to a pooled median fee of $2.33 million and median gross recovery of $12.5 million in our sample, as shown in Table 3, which yields a pooled ratio of 19 percent. The scaling effect, combined with our higher median gross recovery, probably helps explain the lower ratio in our sample of cases.

Aside from the RAND study's similar findings about fee levels, the study shows the small fraction of class action filings that lead to information about fees, even in the absence of being limited to available opinions. In the RAND data, 564 purported class actions led to 78 certified classes and 32 cases with available fee information. Thus, less than 15 percent of purported class actions were certified and about 6 percent led to usable fee information. If the same proportions are assumed to apply more broadly, then our 689 fee cases can be thought of as representing over 12,000 purported class action filings.

*Federal-State Differences.* Despite claims that CAFA was needed to redress differences in state and federal court processing of class actions, our data provide little evidence of federal-state differences. The fee per amount recovered did not systematically differ between federal and state courts, as shown in Table 17. Table 13 shows that state courts were, if anything, less likely than federal courts to grant the requested fee amount.

---

and Non-Consumer Contracts, 92 Judicature 118 (Nov.–Dec. 2008); Theodore Eisenberg, Geoffrey P. Miller & Emily Sherwin, Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Nonconsumer Contracts, U. Mich J.L. Reform 871 (2008), reprinted in 4 ICFAI U.J. of Alternative Disp. Resol. 51 (2008).

[34]Nicholas M. Pace, Stephen J. Carroll, Ingo Vogelsang & Laura Zakaras, Insurance Class Actions in the United States 9–10 (2007).

[35]Id. at 47 (tbl. 3.16).

[36]Id. at 54.

[37]Id. at 55.

The absence of pro-class bias in state courts is consistent with sources cited above[38] and with additional research. In the RAND insurance study, of 564 attempted class actions, 12 percent led to a class settlement, with 12 percent of the 465 state court cases and 15 percent of the 98 federal court cases settling.[39] The modal outcome of a pretrial ruling for the defense did not significantly differ between federal and state courts.[40] The settlement rate for the cases with certified classes did not statistically significantly differ between federal and state courts.[41]

Thus, available evidence about comparative state-federal judicial performance in class actions consistently suggests no strong differences.

## VIII. Conclusion

Over the course of 16 years, attorney fees in class action cases have displayed a strikingly strong linear relation to class recoveries. Significant associations also exist between the fee amount and both the fee method and the riskiness of the case. Despite CAFA's premise of differences between federal and state court treatment of class actions, our findings add to a growing body of evidence that little hard data support claims of significant state-federal differences. Core results persisted in mega-cases, those with recoveries of $100 million or more, in cases with settlement classes, and in cases with and without objectors and opt outs. Fees and costs decline as a percent of the recovery as the recovery amount increases, suggesting the efficiency of this form of aggregate litigation. In this data set that likely includes the most significant class action decisions, those that lead to an available opinion, neither fees nor recoveries materially increased over time.

We hope that the information contained in this study can be of use to courts charged with the important and sometimes daunting task of setting counsel fees in class action and derivative cases.

---

[38]Text accompanying notes 18–22 supra.

[39]Pace et al., supra note 34, at 47 (tbl. 3.16).

[40]Id.

[41]Id. at 48 (tbl. 3.17). The study did not distinguish between orders certifying the case for a class trial, those certifying for settlement purposes only, and those certifying on a provisional basis only. Id. at 17. Neil Marchand reports that plaintiffs' preferences for state or federal court in Michigan class actions vary depending on the governing substantive law, with preference for state courts in cases governed by state substantive law and preference for federal courts in cases governed by federal substantive law. Neil J. Marchand, Class Action Activity in Michigan's State and Federal Courts, available at <http://ssrn.com/abstract=1334923>.