# EXHIBIT K

# Vanderbilt University Law School

## Public Law & Legal Theory
Working Paper Number 10-10

## Law & Economics
Working Paper Number 10-06



**An Empirical Study of Class Action Settlements and their Fee Awards**

Brian T. Fitzpatrick
Vanderbilt University Law School

This paper can be downloaded without charge from the
Social Science Research Network Electronic Paper Collection:
http://ssrn.com/abstract_id=1442108

Electronic copy available at: http://ssrn.com/abstract=1442108

7 Journal of Empirical Legal Studies (forthcoming 2010)

# An Empirical Study of Class Action Settlements and Their Fee Awards

Brian T. Fitzpatrick[*]

This article is a comprehensive empirical study of class action settlements in federal court. Although there have been prior empirical studies of federal class action settlements, these studies have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). By contrast, in this article, I attempt to study every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first attempt to collect a complete set of federal class action settlements for any given year. I find that district court judges approved 688 class action settlements over this two-year period, involving nearly $33 billion. Of this $33 billion, roughly $5 billion was awarded to class action lawyers, or about 15% of the total. Most judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and the fees awarded according to this method varied over a broad range, with a mean and median around 25%. Fee percentages were strongly and inversely associated with the size of the settlement. The age of the case at settlement was positively associated with fee percentages. There was some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located, with lower percentages in securities cases and in settlements from the Second and Ninth Circuits. There was no evidence that fee percentages were associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.

## I.  Introduction

Class actions have been the source of great controversy in the United States. Corporations fear them.[1] Policymakers have tried to corral them.[2]

[*] Associate Professor of Law, Vanderbilt University Law School. J.D., 2000, Harvard Law School. Address: Vanderbilt Law School, 131 21st Ave South, Nashville, TN 37203; email: brian.fitzpatrick@vanderbilt.edu. Research for this article was supported by Vanderbilt's Cecil D. Branstetter Litigation & Dispute Resolution Program and Law & Business Program. I am grateful for comments I received from Dale Collins, Robin Effron, Ted Eisenberg, Deborah Hensler, Richard Nagareda, Randall Thomas, an anonymous referee for this journal, and participants at workshops at Vanderbilt Law School, the University of Minnesota Law School, the 2009 Meeting of the Midwestern Law and Economics Association, and the 2009 Conference on Empirical Legal Studies. I am also grateful for the research assistance of Drew Dorner, David Dunn, James Gottry, Chris Lantz, Gary Peeples, Keith Randall, Andrew Yi, and, especially, Jessica Pan.

[1] *See, e.g.*, Robert W. Wood, *Defining Employees and Independent Contractors*, BUS. L. TODAY, May-June 2008, at 45, 48.

Electronic copy available at: http://ssrn.com/abstract=1442108

Draft of July 7, 2010

Commentators and scholars have suggested countless ways to reform them.[3] Despite all of the attention showered on class actions, and despite the excellent empirical work on class actions to date, the data that currently exists on how the class action system operates in the United States is limited. We do not know, for example, how much money changes hands in class action litigation every year. We do not know how much of this money goes to class action lawyers rather than class members. Indeed, we do not even know how many class action cases are resolved on an annual basis. In order to intelligently assess our class action system as well as whether and how it should be reformed, answers to all of these questions are important. Answers to these questions are equally important to policymakers in other countries who are currently thinking about adopting American-style class action devices.[4]

This article tries to answer these and other questions by reporting the results of an empirical study that attempted to gather all class action settlements approved by federal judges over a recent two-year period, 2006 and 2007. I use class action settlements as the basis of the study because, even more so than individual litigation, virtually all cases certified as class actions and not dismissed before trial end in settlement.[5] I use federal settlements as the basis of the study for practical reasons: it was easier to identify and collect settlements approved by federal judges than those approved by state judges. Systematic study of class action settlements in state courts must await further study;[6] these future studies are important

---

[2] *See* Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); Class Action Fairness Act of 2005, 28 U.S.C. §§ 1453, 1711-1715 (2006).

[3] *See, e.g.,* Robert G. Bone, *Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness*, 83 B.U. L. REV. 485, 490-94 (2003); Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 VAND. L. REV. 995, 1080-81 (2005).

[4] *See, e.g.,* Samuel Issacharoff & Geoffrey Miller, *Will Aggregate Litigation Come to Europe?*, 62 VAND. L. REV. 179 (2009).

[5] *See, e.g.,* Emery Lee & Thomas E. Willing, *Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions* 11 (Federal Judicial Center 2008); Tom Baker & Sean J. Griffith, *How the Merits Matter: D&O Insurance and Securities Settlements*, 157 U. PA. L. REV. 755 (2009).

[6] Empirical scholars have begun to study state court class actions in certain subject areas and in certain states. *See, e.g.,* Robert B. Thompson & Randall S. Thomas, *The Public and Private Faces of Derivative Suits*, 57 VAND. L. REV. 1747 (2004); Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions*, 57 VAND. L. REV. 133 (2004); *Findings of the Study of California Class Action Litigation* (Administrative Office of the Courts) (First Interim Report, 2009).

Electronic copy available at: http://ssrn.com/abstract=1442108

Draft of July 7, 2010

because there may be more class action settlements in state courts than there are in federal court.[7]

This article attempts to make three contributions to the existing empirical literature on class action settlements. First, virtually all of the prior empirical studies of federal class action settlements have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). In this article, by contrast, I attempt to collect every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first to attempt to collect a complete set of federal class action settlements for any given year.[8] As such, this article allows us to see for the first time a complete picture of the cases that are settled in federal court. This includes aggregate annual statistics, such as how many class actions are settled every year, how much money is approved every year in these settlements, and how much of that money class action lawyers reap every year. It also includes how these settlements are distributed geographically as well as by litigation area, what sort of relief was provided in the settlements, how long the class actions took to reach settlement, and an analysis of what factors were associated with the fees awarded to class counsel by district court judges.

Second, because this article analyzes settlements that were approved in both published and unpublished opinions, it allows us to assess how well the few prior studies that looked beyond securities cases but relied only on published opinions capture the complete picture of class action settlements. To the extent these prior studies adequately capture the complete picture, it may be less imperative for courts, policymakers, and empirical scholars to spend the considerable resources needed to collect unpublished opinions in order to make sound decisions about how to design our class action system.

Third, this article studies factors that may influence district court judges when they award fees to class counsel that have not been studied before. For example, in light of the discretion district court judges have been delegated over fees under Rule 23, as well as the salience the issue of class action litigation has assumed in national politics, Realist theories of judicial behavior would predict that Republican judges would award smaller fee percentages than Democratic judges. I study whether the political beliefs of district court judges are associated with the fees they award, and, in doing so, contribute to the literature that attempts to assess the extent to which these beliefs influence the decisions of not just appellate judges, but trial judges as

---

[7] *See* DEBORAH R. HENSLER, ET AL., CLASS ACTION DILEMMAS: PURSUING PUBLIC GOALS FOR PRIVATE GAIN 56 (2000).

[8] Of course, I cannot be certain that I found every one of the class actions that settled in federal court over this period. Nonetheless, I am confident that, if I did not find some, the number I did not find is small and would not contribute meaningfully to the data reported in this article.

Draft of July 7, 2010

well.  Moreover, it contributes to the small but growing literature examining whether the ideological influences found in published judicial decisions persist when unpublished decisions are examined as well.

In Part II of this article, I briefly survey the existing empirical studies of class action settlements.  In Part III, I describe the methodology I used to collect the 2006-2007 federal class action settlements and I report my findings regarding these settlements.  District court judges approved 688 class action settlements over this two-year period, involving over $33 billion.  I report a number of descriptive statistics for these settlements, including the number of plaintiff versus defendant classes, the distribution of settlements by subject matter, the age of the case at settlement, the geographic distribution of settlements, the number of settlement classes, the distribution of relief across settlements, and various statistics on the amount of money involved in the settlements.  It should be noted that, despite the fact that the few prior studies that looked beyond securities settlements appeared to oversample larger settlements, much of the analysis set forth in this article is consistent with these prior studies.  This suggests that scholars may not need to sample unpublished as well as published opinions in order to paint an adequate picture of class action settlements.

In Part IV, I perform an analysis of the fees judges awarded to class action lawyers in the 2006-2007 settlements.  All told, judges awarded nearly $5 billion over this two-year period in fees and expenses to class action lawyers, or about 15% of the total amount of the settlements.  Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and, unsurprisingly, the fees awarded according to this method varied over a broad range, with a mean and median around 25%.  Using regression analysis, I confirm prior studies and find that fee percentages are strongly and inversely associated with the size of the settlement.  Further, I find that the age of the case is positively associated with fee percentages but that the percentages were not associated with whether the class action was certified as a settlement class.  There also appeared to be some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located.  Fee percentages in securities cases were lower than the percentages in some but not all other areas, and district courts in some circuits—the Ninth and the Second (in securities cases)—awarded lower fee percentages than courts in many other circuits.  Finally, the regression analysis did not confirm the Realist hypothesis: there was no association between fee percentage and the political beliefs of the judge in any regression.

## II.        Prior Empirical Studies of Class Action Settlements

Draft of July 7, 2010

There are many existing empirical studies of federal securities class action settlements.[9]   Studies of securities settlements have been plentiful because for-profit organizations maintain lists of all federal securities class action settlements for the benefit of institutional investors that are entitled to file claims in these settlements.[10]   Using this data, studies have shown that since 2005, for example, there have been roughly 100 securities class action settlements in federal court each year, and these settlements have involved between $7 billion and $17 billion per year.[11]   Scholars have used this data to analyze many different aspects of these settlements, including the factors that are associated with the percentage of the settlements that courts have awarded to class action lawyers.[12]   These studies have found that the mean and median fees awarded by district court judges are between 20% and 30% of the settlement amount.[13]   These studies have also found that a number of factors are associated with the percentage of the settlement awarded as fees, including (inversely) the size of the settlement, the age of the case, whether a public pension fund was the lead plaintiff, and whether certain law firms were class counsel.[14]   None of these studies has examined whether the political affiliation of the federal district court judge awarding the fees was associated with the size of awards.

---

[9] *See, e.g.*, James D. Cox & Randall S. Thomas, *Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions*, 106 COLUM. L. REV. 1587 (2006); James D. Cox, Randall S. Thomas & Lynn Bai, *There are Plaintiffs and . . . there are Plaintiffs: An Empirical Analysis of Securities Class Action Settlements*, 61 VAND. L. REV. 355 (2008); Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, *A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after* Goldberger v. Integrated Resources, Inc., 29 WASH. U. J.L. & POL'Y 5 (2009); Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions* (St. John's Legal Studies, Research Paper No. 06-0034, 2006), *available at* http://ssrn.com/abstract=870577 [hereinafter Perino, *Markets and Monitors*]; Michael A. Perino, *The Milberg Weiss Prosecution: No Harm, No Foul?* (St. John's Legal Studies, Research Paper No. 08-0135, 2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133995 [hereinafter Perino, *Milberg Weiss*].

[10] *See, e.g.,* RiskMetrics Group, *available at* http://www.riskmetrics.com/scas.

[11] *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2007 REVIEW AND ANALYSIS 1 (2008), *available at* http://securities.stanford.edu/Settlements/REVIEW_1995-2007/Settlements_Through_12_2007.pdf.

[12] *See, e.g.*, Eisenberg, Miller & Perino, *supra* note 9, at 17-24, 28-36; Perino, *Markets and Monitors*, *supra* note 9, at 12-28, 39-44; Perino, *Milberg Weiss*, *supra* note 9, at 32-33, 39-60.

[13] *See, e.g.*, Eisenberg, Miller & Perino, *supra* note 9, at 17-18, 22, 28, 33; Perino, *Markets and Monitors*, *supra* note 9, at 20-21, 40; Perino, *Milberg Weiss*, *supra* note 9, at 32-33, 51-53.

[14] *See, e.g.*, Eisenberg, Miller & Perino, *supra* note 9, at 14-24, 29-30, 33-34; Perino, *Markets and Monitors*, *supra* note 9, at 20-28, 41; Perino, *Milberg Weiss*, *supra* note 9, at 39-58.

Draft of July 7, 2010

There are no comparable organizations that maintain lists of non-securities class action settlements.   As such, studies of class action settlements beyond the securities area are much rarer, and, when they have been done, rely on samples of settlements that were not intended to be representative of the whole.   The two largest studies of class action settlements not limited to securities class actions are a 2004 study by Ted Eisenberg and Geoff Miller,[15] which was recently updated to include data through 2008,[16] and a 2003 study by Class Action Reports.[17]  The Eisenberg-Miller studies collected data from class action settlements in both state and federal courts found from court opinions published in the Westlaw and Lexis databases and checked against lists maintained by the CCH Federal Securities and Trade Regulation Reporters.  Through 2008, their studies have now identified 689 settlements over a sixteen-year period, or less than 45 settlements per year.[18]  Over this sixteen-year period, their studies found that the mean and median settlement amounts were, respectively, $116 million and $12.5 million (in 2008 dollars), and that the mean and median fees awarded by district courts were 23% and 24% of the settlement, respectively.[19]  Their studies also performed an analysis of fee percentages and fee awards.  For the data through 2002, they found that the percentage of the settlement awarded as fees was associated with the size of the settlement (inversely), the age of the case, and whether the district court went out of its way to comment on the level of risk that class counsel had assumed in pursuing the case.[20]  For the data through 2008, they regressed only fee awards and found that the awards were inversely associated with the size of the settlement, that state courts gave lower awards than federal courts, and that the level of risk was still associated with larger awards.[21]  Their studies have not examined whether the political affiliations of the federal district court judges awarding fees were associated with the size of the awards.

The Class Action Reports study collected data on 1120 state and federal settlements over a 30 year period, or less than 40 per year.[22]

---

[15] *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27 (2004).

[16] *See* Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) [hereinafter Eisenberg & Miller II].

[17] *See* Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports 169 (Mar.-Apr. 2003).

[18] *See* Eisenberg & Miller II, *supra* note 16, at 251.

[19] *See id.* at 258-59.

[20] *See* Eisenberg & Miller, *supra* note 15, at 61-62.

[21] *See* Eisenberg & Miller II, *supra* note 16, at 278.

[22] *See* Eisenberg & Miller, *supra* note 15, at 34.

Draft of July 7, 2010

Over the same ten-year period analyzed by the Eisenberg-Miller study, the Class Action Reports data found mean and median settlements of $35.4 and $7.6 million (in 2002 dollars), as well as mean and median fee percentages between 25% and 30%.[23]   Professors Eisenberg and Miller performed an analysis of the fee awards in the Class Action Reports study and found the percentage of the settlement awarded as fees was likewise associated with the size of the settlement (inversely) and the age of the case.[24]

### III.      Federal Class Action Settlements 2006 & 2007

As far as I am aware, there has never been an empirical study of all federal class action settlements in a particular year.  In this Article, I attempt to make such a study for two recent years: 2006 and 2007.  In order to compile a list of all federal class settlements in 2006 and 2007, I started with one of the aforementioned lists of securities settlements, the one maintained by RiskMetrics, and I supplemented this list with settlements that could be found through three other sources: 1) broad searches of district court opinions in the Westlaw and Lexis databases,[25] 2) four reporters of class action settlements—*BNA Class Action Litigation Report*, *Mealey's Jury Verdicts and Settlements*, *Mealey's Litigation Report*, and the *Class Action World* website[26]—and 3) a list from the Administrative Office of Courts of all district court cases coded as class actions that terminated by settlement between 2005 and 2008.[27]  I then removed any duplicate cases and examined the docket sheets and court orders of each of the remaining cases to determine whether the cases were in fact certified as class actions under either Rule 23, Rule 23.1, or Rule 23.2.[28]  For each of the cases verified as such, I gathered the district court's order approving the settlement, the district court's order awarding attorneys' fees, and, in many cases, the settlement agreements and class counsel's motions for fees, from electronic databases

---

[23] *See id.* at 47, 51.

[24] *See id.* at 61-62.

[25] The searches consisted of the following terms: ("class action" & (settle! /s approv! /s (2006 2007))); (((counsel attorney) /s fee /s award!) & (settle! /s (2006 2007)) & "class action"); ("class action" /s settle! & da(aft 12/31/2005 & bef 1/1/2008)); ("class action" /s (fair reasonable adequate) & da(aft 12/31/2005 & bef 1/1/2008)).

[26] *See* http://classactionworld.com/

[27] I examined the AO lists in the year before and after the two-year period under investigation because the termination date recorded by the AO was not necessarily the same date the district court approved the settlement.

[28] *See* FED. R. CIV. P. 23, 23.1 & 23.2.  I excluded from this analysis opt-in collective actions, such as those brought pursuant to the provisions of the Fair Labor Standards Act, *see* 29 U.S.C. § 216(b), if such actions did not also include claims certified under the opt-out mechanism in Rule 23.

Draft of July 7, 2010

(such as Westlaw or PACER), and, when necessary, from the clerk's offices of the various federal district courts. In this Part, I report the characteristics of the settlements themselves, and, in the next Part, I report the characteristics of the attorneys' fees awarded to class counsel by the district courts that approved the settlements.

### A. Number of settlements

I found 688 settlements approved by federal district courts during 2006 and 2007 using the methodology described above. This is almost the exact same number the Eisenberg-Miller study found over a *sixteen*-year period in both federal *and* state court. Indeed, the number of annual settlements identified in this study is *several times* the number of annual settlements that have been identified in any prior empirical study of class action settlements. Of the 688 settlements I found, 304 of these settlements were approved in 2006 and 384 were approved in 2007.[29]

### B. Defendant versus plaintiff classes

Although Rule 23 permits federal judges to certify either a class of plaintiffs or a class of defendants, it is widely assumed that it is extremely rare for courts to certify defendant classes.[30] My findings confirm this widely held assumption. Of the 688 class action settlements approved in 2006 and 2007, 685 involved plaintiff classes and only three involved defendant classes. All three of these defendant-class settlements were in employment benefits cases, where companies sued classes of current or former employees.[31]

### C. Settlement subject areas

---

[29] A settlement was assigned to a particular year if the district court judge's order approving the settlement was dated between January 1 and December 31 of that year. Cases involving multiple defendants sometimes settled over time because defendants would settle separately with the plaintiff class. All such partial settlements approved by the district court on the same date were treated as one settlement. Partial settlements approved by the district court on different dates were treated as different settlements.

[30] *See, e.g.,* Robert H. Klonoff, Edward K.M. Bilich & Suzette M. Malveaux, Class Actions and Other Multi-Party Litigation: Cases and Materials 1061 (2d ed. 2006).

[31] *See* Halliburton Company v. Graves, No. 04-00280 (S.D. Tex., Sep. 28, 2007); Rexam, Inc. v. United Steel Workers of America, No. 03-2998 (D. Minn. Aug. 29, 2007); Rexam, Inc. v. United Steel Workers of America, No. 03-2998 (D. Minn. Sept. 17, 2007).

Draft of July 7, 2010

Although courts are free to certify Rule 23 classes in almost any subject area, it is widely assumed that securities settlements dominate the federal class action docket.[32]  At least in terms of the number of settlements, my findings reject this conventional wisdom.  As Table 1 shows, although securities settlements comprised a large percentage of the 2006 and 2007 settlements, they did not comprise a majority of those settlements.  As one would have expected in light of Supreme Court precedent over the last two decades,[33] there were almost no mass tort class actions (included in the "Other" category) settled over the two-year period.

Although the Eisenberg-Miller study through 2008 is not directly comparable on the distribution of settlements across litigation subject areas—because its state and federal court data cannot be separated (more than 10% of the settlements were from state court[34]) and because it excludes settlements in fee-shifting cases—their study through 2008 is the best existing point of comparison.  Interestingly, despite the fact that state courts were included in their data, their study through 2008 found about the same percentage of securities cases (39%) as my 2006-2007 dataset shows.[35]  But their study found many more consumer (18%) and antitrust (10%) cases while finding many fewer labor and employment (8%), employee benefits (6%), and civil rights (3%) cases.[36]  This is not unexpected given their reliance on published opinions and their exclusion of fee-shifting cases.

---

[32] *See, e.g.*, John C. Coffee, Jr., *Reforming the Security Class Action: An Essay on Deterrence and its Implementation*, 106 COLUM. L. REV. 1534, 1539-40 (2006) (describing securities class actions as "the 800-pound gorilla that dominates and overshadows other forms of class actions").

[33] *See, e.g.*, Samuel Issacharoff, *Private Claims, Aggregate Rights*, 2008 SUP. CT. REV. 183, 208.

[34] *See* Eisenberg & Miller II, *supra* note 16, at 257.

[35] *See id.* at 262.

[36] *See id.*

Draft of July 7, 2010

**Table 1: The number of class action settlements approved by federal judges in 2006 and 2007 in each subject area**

| Subject matter | Number of settlements | |
|---|---|---|
| | **2006** | **2007** |
| Securities | 122 (40%) | 135 (35%) |
| Labor and Employment | 41 (14%) | 53 (14%) |
| Consumer | 40 (13%) | 47 (12%) |
| Employee Benefits | 23 (8%) | 38 (10%) |
| Civil Rights | 24 (8%) | 37 (10%) |
| Debt Collection | 19 (6%) | 23 (6%) |
| Antitrust | 13 (4%) | 17 (4%) |
| Commercial | 4 (1%) | 9 (2%) |
| Other | 18 (6%) | 25 (6%) |
| **Total** | **304** | **384** |

Note: Securities: cases brought under federal and state securities laws. Labor and Employment: workplace claims brought under either federal or state law, with the exception of ERISA cases. Consumer: cases brought under the Fair Credit Reporting Act as well as cases for consumer fraud, etc. Employee Benefits: ERISA cases. Civil Rights: cases brought under 42 U.S.C. § 1983 or cases brought under the Americans with Disability Act seeking non-workplace accommodations. Debt Collection: cases brought under the Fair Debt Collection Practices Act. Antitrust: cases brought under federal or state antitrust laws. Commercial: cases between businesses, excluding antitrust cases. Other: includes, among other things, derivative actions against corporate managers and directors, environmental suits, insurance suits, Medicare and Medicaid suits, product liability suits, and mass tort suits.
Sources: Westlaw, PACER, district court clerks' offices.

*D. Settlement classes*

The Federal Rules of Civil Procedure permit parties to seek certification of a suit as a class action for settlement purposes only.[37] When the district court certifies a class in such circumstances, the court need not consider whether it would be manageable to try the litigation as a class.[38] So-called "settlement classes" have always been more controversial than classes certified for litigation because they raise the prospect that, at least where there are competing class actions filed against the same defendant, the defendant could play class counsel off one another to find the one willing to settle the case for the least amount of money.[39] Prior to the Supreme Court's 1997 opinion in *Amchem Products, Inc. v. Windsor*,[40] it was uncertain

---

[37] *See* Martin H. Redish, *Settlement Class Actions, The Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process*, 73 U. Chi. L. Rev. 545, 553 (2006).

[38] *See* Amchem Products, Inc v Windsor, 521 US 591, 620 (1997).

[39] *See* Redish, *supra* note 37, at 557-59.

[40] 521 US 591 (1997).

Draft of July 7, 2010

whether the Federal Rules even permitted settlement classes. It may therefore be a bit surprising to learn that 68% of the federal settlements in 2006 and 2007 were settlement classes. This percentage is higher than the percentage found in the Eisenberg-Miller studies, which found that only 57% of class action settlements in state and federal court between 2003 and 2008 were settlement classes.[41] It should be noted that the distribution of litigation subject areas among the settlement classes in my 2006-2007 federal data set did not differ much from the distribution among non-settlement classes, with two exceptions. One exception was consumer cases, which were nearly three times as prevalent among settlement classes (15.9%) as non-settlement classes (5.9%); the other was civil rights cases, which were four times as prevalent among non-settlement classes (18.0%) as settlements classes (4.5%). In light of the skepticism with which the courts had long treated settlement classes, one might have suspected that courts would award lower fee percentages in such settlements. Nonetheless, as I report in Part III, whether a case was certified as a settlement class was not associated with the fee percentages awarded by federal district court judges.

###### E. The age at settlement

One interesting question is how long class actions were litigated before they reached settlement. Unsurprisingly, cases reached settlement over a wide range of ages.[42] As shown in Table 2, the average time to settlement was a bit more than 3 years (1196 days) and the median time was a bit under 3 years (1068 days). The average and median ages here are similar to those found in Eisenberg-Miller study through 2002, which found averages of 3.35 years in fee-shifting cases and 2.86 years in non-fee-shifting cases, and medians of 4.01 years in fee-shifting cases and 3.0 years in non-fee-shifting cases.[43] Their study through 2008 did not report case ages.

The shortest time to settlement was 105 days in a labor and employment case.[44] The longest time to settlement was nearly 15 years (5443 days) in a commercial case.[45] The average and median time to settlement varied

---

[41] *See* Eisenberg & Miller II, *supra* note 16, at 266.

[42] The age of the case was calculated by subtracting the date the relevant complaint was filed from the date the settlement was approved by the district court judge. The dates were taken from PACER. For consolidated cases, I used the date of the earliest complaint. If the case had been transferred, consolidated, or removed, the date the complaint was filed was not always available from PACER. In such cases, I used the date the case was transferred, consolidated, or removed as the start date.

[43] *See* Eisenberg & Miller, *supra* note 15, at 59-60.

[44] *See* Clemmons v. Rent-A-Center West, Inc., No. 05-6307 (D. Or. Jan. 20, 2006).

[45] *See* Allapattah Services Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006).

Draft of July 7, 2010

significantly by litigation subject matter, with securities cases generally taking the longest time and debt collection cases taking the shortest time. Labor and employment cases and consumer cases also settled relatively early.

**Table 2: The number of days 2006-2007 federal class action cases took to reach settlement in each subject area**

| Subject matter | Average | Median | Minimum | Maximum |
|---|---|---|---|---|
| | | | | |
| Securities | 1438 | 1327 | 392 | 3802 |
| Labor and Employment | 928 | 786 | 105 | 2497 |
| Consumer | 963 | 720 | 127 | 4961 |
| Employee Benefits | 1162 | 1161 | 164 | 3157 |
| Civil Rights | 1373 | 1360 | 181 | 3354 |
| Debt Collection | 738 | 673 | 223 | 1973 |
| Antitrust | 1140 | 1167 | 237 | 2480 |
| Commercial | 1267 | 760 | 163 | 5443 |
| Other | 1065 | 962 | 185 | 3620 |
| | | | | |
| **All** | **1196** | **1068** | **105** | **5443** |
| Source: PACER. | | | | |

*F.  The location of settlements*

The 2006-2007 federal class action settlements were not distributed across the country in the same way federal civil litigation is in general.  As Figure 1 shows, some of the geographic circuits attracted much more class action attention than we would expect based on their docket size, and others attracted much less.  In particular, district courts in the First, Second, Seventh, and Ninth Circuits approved a much larger share of class action settlements than the share of all civil litigation they resolved, with the First, Second, and Seventh Circuits approving nearly double the share and the Ninth Circuit approving one-and-one half times the share.  By contrast, the shares of class action settlements approved by district courts in the Fifth and Eighth Circuits were less than one half of their share of all civil litigation, with the Third, Fourth, and Eleventh Circuits also exhibiting significant underrepresentation.

With respect to a comparison with the Eisenberg-Miller studies, their federal court data through 2008 can be separated from their state court data on the question of the geographic distribution of settlements, and there are some significant differences between their federal data and the numbers reflected in Figure 1.  Their study reported considerably higher proportions of settlements than I found from the Second (23.8%), Third (19.7%), Eighth

Draft of July 7, 2010

(4.8%), and D.C. (3.3%) Circuits, and considerably lower proportions from the Fourth (1.3%), Seventh (6.8%), and Ninth (16.6%) Circuits.[46]

**Figure 1: The percentage of 2006-2007 district court civil terminations and class action settlements in each federal circuit**



Sources: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (*available at* http://www.uscourts.gov/stats/index.html).

Figure 2 separates the class action settlement data in Figure 1 into securities and non-securities cases. Figure 2 suggests that the over-representation of settlements in the First and Second Circuits is largely attributable to securities cases, whereas the over-representation in the Seventh Circuit is attributable to non-securities cases, and the over-representation in the Ninth is attributable to both securities and non-securities cases.

---

[46] *See* Eisenberg & Miller II, *supra* note 16, at 260.

13

Draft of July 7, 2010

**Figure 2: The percentage of 2006-2007 district court civil terminations and class action settlements in each federal circuit**



Sources: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (*available at* http://www.uscourts.gov/stats/index.html).

It is interesting to ask why some circuits received more class action attention than others.  One hypothesis is that class actions are filed in circuits where class action lawyers believe they can find favorable law or favorable judges.  Federal class actions often involve class members spread across multiple states, and, as such, class action lawyers may have a great deal of discretion over which district they file suit in.[47]  One way in which law or judges may be favorable to class action attorneys is with regard to attorneys' fees.  In Part III, I attempt to test whether district court judges in the circuits with the most over- and under-subscribed class action dockets award attorneys' fees that would attract or discourage filings there; I find no evidence that they do.

Another hypothesis is that class action suits are settled in jurisdictions where defendants are located.  This might be the case because, although class action lawyers may have discretion over where to file, venue restrictions might ultimately restrict cases to jurisdictions in which defendants have their corporate headquarters or other operations.[48]  This might explain why the

---

[47] *See* Samuel Issacharoff & Richard Nagareda, *Class Settlements Under Attack*, 156 U. PA. L. REV. 1649, 1662 (2008).

[48] *See* 28 U.S.C. §§ 1391, 1404, 1406, 1407.  *See also* Foster v. Nationwide Mutual Ins. Co., No. 07-04928, 2007 U.S. Dist. LEXIS 95240 at *2-17 (N.D. Cal. Dec. 14, 2007) (transferring

Draft of July 7, 2010

Second Circuit, with the financial industry in New York, sees so many securities suits, and why other circuits with cities with a large corporate presence, such as the First (Boston), Seventh (Chicago), and Ninth (Los Angeles and San Francisco), see more settlements than one would expect based on the size of their civil dockets.

Another hypothesis might be that class action lawyers file cases wherever it is most convenient for them to litigate the cases—*i.e.*, in the cities in which their offices are located. This, too, might explain the Second Circuit's overrepresentation in securities settlements, with prominent securities firms located in New York, as well as the over-representation of other settlements in some of the circuits in which major metropolitan areas with prominent plaintiffs' firms are found.

### G.   Type of relief

Under Rule 23, district court judges can certify class actions for injunctive or declaratory relief, for money damages, or for a combination of the two.[49] In addition, settlements can provide money damages both in the form of cash as well as in the form of in-kind relief, such as coupons to purchase the defendant's products.[50]

As shown in Table 3, the vast majority of class actions settled in 2006 and 2007 provided cash relief to the class (89%), but a substantial number also provided in-kind relief (6%) or injunctive or declaratory relief (23%). As would be expected in light of the focus on consumer cases in the debate over the anti-coupon provision in the Class Action Fairness Act of 2005,[51] consumer cases had the greatest percentage of settlements providing for in-kind relief (30%). Civil rights cases had the greatest percentage of settlements providing for injunctive or declaratory relief (75%), though almost half of civil rights cases also provided some cash relief (49%). The securities settlements were quite distinctive from the settlements in other

---

venue to jurisdiction where the defendant's corporate headquarters were located). One prior empirical study of securities class action settlements found that 85% of such cases are filed in the home circuit of the defendant corporation. *See* James D. Cox, Randall S. Thomas & Lynn Bai, *Do Differences in Pleading Standards Cause Forum Shopping in Securities Class Actions?: Doctrinal and Empirical Analyses*, 2009 WIS. L. REV. 421, 429, 440, 450-51 (2009).

[49] *See* FED. R. CIV. P. 23(b).

[50] These coupon settlements have become very controversial in recent years, and Congress discouraged them in the Class Action Fairness Act of 2005 by tying attorneys' fees to the value of coupons that were ultimately redeemed by class members as opposed to the value of coupons offered class members. *See* 28 U.S.C. § 1712.

[51] *See, e.g.,* 151 CONG. REC. H723 (2005) (statement of Rep. Sensenbrenner) (arguing that consumers are "seeing all of their gains go to attorneys and them just getting coupon settlements from the people who have allegedly done them wrong.").

Draft of July 7, 2010

areas in their singular focus on cash relief: every single securities settlement provided cash to the class and almost none of them provided in-kind, injunctive, or declaratory relief.  This is but one example of how the focus on securities settlements in the prior empirical scholarship can lead to a distorted picture of class action litigation.

**Table 3: The percentage of 2006 and 2007 class action settlements providing each type of relief in each subject area**

| Subject matter | Cash | In-kind relief | Injunctive or declaratory relief |
|---|---|---|---|
| Securities (n=257) | 100% | 0% | 2% |
| Labor and Employment (n=94) | 95% | 6% | 29% |
| Consumer (n=87) | 74% | 30% | 37% |
| Employee Benefits (n=61) | 90% | 0% | 34% |
| Civil Rights (n=61) | 49% | 2% | 75% |
| Debt Collection (n=42) | 98% | 0% | 12% |
| Antitrust (n=30) | 97% | 13% | 7% |
| Commercial (n=13) | 92% | 0% | 62% |
| Other (n=43) | 77% | 7% | 33% |
| **All (n=688)** | **89%** | **6%** | **23%** |

Note: Cash: cash, securities, refunds, charitable contributions, contributions to employee benefit plans, forgiven debt, relinquishment of liens or claims, and liquidated repairs to property.  In-kind relief: vouchers, coupons, gift cards, warranty extensions, merchandise, services, and extended insurance policies.  Injunctive or declaratory relief: modification of terms of employee benefit plans, modification of compensation practices, changes in business practices, capital improvements, research, and unliquidated repairs to property.
Sources: Westlaw, PACER, district court clerks' offices.

### H.   Settlement money

Although securities settlements did not comprise the majority of federal class action settlements in 2006 and 2007, they did comprise the majority of the money—indeed, the *vast majority* of the money—involved in class action

Draft of July 7, 2010

settlements.  In Table 4, I report the total amount of ascertainable value involved in the 2006 and 2007 settlements.  This amount includes all determinate[52] payments in cash or cash equivalents (such as marketable securities), including attorneys' fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.[53]  I did not attempt to assign a value to any relief that was not valued by the district court (even if it may have been valued by class counsel).  It should be noted that district courts did not often value in-kind or injunctive relief—they did so only 18% of the time—and very little of the amounts set forth in Table 4—only $1.3 billion, or 4%—are based on these valuations.  It should also be noted that the amounts in Table 4 reflect only what defendants *agreed to pay*; they do not reflect the amounts that defendants *actually paid* out after the claims administration process concluded.  Prior empirical research has found that, depending on how settlements are structured (e.g., whether they awarded a fixed amount of money to each class member who eventually files a valid claim or a pro rata amount of a fixed settlement to each class member), defendants can end up paying much less than they agreed.[54]

---

[52] For example, I excluded awards of a fixed amount of money to each class member who eventually filed a valid claim (as opposed to settlements that awarded a pro rata amount of a fixed settlement to each class member) if the total amount of money set aside to pay the claims was not set forth in the settlement documents.

[53] In some cases, the district court valued the relief in the settlement over a range.  In these cases, I used the middle point in the range.

[54] *See* HENSLER, ET AL., *supra* note 7, at 427-430.

Draft of July 7, 2010

**Table 4: The total amount of money involved in federal class action settlements in 2006 and 2007**

| Subject matter | Total ascertainable monetary value in settlements (and percentage of overall annual total) | | | |
|---|---|---|---|---|
| | **2006** (n=304) | | **2007** (n=384) | |
| Securities | $16,728 | 76% | $8,038 | 73% |
| Labor and Employment | $266.5 | 1% | $547.7 | 5% |
| Consumer | $517.3 | 2% | $732.8 | 7% |
| Employee Benefits | $443.8 | 2% | $280.8 | 3% |
| Civil Rights | $265.4 | 1% | $81.7 | 1% |
| Debt Collection | $8.9 | <1% | $5.7 | <1% |
| Antitrust | $1,079 | 5% | $660.5 | 6% |
| Commercial | $1,217 | 6% | $124.0 | 1% |
| Other | $1,568 | 7% | $592.5 | 5% |
| | | | | |
| **Total** | **$22,093** | **100%** | **$11,063** | **100%** |

Note: Dollar amounts are in millions.  Includes all determinate  payments in cash or cash equivalents (such as marketable securities), including attorneys' fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court. Sources: Westlaw, PACER, district court clerks' offices.

Table 4 shows that, in both years, around three-quarters of all the money involved in federal class action settlements came from securities cases.  Thus, in this sense, the conventional wisdom about the dominance of securities cases in class action litigation is correct.   Figure 3 is a graphical representation of the contribution each litigation area makes to the total number and total amount of money involved in the 2006-2007 settlements.

Draft of July 7, 2010

**Figure 3: The percentage of 2006-2007 federal class action settlements and settlement money from each subject area**



Sources: Westlaw, PACER, district court clerks' offices.

Table 4 also shows that, in total, over $33 billion was approved in the 2006-2007 settlements. Over $22 billion was approved in 2006 and over $11 billion in 2007. It should be emphasized again that the totals in Table 4 understate the amount of money defendants agreed to pay in class action settlements in 2006 and 2007 because they exclude the unascertainable value of those settlements. This understatement disproportionately affects litigation areas, such as civil rights, where much of the relief is injunctive because, as I noted, very little of such relief was valued by district courts. Nonetheless, these numbers are, as far as I am aware, the first attempt to calculate how much money is involved in federal class action settlements in a given year.

The significant discrepancy between the two years is largely attributable to the 2006 securities settlement related to the collapse of Enron, which totaled $6.6 billion, as well as to the fact that seven of the eight 2006-2007 settlements for more than $1 billion were approved in 2006.[55] Indeed, it is

---

[55] *See* In re Enron Corporation Securities Litigation, MDL 1446 (S.D. Tex. May 24, 2006) ($6,600,000,000); In re Tyco International Ltd. Multidistrict Litigation, MDL 02-1335 (D.N.H. Dec. 19, 2007) ($3,200,000,000); In re AOL Time Warner, Inc. Securities and "ERISA" Litigation, MDL 1500 (S.D.N.Y. Apr. 6, 2006) ($2,500,000,000); In re: Diet Drugs

Draft of July 7, 2010

worth noting that the eight settlements for more than $1 billion accounted for almost $18 billion of the $33 billion that changed hands over the two year period. That is, a mere 1% of the settlements comprised over 50% of the wealth involved in federal class action settlements in 2006 and 2007. In order to give some sense of the distribution of settlement size in the 2006-2007 dataset, Table 5 sets forth the number of settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards (605 out of the 688 settlements). Nearly two-thirds of all settlements fell below $10 million.

**Table 5: The distribution by size of 2006-2007 federal class action settlements with ascertainable value**

| Settlement Size (in millions) | Number of Settlements |
|---|---|
| [$0 to $1] | 131 (21.7%) |
| ($1 to $10] | 261 (43.1%) |
| ($10 to $50] | 139 (23.0%) |
| ($50 to $100] | 33 (5.45%) |
| ($100 to $500] | 31 (5.12%) |
| ($500 to $6600] | 10 (1.65%) |
| **Total** | 605 |

Note: includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
Sources: Westlaw, PACER, district court clerks' offices.

Given the disproportionate influence exerted by securities settlements on the total amount of money involved in class actions, it is unsurprising that the average securities settlement involved more money than the average settlement in most of the other subject areas. These numbers are provided in Table 6, which includes, again, only the settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards. The average settlement over the entire two-year period for all types of cases was almost $55 million, but the median was only $5.1 million. (With the $6.6 billion Enron settlement excluded, the average settlement for all ascertainable

Products Liability Litigation, MDL 1203 (E.D. Pa. May 24, 2006) ($1,275,000,000); In re Nortel Networks Corp. Securities Litigation (Nortel I), No.01-1855 (S.D.N.Y. Dec. 26, 2006) ($1,142,780,000); In re Royal Ahold N.V. Securities and ERISA Litigation, 03-1539 (D. Md. Jun. 16, 2006) ($1,100,000,000); Allapattah Services Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) ($1,075,000,000); In re Nortel Networks Corp. Securities Litigation (Nortel II), No. 05-1659 (S.D.N.Y. Dec. 26, 2006) ($1,074,270,000).

Draft of July 7, 2010

cases dropped to $43.8 million, and, for securities cases, dropped to $71.0 million.) The average settlements varied widely by litigation area, with securities and commercial settlements at the high end of around $100 million, but the median settlements for nearly every area were bunched around a few million dollars. It should be noted that the high average for commercial cases is largely due to one settlement above $1 billion;[56] when that settlement is removed, the average for commercial cases was only $24.2 million.

**Table 6: The average and median settlement amounts in the 2006-2007 federal class action settlements with ascertainable value to the class**

| Subject matter | Average | Median |
|---|---|---|
| | | |
| Securities (n=257) | $96.4 | $8.0 |
| Labor and Employment (n=88) | $9.2 | $1.8 |
| Consumer (n=65) | $18.8 | $2.9 |
| Employee Benefits (n=52) | $13.9 | $5.3 |
| Civil Rights (n=34) | $9.7 | $2.5 |
| Debt Collection (n=40) | $0.37 | $0.088 |
| Antitrust (n=29) | $60.0 | $22.0 |
| Commercial (n=12) | $111.7 | $7.1 |
| Other (n=28) | $76.6 | $6.2 |
| | | |
| **All (n=605)** | **$54.7** | **$5.1** |

Note: Dollar amounts are in millions. Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
Sources: Westlaw, PACER, district court clerks' offices.

Table 6 permits comparison with the two prior empirical studies of class action settlements that sought to include non-securities as well as securities cases in their purview. The Eisenberg-Miller study through 2002, which included both common-fund and fee-shifting cases, found that the mean class action settlement was $112 million and the median was $12.9 million, both in 2006 dollars,[57] more than double the average and median I found for all settlements in 2006 and 2007. The Eisenberg-Miller update through 2008 included only common-fund cases and found mean and median settlements in federal court of $115 million and $11.7 million (both again in 2006 dollars),[58] respectively; this is still more than double the average and median I found. This suggests that the methodology used by the Eisenberg-Miller studies—

---

[56] See Allapattah Services Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) (approving $1,075,000,000 settlement).

[57] See Eisenberg & Miller, *supra* note 15, at 47.

[58] See Eisenberg & Miller II, *supra* note 16, at 262.

Draft of July 7, 2010

looking at district court opinions that were published in Westlaw or Lexis—oversampled larger class actions (because opinions approving larger class actions are, presumably, more likely to be published than opinions approving smaller ones). It is also possible that the exclusion of fee-shifting cases from their data through 2008 contributed to this skew, although, given that their data through 2002 included fee-shifting cases and found an almost identical mean and median as their data through 2008, the primary explanation for the much larger mean and median in their study through 2008 is probably their reliance on published opinions. Over the same years examined by Professors Eisenberg and Miller, the Class Action Reports study found a smaller average settlement than I did ($39.5 million in 2006 dollars), but a larger median ($8.48 million in 2006 dollars). It is possible that the Class Action Reports methodology also oversampled larger class actions, explaining its larger median, but that there are more "mega" class actions today than there were before 2003, explaining its smaller mean.[59]

It is interesting to ask how significant the $16 billion that was involved annually in these 350 or so federal class action settlements is in the grand scheme of American litigation. Unfortunately, we do not know how much money is transferred every year in American litigation. The only studies of which I am aware that attempt even a partial answer to this question are the estimates of how much money is transferred in the American "tort" system every year by a financial services consulting firm, Tillinghast-Towers Perrin.[60] These studies are not directly comparable to the class action settlement numbers because, again, the number of tort class action settlements in 2006 and 2007 was very small. Nonetheless, as the tort system no doubt constitutes a large percentage of the money transferred in all litigation, these studies provide something of a point of reference to assess the significance of class action settlements. In 2006 and 2007, Tillinghast-Towers Perrin estimated that the American tort system transferred $160 billion and $164 billion, respectively, to claimants and their lawyers.[61] The total amount of money involved in the 2006 and 2007 federal class action settlements reported in Table 4 was, therefore, roughly 10% of the

---

[59] There were eight class action settlements during 2006 and 2007 of more than $1 billion. *See* note 55 *supra.*

[60] Some commentators have been critical of Tillinghast's reports, typically on the ground that the reports overestimate the cost of the tort system. *See* M. Martin Boyer, *Three Insights from the Canadian D&O Insurance Market: Inertia, Information and Insiders*, 14 CONN. INS. L.J. 75, 84 (2007); John Fabian Witt, *Form and Substance in the Law of Counterinsurgency Damages*, 41 LOY. L.A. L. REV. 1455, 1475 n.135 (2008). If these criticisms are valid, then class action settlements would appear even more significant as compared to the tort system.

[61] *See* TILLINGHAST-TOWERS PERRIN, U.S. TORT COSTS: 2008 UPDATE 5 (2008). The report calculates $252 billion in total tort "costs" in 2007 and $246.9 billion in 2006, *see id.*, but only 65% of those costs represent payments made to claimants and their lawyers (the remainder represents insurance administration costs and legal costs to defendants). *See* TILLINGHAST-TOWERS PERRIN, U.S. TORT COSTS: 2003 UPDATE 17 (2003).

Draft of July 7, 2010

Tillinghast-Towers Perrin estimate.  This suggests that, in merely 350 cases every year, federal class action settlements involve the same amount of wealth as 10% of the entire American tort system.  It would seem that this is a significant amount of money for so few cases.

## IV.    Attorneys' Fees in Federal Class Action Settlements 2006 & 2007

### A.   Total Amount of Fees and Expenses

As I demonstrated in Part III, federal class action settlements involved a great deal of money in 2006 and 2007, some $16 billion a year.  A perennial concern with class action litigation is whether class action lawyers are reaping an outsized portion of this money.[62]  The 2006-2007 federal class action data suggest that these concerns may be exaggerated.  As shown in Table 7, only 13% of the settlement amount in 2006 and 20% of the amount in 2007 went to class action lawyers as fee and expense awards.[63]  The 2006 percentage is lower than the 2007 percentage in large part because the class action lawyers in the Enron securities settlement received less than 10% of the $6.6 billion corpus.  In any event, the percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33%.[64]  Lawyers received less than 33% of settlements in fees and expenses in virtually every subject area in both years.

---

[62] *See, e.g.*, John C. Coffee, Jr., Commentary, *Conflicts, Consent, and Allocation After Amchem Products—Or, Why Attorneys Still Need Consent to Give Away Their Clients' Money*, 84 VA. L. REV. 1541, 1544 (1998); Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. REV. 991, 995 (2002).

[63] In some of the partial settlements, *see* note 29 *supra*, the district court awarded expenses for all the settlements at once and it was unclear what portion of the expenses was attributable to which settlement.  In these instances, I assigned each settlement a pro rata portion of expenses.  To the extent possible, all of the fee and expense numbers in this article exclude any interest known to be awarded by the courts.

[64] *See, e.g.*, Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267, 284-86 (1998) (reporting results of a survey of Wisconsin lawyers).

Draft of July 7, 2010

**Table 7: The total amount of fees and expenses awarded to class action
lawyers in federal class action settlements in 2006 and 2007**

| Subject matter | Total fees and expenses awarded in settlements (and as percentage of total settlement amounts) in each subject area | |
|---|---|---|
| | **2006** (n=292) | **2007** (n=363) |
| Securities | $1,899 (11%) | $1,467 (20%) |
| Labor and Employment | $75.1 (28%) | $144.5 (26%) |
| Consumer | $126.4 (24%) | $65.3 (9%) |
| Employee Benefits | $57.1 (13%) | $71.9 (26%) |
| Civil Rights | $31.0 (12%) | $32.2 (39%) |
| Debt Collection | $2.5 (28%) | $1.1 (19%) |
| Antitrust | $274.6 (26%) | $157.3 (24%) |
| Commercial | $347.3 (29%) | $18.2 (15%) |
| Other | $119.3 (8%) | $103.3 (17%) |
| | | |
| **Total** | **$2,932 (13%)** | **$2,063 (20%)** |

Note: Dollar amounts are in millions.  Excludes settlements in which fees were not (or at least not yet) sought (22 settlements), settlements in which fees have not yet been awarded (2 settlements), and settlements in which fees could not be ascertained due to indefinite award amounts, missing documents, or non-public side agreements (9 settlements).
Sources: Westlaw, PACER, district court clerks' offices.

It should be noted that, in some respect, the percentages in Table 7 overstate the portion of settlements that were awarded to class action attorneys because, again, many of these settlements involved indefinite cash relief or non-cash relief that could not be valued.[65]  If the value of all of this relief could have been included, then the percentages in Table 7 would have been even lower.  On the other hand, as noted above, not all of the money defendants agree to pay in class action settlements is ultimately collected by the class.[66]  To the extent leftover money is returned to the defendant, the percentages in Table 7 understate the portion class action lawyers received relative to their clients.

*B.  Method of Awarding Fees*

---

[65] Indeed, the large year-to-year variation in the percentages in labor, consumer, and employee benefits cases arose because district courts made particularly large valuations of the equitable relief in a few settlements and used the lodestar method to calculate the fees in these settlements (and thereby did not consider their large valuations in calculating the fees).

[66] *See* HENSLER, ET AL., *supra* note 7, at 427-430.

Draft of July 7, 2010

District court judges have a great deal of discretion in how they set fee awards in class action cases. Under Rule 23, federal judges are told only that the fees they award to class counsel must be "reasonable."[67]  Courts often exercise this discretion by choosing between two approaches: the lodestar approach or the percentage-of-the-settlement approach.[68]  The lodestar approach works much the way it does in individual litigation: the court calculates the fee based on the number of hours class counsel actually worked on the case multiplied by a reasonable hourly rate and a discretionary multiplier.[69]  The percentage-of-the-settlement approach bases the fee on the size of the settlement rather than the hours class counsel actually worked: the district court picks a percentage of the settlement that it thinks is reasonable based on a number of factors, one of which is often the fee lodestar (sometimes referred to as a "lodestar cross check").[70]  My 2006-2007 dataset shows that the percentage-of-the-settlement approach has become much more common than the lodestar approach. In 69% of the settlements reported in Table 7, district court judges employed the percentage-of-the-settlement method with or without the lodestar cross check. They employed the lodestar method in only 12% of settlements. In the other 20% of settlements, the court did not state the method it used or it used another method altogether.[71]  The pure lodestar method was used most often in consumer (29%) and debt collection (45%) cases.  These numbers are fairly consistent with the Eisenberg-Miller data from 2003 to 2008.  They found that the lodestar method was used in only 9.6% of settlements.[72]  Their number is no doubt lower than the 12% number found in the 2006-2007 dataset because they excluded fee-shifting cases from their study.

---

[67]  Fed. R. Civ. P. 23(h).

[68]  The discretion to pick between these methods is most pronounced in settlements where the underlying claim was not found in a statute that would shift attorney's fees to the defendant, *see, e.g., In re* Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st. Cir. 1995) (permitting either percentage or lodestar method in common fund cases); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (same); Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993) (same).  By contrast, courts typically used the lodestar approach in settlements arising from fee-shifting cases.

[69]  *See* Eisenberg & Miller, *supra* note 15, at 31.

[70]  *See id.* at 31-32.

[71]  These numbers are based on the fee method described in the district court's order awarding fees, unless the order was silent, in which case the method, if any, described in class counsel's motion for fees (if it could be obtained) was used.  If the court explicitly justified the fee award by reference to its percentage of the settlement, I counted it as the percentage method.  If the court explicitly justified the award by reference to a lodestar calculation, I counted it as the lodestar method.  If the court explicitly justified the award by reference to both, I counted it as the percentage method with a lodestar cross check.  If the court calculated neither a percentage nor the fee lodestar in its order, then I counted it as an "other" method.

[72]  *See* Eisenberg & Miller II, *supra* note 16, at 267.

Draft of July 7, 2010

### C.   Variation in Fees Awarded

Not only do district courts often have discretion to choose between the lodestar method and the percentage-of-the-settlement method, but each of these methods leaves district courts with a great deal of discretion in how the method is ultimately applied.   The courts that use the percentage-of-the-settlement method usually rely upon a multi-factor test,[73] and, like most multifactor tests, it can plausibly yield almost any result.   It is true that in many of these cases, judges examine the fee percentages that other courts have awarded to guide their discretion.[74]   In addition, the Ninth Circuit has adopted a presumption that 25% is the proper fee award percentage in class action cases.[75]   Moreover, in securities cases, some courts presume that the proper fee award percentage is the one class counsel agreed to when it was hired by the large shareholder that is now usually selected as the lead plaintiff in such cases.[76]   Nonetheless, presumptions, of course, can be overcome, and, as one court has put it, "[t]here is no hard and fast rule mandating a certain percentage . . . which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case."[77]   The court added: "[i]ndividualization in the exercise of a discretionary power [for fee awards] will alone retain equity as a living system and save it from sterility."[78]   It is therefore not surprising that district courts awarded fees over a broad range when they used the percentage-of-the-settlement method.   Figure 4 is a graph of the distribution of fee awards as a percentage of the settlement in the 444 cases where district courts used the percentage method with or without a lodestar cross check and the fee percentages were ascertainable.   These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district

---

[73] The Eleventh Circuit, for example, has identified a *non-exclusive* list of 15 factors that district courts might consider.  *See* Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 772 n.3, 775 (11th Cir. 1991).  *See also In re* Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 265 (D.N.H. 2007) (five factors); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (six factors); Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n. 1 (3d Cir. 2000) (seven factors); In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 385 (D. Md. 2006) (thirteen factors); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988) (twelve factors); *In re* Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (seven factors).

[74] *See* Eisenberg & Miller, *supra* note 15, at 32.

[75] *See* Staton v. Boeing Co., 327 F.3d 938, 968 (9th Cir. 2003).

[76] *See, e.g.*, *In re* Cendant Corp. Litigation, 264 F.3d 201, 282 (3d Cir. 2001).

[77] *Camden I Condominium Ass'n*, 946 F.2d at 774.

[78] *Camden I Condominium Ass'n*, 946 F.2d at 774 (alterations in original and internal quotation marks omitted).

Draft of July 7, 2010

court's order or counsel's motion for fees and expenses (which was 96% of the time). The awards ranged from 3% of the settlement to 47% of the settlement. The average award was 25.4% and the median was 25%. Most fee awards were between 25% and 35%, with almost no awards more than 35%. The Eisenberg-Miller study through 2008 found a slightly lower mean (24%) but the same median (25%) among its federal court settlements.[79]

**Figure 4: The distribution of 2006-2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar crosscheck**



Sources: Westlaw, PACER, district court clerks' offices.

It should be noted that in 218 of these 444 settlements (49%), district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded. In 204 of these settlements, the lodestar multiplier resulting from the fee award could be ascertained. The lodestar multiplier in these cases ranged from .07 to 10.3, with a mean of 1.65 and a median of 1.34. Although there is always the possibility that class counsel are optimistic with their time sheets when they submit them for lodestar consideration, these lodestar numbers—only one multiplier above 6.0, with the bulk of the range not much above 1.0—strike me as fairly parsimonious for the risk that goes into any piece of litigation

---

[79] *See* Eisenberg & Miller II, *supra* note 16, at 259.

Draft of July 7, 2010

and cast doubt on the notion that the percentage-of-the-settlement method results in windfalls to class counsel.[80]

Table 8 shows the mean and median fee percentages awarded in each litigation subject area. The fee percentages did not appear to vary greatly across litigation subject areas, with most mean and median awards between 25% and 30%. As I report later in this Part, however, after controlling for other variables, there were statistically significant differences in the fee percentages awarded in some subject areas compared to others. The mean and median percentages for securities cases were 24.7% and 25.0%, respectively; for all non-securities cases, the mean and median were 26.1% and 26.0%, respectively. The Eisenberg-Miller study through 2008 found mean awards ranging from 21-27% and medians from 19-25%,[81] a bit lower than the ranges in my 2006-2007 dataset, which again, may be because they oversampled larger settlements (as I show below, district courts awarded smaller fee percentages in larger cases).

---

[80] It should be emphasized, of course, that these 204 settlements may not be representative of the settlements where the percentage-of-the-settlement method was used without the lodestar crosscheck.

[81] *See* Eisenberg & Miller II, supra *note* 16, at 262.

Draft of July 7, 2010

**Table 8: Fee awards in 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Subject matter | Percentage of settlement awarded as fees | |
|---|---|---|
| | Mean | Median |
| Securities (n=233) | 24.7% | 25.0% |
| Labor and Employment (n=61) | 28.0% | 29.0% |
| Consumer (n=39) | 23.5% | 24.6% |
| Employee Benefits (n=37) | 26.0% | 28.0% |
| Civil Rights (n=20) | 29.0% | 30.3% |
| Debt Collection (n=5) | 24.2% | 25.0% |
| Antitrust (n=23) | 25.4% | 25.0% |
| Commercial (n=7) | 23.3% | 25.0% |
| Other (n=19) | 24.9% | 26.0% |
| **All (n=444)** | **25.7%** | **25.0%** |
| Sources: Westlaw, PACER, district court clerks' offices. | | |

In light of the fact that, as I noted above, the distribution of class action settlements among the geographic circuits does not track their civil litigation dockets generally, it is interesting to ask whether one reason for the pattern in class action cases is that circuits oversubscribed with class actions award higher fee percentages. Although this question will be taken up with more sophistication in the regression analysis below, it is worth describing here the mean and median fee percentages in each of the circuits. Those data are presented in Table 9. Contrary to the hypothesis set forth in Part III, two of the circuits most oversubscribed with class actions, the Second and the Ninth, were the only circuits in which the mean fee awards were *under* 25%. As I explain below, these differences are statistically significant and remain so after controlling for other variables.

Draft of July 7, 2010

**Table 9: Fee awards in 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Circuit | Percentage of settlement awarded as fees | |
|---|---|---|
| | Mean | Median |
| First (n=27) | 27.0% | 25.0% |
| Second (n=72) | 23.8% | 24.5% |
| Third (n=50) | 25.4% | 29.3% |
| Fourth (n=19) | 25.2% | 28.0% |
| Fifth (n=27) | 26.4% | 29.0% |
| Sixth (n=25) | 26.1% | 28.0% |
| Seventh (n=39) | 27.4% | 29.0% |
| Eighth (n=15) | 26.1% | 30.0% |
| Ninth (n=111) | 23.9% | 25.0% |
| Tenth (n=18) | 25.3% | 25.5% |
| Eleventh (n=35) | 28.1% | 30.0% |
| DC (n=6) | 26.9% | 26.0% |
| Sources: Westlaw, PACER, district court clerks' offices. | | |

The lodestar method likewise permits district courts to exercise a great deal of leeway through the application of the discretionary multiplier. Figure 5 shows the distribution of lodestar multipliers in the 71 settlements in which district courts used the lodestar method and the multiplier could be ascertained. The average multiplier was .98 and the median was .92, which suggests that courts were not terribly prone to exercise their discretion to deviate from the amount of money encompassed in the lodestar calculation. These 71 settlements were heavily concentrated within the consumer (median multiplier 1.13) and debt collection (.66) subject areas. If cases in which district courts used the percentage-of-the-settlement method with a lodestar cross check are combined with the lodestar cases, the average and median multipliers (in the 263 cases where the multipliers were ascertainable) were 1.45 and 1.19, respectively. Again—putting to one side the possibility that

Draft of July 7, 2010

class counsel are optimistic with their time sheets—these multipliers appear fairly modest in light of the risk involved in any piece of litigation.

**Figure 5: The distribution of lodestar multipliers in 2006-2007 federal class action fee awards using the lodestar method**



Sources: Westlaw, PACER, district court clerks' offices.

*D. Factors Influencing Percentage Awards*

Whether district courts are exercising their discretion over fee awards wisely is an important public policy question given the amount of money at stake in class action settlements. As shown above, district court judges awarded class action lawyers nearly \$5 billion in fees and expenses in 2006-2007. Based on the comparison to the tort system set forth in Part III, it is not difficult to surmise that, in the 350 or so settlements every year, district court judges are awarding a significant portion of all of the annual compensation received by contingency-fee lawyers in the United States. Contingency fees are arguably the engine that drives much of the non-criminal regulation in America; unlike many other nations, we regulate largely through the *ex post*, decentralized device of litigation.[82] To the extent district courts could have exercised their discretion to award billions more or

---

[82] *See, e.g.*, Samuel Issacharoff, *Regulating after the Fact*, 56 DEPAUL L. REV. 375, 377 (2007).

Draft of July 7, 2010

billions less to class action lawyers, district courts have been delegated a great deal of leeway over a big chunk of our regulatory horsepower. It is therefore worth examining how district courts exercise their discretion over fees. This examination is particularly important in cases where district courts use the percentage-of-the-settlement method to award fees: not only do such cases comprise the vast majority of settlements, but they comprise the vast majority of the money awarded as fees. As such, the analysis that follows will be confined to the 444 settlements where the district courts used the percentage-of-the-settlement method.

As I noted, prior empirical studies have shown that fee percentages are strongly and inversely related to the size of the settlement both in securities fraud and other cases. As shown in Figure 6, the 2006-2007 data are consistent with prior studies. Regression analysis, set forth in more detail below, confirms that, after controlling for other variables, fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all non-securities cases.

**Figure 6: Fee awards as a function of settlement size in 2006-2007 class action cases using the percentage-of-the-settlement method with or without lodestar crosscheck**



Sources: Westlaw, PACER, district court clerks' offices.

As noted above, courts often look to fee percentages in other cases as one factor they consider in deciding what percentage to award in a settlement at hand. In light of this practice, and, in light of the fact that the size of the

Draft of July 7, 2010

settlement has such a strong relationship to fee percentages, scholars have tried to help guide the practice by reporting the distribution of fee percentages across different settlement sizes.[83]   In Table 10, I follow the Eisenberg-Miller studies and attempt to contribute to this guidance by setting forth the mean and median fee percentages, as well as the standard deviation, for each decile of the 2006-2007 settlements in which courts used the percentage-of-the-settlement method to award fees.  The mean percentages ranged from over 28% in the first decile to less than 19% in the last decile.

**Table 10: Mean, median, and standard deviation of fee awards by settlement size in 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Settlement Size (in millions) | Mean | Median | Standard Deviation |
|---|---|---|---|
| [$0 to $0.75] (n = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (n=44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (n = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (n = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (n = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (n = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (n = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (n = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (n = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6600] (n = 45) | 18.4% | 19.0% | 7.9% |
| Sources: Westlaw, PACER, district court clerks' offices. | | | |

It should be noted that the last decile in Table 10 covers an especially wide range of settlements, those from $72.5 million to the Enron settlement of $6.6 billion.  In order to give more meaningful data to courts that must award fees in the largest settlements, Table 11 shows the last decile broken into additional cut points.  When both Tables 10 and 11 are examined together, it appears that fee percentages tended to drift lower at a fairly slow

---

[83] *See* Eisenberg & Miller II, *supra* note 16, at 265.

33

pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20%, and by the time $500 million was reached, they plunged well below 15%, with most awards at that level under even 10%.

**Table 11: Mean, median, and standard deviation of fee awards of the largest 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Settlement Size (in millions) | Mean | Median | Standard Deviation |
|---|---|---|---|
| ($72.5 to $100] (n = 12) | 23.7% | 24.3% | 5.3% |
| ($100 to $250] (n=14) | 17.9% | 16.9% | 5.2% |
| ($250 to $500] (n = 8) | 17.8% | 19.5% | 7.9% |
| ($500 to $1000] (n = 2) | 12.9% | 12.9% | 7.2% |
| ($1000 to $6600] (n = 9) | 13.7% | 9.5% | 11% |
| Sources: Westlaw, PACER, district court clerks' offices. | | | |

Prior empirical studies have not examined whether fee awards are associated with the political affiliation of the district court judges making the awards.   This is surprising because Realist theories of judicial behavior would predict that political affiliation would influence fee decisions.[84]   It is true that, as a general matter, political affiliation may influence district court judges to a lesser degree than it does appellate judges (who have been the focus of most of the prior empirical studies of Realist theories): district court judges decide more routine cases and are subject to greater oversight on appeal than appellate judges.  On the other hand, class action settlements are a bit different in these regards than many other decisions made by district court judges.   To begin with, class action settlements are almost never appealed, and when they are, the appeals are usually settled before the appellate court hears the case.[85]   Thus, district courts have much less reason to worry about the constraint of appellate review in fashioning fee awards. Moreover, one would think the potential for political affiliation to influence

---

[84] *See generally* C. K. ROWLAND & ROBERT A. CARP, POLITICS AND JUDGMENT IN FEDERAL DISTRICT COURTS (1996).  *See also* Max M. Schanzenbach & Emerson H. Tiller, *Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence, and Reform*, 75 U. Chi. L. Rev. 715, 724-25 (2008).

[85] *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1640, 1634-38 (2009) (finding that less than 10% of class action settlements approved by federal courts in 2006 were appealed by class members).

Draft of July 7, 2010

judicial decisionmaking is greatest when legal sources lead to indeterminate outcomes and when judicial decisions touch upon matters that are salient in national politics.  (The more salient a matter is, the more likely Presidents will select judges with views on the matter and the more likely those views will diverge between Republicans and Democrats.)  Fee award decisions would seem to satisfy both of these criteria.  The law of fee awards, as explained above, is highly discretionary, and fee award decisions are wrapped up in highly salient political issues such as tort reform and the relative power of plaintiffs' lawyers and corporations.  I would expect to find that judges appointed by Democratic presidents awarded higher fees in the 2006-2007 settlements than did judges appointed by Republican presidents.

The data, however, do not appear to bear this out.  Of the 444 fee awards using the percentage-of-the-settlement approach, 52% were approved by Republican appointees, 45% were approved by Democratic appointees, and 4% were approved by non-Article III judges (usually magistrate judges).  The mean fee percentage approved by Republican appointees (25.6%) was slightly *greater* than the mean approved by Democratic appointees (24.9%).  The medians (25%) were the same.

In order to examine whether the Realist hypothesis fared better after controlling for other variables, I performed regression analysis of the fee percentage data for the 427 settlements approved by Article III judges.  I used ordinary least squares regression with the dependent variable the percentage of the settlement that was awarded in fees.[86]  The independent variables were the natural log of the amount of the settlement, the natural log of the age of the case (in days), indicator variables for whether the class was certified as a settlement class, for litigation subject areas, and for circuits, as well as indicator variables for whether the judge was appointed by a Republican or Democratic President and for the judge's race and gender.[87]

The results for five regressions are in Table 12.  In the first regression (column 1), only the settlement amount, case age, and judge's political affiliation, gender, and race were included as independent variables.  In the second regression (column 2), all of the independent variables were included.

---

[86] Professors Eisenberg and Miller used a square root transformation of the fee percentages in some of their regressions. I ran all of the regressions using this transformation as well and it did not appreciably change the results.  I also ran the regressions using a natural log transformation of fee percentage and with the dependent variable natural log of the fee amount (as opposed to the fee percentage).  None of these models changed the results appreciably. The regressions were also run with and without the 2006 Enron settlement because it was such an outlier ($6.6 billion); the case did not change the regression results appreciably.  For every regression, the data and residuals were inspected to confirm the standard assumptions of linearity, homoscedasticity, and the normal distribution of errors.

[87] Prior studies of judicial behavior have found that the race and sex of the judge can be associated with their decisions.  *See, e.g.*, Adam B. Cox & Thomas J. Miles, *Judging the Voting Rights Act*, 108 COLUM. L. REV. 1 (2008) Donald R. Songer et al., *A Reappraisal of Diversification in the Federal Courts: Gender Effects in the Courts of Appeals*, 56 J. POL. 425 (1994).

Draft of July 7, 2010

In the third regression (column 3), only securities cases were analyzed, and, in the fourth regression (column 4), only non-securities cases were analyzed.

In none of these regressions was the political affiliation of the district court judge associated with fee percentage in a statistically significant manner.[88]  One possible explanation for the lack of evidence for the Realist hypothesis is that district court judges elevate other preferences above their political and ideological ones.  For example, district courts of both political stripes may succumb to docket-clearing pressures and largely rubber stamp whatever fee is requested by class counsel; after all, these requests are rarely challenged by defendants.  Moreover, if judges award class counsel whatever they request, class counsel will not appeal, and, given that, as noted above, class members rarely appeal settlements (and when they do, often settle them before the appeal is heard),[89] judges can thereby virtually guarantee there will be no appellate review of their settlement decisions.  Indeed, scholars have found that, in the vast majority of cases, the fees ultimately awarded by federal judges are little different than those sought by class counsel.[90]

Another explanation for the lack of evidence for the Realist hypothesis is that my dataset includes both unpublished as well as published decisions.  It is thought that Realist theories of judicial behavior lose force in unpublished judicial decisions.  This is the case because the kinds of questions for which Realist theories would predict that judges have the most room to let their ideologies run are questions for which the law is ambiguous; it is thought that these kinds of questions are more often answered in published opinions.[91]  Indeed, most of the studies finding an association between ideological beliefs and case outcomes were based on datasets that included only published opinions.[92]  On the other hand, there are a small but growing number of studies that have examined unpublished opinions as well, and some of these studies have shown that ideological effects persisted.[93]  Nonetheless, in light

---

[88] Although these coefficients are not reported in Table 8, the gender of the district court judge was never statistically significant.  The race of the judge was only occasionally significant.

[89] *See* Fitzpatrick, *supra* note 85, at 1640.

[90] *See* Eisenberg & Miller II, *supra* note 16, at 270 (finding that state and federal judges awarded the fees requested by class counsel in 72.5% of settlements); Eisenberg, Miller & Perino, *supra* note 9, at 22 ("[J]udges take a light touch when it comes to reviewing fee requests.").

[91] *See, e.g.*, Ahmed E. Taha, *Data and Selection Bias: A Case Study*, 75 UMKC L. REV. 171, 179 (2006).

[92] *See id.* at 178-79.

[93] *See, e.g.*, David S. Law, *Strategic Judicial Lawmaking: Ideology, Publication, and Asylum Law in the Ninth Circuit*, 73 U. CIN. L. REV. 817, 843 (2005); Deborah Jones Merritt & James J. Brudney, *Stalking Secret Law: What Predicts Publication in the United States Courts of Appeals*, 54 VAND. L. REV. 71, 109 (2001); Donald R. Songer, *Criteria for Publication of Opinions in the U.S. Courts of Appeals: Formal Rules Versus Empirical Reality*, 73 JUDICATURE 307, 312 (1990).  At the trial court level, however, the studies of civil cases have

Draft of July 7, 2010

of the discretion that judges exercise with respect to fee-award decisions, it hard to characterize *any* decision in this area as "unambiguous."  Thus, even when unpublished, I would have expected the fee award decisions to exhibit an association with ideological beliefs.  Thus, I am more persuaded by the explanation suggesting that judges are more concerned with clearing their dockets or insulating their decisions from appeal in these cases than with furthering their ideological beliefs.

In all of the regressions, the size of the settlement was strongly and inversely associated with fee percentages.  Whether the case was certified as a settlement class was not associated with fee percentages in any of the regressions.  The age of the case at settlement was associated with fee percentages in the first two regressions, and when the settlement class variable was removed in regressions three and four, the age variable became positively associated with fee percentages in non-securities cases but remained insignificant in securities cases.  Professors Eisenberg and Miller likewise found that the age of the case at settlement was positively associated with fee percentages in their 1993-2002 dataset,[94] and that settlement classes were not associated with fee percentages in their 2003-2008 dataset.[95]

Although the structure of these regressions did not permit extensive comparisons of fee awards across different litigation subject areas, fee percentages appeared to vary somewhat depending on the type of case that settled.  Securities cases were used as the baseline litigation subject area in the second and fifth regressions, permitting a comparison of fee awards in each non-securities area with the awards in securities cases.  These regressions show that awards in a few areas, including labor/employment and antitrust, were more lucrative than those in securities cases.  In the fourth regression, which included only non-securities cases, labor and employment cases were used as the baseline litigation subject area, permitting comparison between fee percentages in that area and the other non-securities areas.  This regression shows that fee percentages in several areas, including consumer and employee benefits cases, were lower than the percentages in labor and employment cases.

In the fifth regression (column 5), I attempted to discern whether the circuits identified in Part III as those with the most overrepresented (the First,

---

found no ideological effects.  *See* Laura Beth Nielsen, Robert L. Nelson, & Ryon Lancaster, *Individual Justice or Collective Legal Mobilization? Employment Discrimination Litigation in the Post Civil Rights United States*, 7 J. EMPIRICAL L. STUD. 175, 192-93 (2010); Denise M. Keele et al., *An Analysis of Ideological Effects in Published versus Unpublished Judicial Opinions*, 6 J. EMPIRICAL L. STUDIES 213, 230 (2009); Orley Ashenfelter, Theodore Eisenberg, & Stewart J. Schwab, *Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes*, 24 J. LEGAL STUD. 257, 276-77 (1995).  With respect to criminal cases, there is at least one study at the trial court level that has found ideological effects.  *See* Schanzenbach & Tiller, *supra* note 84, at 734.

[94] *See* Eisenberg & Miller, *supra* note 15, at 61.

[95] *See* Eisenberg & Miller II, *supra* note 16, at 266.

Draft of July 7, 2010

Second, Seventh, and Ninth) and underrepresented (the Fifth and Eighth) class action dockets awarded attorneys' fees differently than the other circuits. That is, perhaps district court judges in the First, Second, Seventh, and Ninth Circuits award greater percentages of class action settlements as fees than do the other circuits, whereas district court judges in the Fifth and Eighth Circuits award smaller percentages. In order to test this hypothesis, in the fifth regression, I included indicator variables only for the six circuits with unusual dockets to measure their fee awards against the other six circuits combined. The regression showed statistically significant association with fee percentages for only two of the six unusual circuits: the Second and Ninth Circuits. In both cases, however, the direction of the association (i.e., the Second and Ninth Circuits awarded *smaller* fees than the baseline circuits) was opposite the hypothesized direction.[96]

The lack of the expected association with the unusual circuits might be explained by the fact that class action lawyers forum shop along dimensions other than their potential fee awards; they might, for example, put more emphasis on favorable class-certification law because there can be no fee award if the class is not certified. As noted above, it might also be the case that class action lawyers are unable to engage in forum shopping at all because defendants are able to transfer venue to the district in which they are headquartered or another district with a significant connection to the litigation.

It is unclear why the Second and Ninth Circuits were associated with lower fee awards despite their heavy class action dockets. Indeed, it should be noted that the Ninth Circuit was the baseline circuit in the second, third, and fourth regressions and, in all of these regressions, district courts in the Ninth Circuit awarded smaller fees than courts in many of the other circuits. The lower fees in the Ninth Circuit may be attributable to the fact that it has adopted a presumption that the proper fee to be awarded in a class action settlement is 25% of the settlement.[97] This presumption may make it more difficult for district court judges to award larger fee percentages. The lower awards in the Second Circuit are more difficult to explain, but it should be noted that the difference between the Second Circuit and the baseline circuits went away when the fifth regression was re-run with only non-securities

---

[96] This relationship persisted when the regressions were re-run among the securities and non-securities cases separately. I do not report these results, but, even though the First, Second, and Ninth Circuits were oversubscribed with securities class action settlements and the Fifth, Sixth, and Eighth were undersubscribed, there was no association between fee percentages and any of these unusual circuits except, again, the inverse association with the Second and Ninth Circuits. In non-securities cases, even though the Seventh and Ninth Circuits were oversubscribed and the Fifth and the Eighth undersubscribed, there was no association between fee percentages and any of these unusual circuits except again for the inverse association with the Ninth Circuit.

[97] *See* note 75 *supra*. It should be noted that none of the results from the previous regressions were affected when the Ninth Circuit settlements were excluded from the data.

Draft of July 7, 2010

cases.[98]   This suggests that the awards in the Second Circuit may be lower *only* in securities cases.   In any event, it should be noted that the lower fee awards from the Second and Ninth Circuits contrast with the findings in the Eisenberg-Miller studies which found no inter-circuit differences in fee awards in common-fund cases in their data through 2008.[99]

---

[98] The Ninth Circuit's differences persisted.

[99] *See* Eisenberg & Miller II, supra *note* 16, at 260.

Draft of July 7, 2010

**Table 12: Regression of fee percentages in 2006-2007 settlements using percentage-of-the-settlement method with or without lodestar crosscheck**

| Independent variable | Regression coefficients (and robust t-statistics) | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| **Settlement amount** (natural log) | -1.77 (-5.43)** | -1.76 (-8.52)** | -1.76 (-7.16)** | -1.41 (-4.00)** | -1.78 (-8.67)** |
| **Age of case** (natural log days) | 1.66 (2.31)** | 1.99 (2.71)** | 1.13 (1.21) | 1.72 (1.47) | 2.00 (2.69)** |
| **Judge's political affiliation** (1 = Democrat) | -0.630 (-0.83) | -0.345 (-0.49) | 0.657 (0.76) | -1.43 (-1.20) | -0.232 (-0.34) |
| **Settlement class** | | .150 (0.19) | .873 (0.84) | -1.62 (-1.00) | .124 (0.15) |
| **1st Circuit** | | 3.30 (2.74)** | 4.41 (3.32)** | 0.031 (0.01) | 0.579 (0.51) |
| **2d Circuit** | | 0.513 (0.44) | -0.813 (-0.61) | 2.93 (1.14) | -2.23 (-1.98)** |
| **3d Circuit** | | 2.25 (1.99)** | 4.00 (3.85)** | -1.11 (-0.50) | -- |
| **4th Circuit** | | 2.34 (1.22) | 0.544 (0.19) | 3.81 (1.35) | -- |
| **5th Circuit** | | 2.98 (1.90)* | 1.09 (0.65) | 6.11 (1.97)** | 0.230 (0.15) |
| **6th Circuit** | | 2.91 (2.28)** | 0.838 (0.57) | 4.41 (2.15)** | -- |
| **7th Circuit** | | 2.55 (2.23)** | 3.22 (2.36)** | 2.90 (1.46) | -0.227 (-0.20) |
| **8th Circuit** | | 2.12 (0.97) | -0.759 (-0.24) | 3.73 (1.19) | -0.586 (-0.28) |
| **9th Circuit** | | -- | -- | -- | -2.73 (-3.44)** |
| **10th Circuit** | | 1.45 (0.94) | -0.254 (-0.13) | 3.16 (1.29) | -- |
| **11th Circuit** | | 4.05 (3.44)** | 3.85 (3.07)** | 4.14 (1.88)* | -- |
| **DC Circuit** | | 2.76 (1.10) | 2.60 (0.80) | 2.41 (0.64) | -- |
| **Securities case** | | -- | | | -- |
| **Labor and employment case** | | 2.93 (3.00)** | | -- | 2.85 (2.94)** |
| **Consumer case** | | -1.65 (-0.88) | | -4.39 (-2.20)** | -1.62 (-0.88) |
| **Employee benefits case** | | -0.306 (-0.23) | | -4.23 (-2.55)** | -0.325 (-0.26) |
| **Civil rights case** | | 1.85 (0.99) | | -2.05 (-0.97) | 1.76 (0.95) |
| **Debt collection case** | | -4.93 (-1.71)* | | -7.93 (-2.49)** | -5.04 (-1.75)* |
| **Antitrust case** | | 3.06 (2.11)** | | 0.937 (0.47) | 2.78 (1.98)** |
| **Commercial case** | | -0.028 (-0.01) | | -2.65 (-0.73) | 0.178 (0.05) |
| **Other case** | | -0.340 (-0.17) | | -3.73 (-1.65) | -0.221 (-0.11) |
| **Constant** | 42.1 (7.29)** | 37.2 (6.08)** | 43.0 (6.72)** | 38.2 (4.14)** | 40.1 (7.62)** |
| **N** | 427 | 427 | 232 | 195 | 427 |
| **R²** | .20 | .26 | .37 | .26 | .26 |
| **Root MSE** | 6.59 | 6.50 | 5.63 | 7.24 | 6.48 |

Note: ** significant at the 5% level; * significant at the 10% level. Standard errors in column 1 were clustered by circuit. Indicator variables for race and gender were included in each regression but not

Draft of July 7, 2010

reported.
Sources: Westlaw, PACER, district court clerks' offices, Federal Judicial Center.

### V.      Conclusion

This article has attempted to fill some of the gaps in our knowledge about class action litigation by reporting the results of an empirical study that attempted to collect all class action settlements approved by federal judges in 2006 and 2007.  District court judges approved 688 class action settlements over this two-year period, involving more than $33 billion.  Of this $33 billion, nearly $5 billion was awarded to class action lawyers, or about 15% of the total.   District courts typically awarded fees using the highly discretionary percentage-of-the-settlement method, and fee awards varied over a wide range under this method, with a mean and median around 25%. Fee awards using this method were strongly and inversely associated with the size of the settlement.  Fee percentages were positively associated with the age of the case at settlement.  Fee percentages were not associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.  Finally, there appeared to be some variation in fee percentages depending on subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all of the other litigation areas, and district courts in the Ninth Circuit and in the Second Circuit (in securities cases) awarded lower fee percentages than district courts in several other circuits.  The lower awards in the Ninth Circuit may be attributable to the fact that it is the only circuit that has adopted a presumptive fee percentage of 25%.