# EXHIBIT 14

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3

4        --------------------------------

5        PATRICIA CONNOR and SHERI L.      )

6        BYWATER, Individually and on       )

7        Behalf of All Others Similarly     )

8        Situated,                          )

9                  Plaintiffs,              ) Case No.

10             vs.                          ) 10-CV-01284

11       JPMORGAN CHASE BANK and FEDERAL    ) DMS(BGS)

12       NATIONAL MORTGAGE ASSOCIATION      )

13       A/K/A FANNIE MAE,                  )

14                  Defendants.             )

15       --------------------------------

16            DEPOSITION OF STEPHEN ALEXANDER KRON

17                 Laguna Hills, California

18                 Monday, October 27, 2014

19                      Volume I

20

21       Reported by:

22       Gail E. Kennamer, CSR 4583, CCRR

23       JOB No. 1956057

24

25       PAGES 1 - 110

                                              Page 1

```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4    --------------------------------

 5    PATRICIA CONNOR and SHERI L.     )

 6    BYWATER, Individually and on     )

 7    Behalf of All Others Similarly   )

 8    Situated,                        )

 9            Plaintiffs,              )  Case No.

10         vs.                         )  10-CV-01284

11    JPMORGAN CHASE BANK and FEDERAL  )  DMS(BGS)

12    NATIONAL MORTGAGE ASSOCIATION    )

13    A/K/A FANNIE MAE,                )

14            Defendants.              )

15    --------------------------------

16

17

18         Deposition of STEPHEN ALEXANDER KRON, Volume I,

19    taken on behalf of Plaintiffs at 23421 South Pointe Drive,

20    Suite 280, Laguna Hills, California, beginning at

21    9:46 a.m., and ending at 12:07 p.m., Monday, October 27,

22    2014, before Gail E. Kennamer, CSR 4583, CCRR.

23

24

25
                                              Page  2
```

1    APPEARANCES:

2

3    For Plaintiffs:

4

5         KAZEROUNI LAW GROUP, APC

6         BY: ABBAS KAZEROUNIAN, ESQ.

7         245 Fischer Avenue, Suite D1

8         Costa Mesa, California 92626

9         800.400.6808

10        ak@kazlg.com

11

12

13   For Defendants:

14

15        STROOCK & STROOCK & LAVAN LLP

16        BY: JULIETA STEPANYAN, ESQ.

17        2029 Century Park  East

18        Los Angeles, California 90067-3086

19        310.556.5800

20        jstepanyan@stroock.com

21

22

23

24

25

                                              Page  3

```
 1    APPEARANCES (Continued):

 2

 3    For Objector:

 4

 5         KRON & CARD LLP

 6         BY: SCOTT A. KRON, ESQ.

 7         23421 South Pointe Drive, Suite 280

 8         Laguna Hills, California 92653-1556

 9         949.367.0520

10         scott@kronandcard.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                           INDEX

 2

 3   WITNESS                                 EXAMINATION

 4   STEPHEN ALEXANDER KRON

 5   Volume I

 6        BY MR. KAZEROUNIAN                          7

 7        BY MS. STEPANYAN                          104

 8

 9

10   Questions the witness refuses or instructed not to answer

11   are located on the following pages:

12            PAGE                    LINE

13             54                      1

14             54                      7

15             61                      2

16

17

18   INFORMATION TO BE SUPPLIED:                   31

19

20

21

22

23

24

25

                                              Page 5
```

```
 1                        EXHIBITS

 2   NUMBER                                          PAGE

 3

 4   Exhibit 1      Plaintiff's Amended Notice        22

 5                  of Taking Deposition of

 6                  Objector Stephen A. Kron

 7

 8   Exhibit 2      Photocopy of Card received        40

 9                  by Stephen and Cheryl Kron

10

11   Exhibit 3      Objections to Proposed            52

12                  Class Action Settlement

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          Laguna Hills, California; Monday, October 27, 2014

 2                          9:46 a.m.

 3

 4

 5                  STEPHEN ALEXANDER KRON,

 6    a witness herein, having been administered an oath, was

 7    examined, and testified as follows:

 8

 9                       -EXAMINATION-

10

11     BY MR. KAZEROUNIAN:

12          Q.   Good morning, Mr. Kron.  My name is Abbas

13    Kazerounian, and I am the attorney for the plaintiffs in

14    the putative class action of Connor versus Chase.

15          To my right is an attorney representing Chase.

16          So thank you for being here today.  I'm just going to

17    go over some ground rules first.

18          But before I do, can you please give me your full

19    name for the record and spell it, please.

20          A.   Stephen, S-t-e-p-h-e-n.  Alexander,

21    A-l-e-x-a-n-d-e-r.  Kron, K-r-o-n.

22          Q.   Thank you, Mr. Kron.

23          Have you ever had your deposition taken before?

24          A.   Yes.

25          Q.   How many times?
```

Page 7

```
 1        Q.   Have you ever changed provider?

 2        A.   Yes.

 3        Q.   How many times?

 4        A.   I don't remember.  I don't know for sure.  I

 5   would be guessing.

 6        Q.   More than two?

 7        A.   Yeah, I would say more than two.

 8        Q.   More than five?

 9        A.   I don't think more than five.

10        Q.   Okay.  Who is your current cell phone provider?

11        A.   AT&T.

12        Q.   And how long have you been with AT&T?

13        A.   Probably three -- probably three years, maybe

14   four.

15        Q.   And who was your provider before that?

16        A.   Sprint.

17        Q.   And how long were you with Sprint?

18        A.   I'd be guessing.

19        Q.   More than five years?

20        A.   No.  I don't think so.

21        Q.   More than two years?

22        A.   I think so.

23        Q.   More than three years?

24        A.   I'd be guessing.  I really don't remember.

25        Q.   Between two and five years?
```

1          A.   I'd be guessing.  If I answered that, I'd be

2     guessing.

3          Q.   You know, you said that you looked at that card

4     in preparation for today's deposition?

5          A.   Yes.

6          Q.   I think that is your claim -- The notice that

7     you got with the claim form on the back; right?

8          A.   Yes.

9          Q.   Do you remember your claim ID number?

10         A.   No.

11         Q.   Do you have the card with you today?

12         A.   It's, I believe, in the office here somewhere.

13         Q.   Okay.  The original one that you received?

14         A.   Correct.

15              MR. KAZEROUNIAN:  Can we go off the record?

16              THE REPORTER:  Is that okay?

17              MR. KRON:  That's fine.

18        (A discussion is held off the record.)

19              MR. KAZEROUNIAN:  Back on the record.

20              THE REPORTER:  Back on the record.

21              MR. KAZEROUNIAN:  So before we get to your claim

22     number, let me just -- Let's make this Exhibit 1, please.

23         Q.   Have you seen that document before, sir?

24         A.   (Indicating.)

25         Yes.

                                          Page 21

```
 1        Q.   That was your Deposition Notice; correct?

 2        A.   Yes.

 3        Q.   And that's why you are here today?

 4        A.   Actually, I received your Subpoena before this.

 5        Q.   Right.  I guess there is two reasons why you are

 6   here today.  So I just want to put that in as Exhibit 1.

 7   There is nothing I really want to ask you about that.

 8        But can we mark that for the court reporter.

 9        (Deposition Exhibit 1 was marked for identification

10   by the court reporter.)

11     BY MR. KAZEROUNIAN:

12        Q.   I'm going to show you what we're going to mark

13   as Exhibit 2.

14        Can you tell me what that is?

15        A.   (Indicating.)

16        It appears to be a copy of the card, front and back

17   of the card, that I received.

18        Q.   Okay.  Now, can you -- Is there a claim number

19   on there?

20        A.   (Indicating.)

21        It would --

22        Q.   Probably called a Claim ID.

23        A.   There is a number next to my name.

24        Q.   Does it begin with 59?

25        A.   Yes.
```

Page 22

```
 1          Q.    Okay.  So do you want to tell me, read that into

 2    the record?

 3          A.    5988124-0.

 4          Q.    Okay.  Have you made a claim based upon this

 5    notice?

 6          A.    Yes.

 7          Q.    You have made a claim?

 8          A.    Yes.

 9          Q.    When did you do that?

10          A.    I don't know the exact date.

11          Q.    Can you give me an approximation, please?

12          A.    You know, I don't even remember when it was.  I

13    think maybe a couple weeks ago.

14          Q.    Couple weeks ago?

15          A.    I think so.

16          Q.    So it was done in October?

17          A.    I don't -- I'd be guessing if I told you exactly

18    when it was.

19          Q.    Was it more than a month ago?

20          A.    I don't think so.

21          Q.    Okay.  And how did you make a claim?

22          A.    My attorney filed a claim.

23          Q.    Do you know how he did it, whether he did it

24    over the internet or whether he made a phone call?

25          A.    I don't.
```

Page 23

1      Q.   Were you told after it was done that the claim

2   was being made or you just made the request, and it was

3   presumed that it was done?

4      A.   The latter.   Correct.

5      Q.   Okay.   Just to clarify, you said, "The latter.

6   Correct"?

7      A.   I did.

8      Q.   Why did you make the claim?

9      A.   I thought the claim was insufficient.   I thought

10  it was -- I didn't understand why there were so few people

11  that had filed the claim.

12     Q.   I think you need to understand what a claim is.

13  A claim is you are saying you want to be a part of the

14  Class.   I think what you are describing is perhaps an

15  objection.

16     A.   Correct.   I wanted to be part of the Class.

17     Q.   You want to be part of the Class?

18     A.   Yeah.

19     Q.   So you didn't want to object?

20     A.   I did want to object.

21     Q.   You did both, you made a claim and made an

22  objection?

23     A.   Yes.

24     Q.   That's what you did?

25     A.   That's a legal term.   I don't know.

Page 24

1        Q.   Do you know the name of the underlying case in

2    this matter?

3             MR. KRON:  Objection.  The record speaks for

4    itself.

5             THE WITNESS:  What do you mean by -- Repeat your

6    question.

7      BY MR. KAZEROUNIAN:

8        Q.   What's the name of this case?

9        A.   The name of this case is on the card here.  It

10   says, Connor, et al. versus JPMorgan Chase, et al.

11       Q.   Okay.  So that's the name of it.

12            When did you first become aware of this lawsuit?  Was

13   it when you first got the claim, the claim form?

14       A.   Correct.

15       Q.   So you never heard of this case ever before?

16       A.   Correct.

17       Q.   When did you receive that card?

18       A.   I don't recall.

19       Q.   Approximately?

20       A.   I don't remember.

21       Q.   Okay.  Now, to the best of your understanding,

22   what is Connor versus Chase about, the lawsuit?

23            MR. KRON:  Objection.  Calls for a legal

24   conclusion from a lay witness.

25            THE WITNESS:  I understand that JPMorgan, Chase,

                                              Page 25

1    et al. violated some laws regarding phone -- phone calls,

2    automated phone calls.

3        BY MR. KAZEROUNIAN:

4        Q.    Violated some laws as it pertains to automated

5    phone calls?

6        A.    Yes.

7        Q.    Okay.  Do you know anything more than that?

8        A.    Not really.

9        Q.    Do you know the damages available to the Class

10   if they pursue their own cases?

11            MR. KRON:  Objection.  Calls for a legal

12   conclusion from a lay witness.

13            THE WITNESS:  No.

14       BY MR. KAZEROUNIAN:

15       Q.    You don't.  Okay.

16       Can I look at the front sheet.

17       Do you know the first name of the plaintiff, Connor?

18       A.    Do I know --

19       Q.    Yes.

20       A.    -- the first name?

21       Q.    Yeah.

22       A.    Yes, I think I do.  It was on some of the other

23   documents that you sent.  Her name was Patricia.

24       Q.    Correct.  Okay.

25       Have you reviewed the Complaint in this case?

                                            Page 26

```
 1        A.   I have skimmed through it.

 2        Q.   So you have reviewed the Complaint?

 3        A.   As the best as I can.  I'm not an attorney,

 4   so...

 5        Q.   I understand.

 6        A.   Sure.

 7        Q.   So you have reviewed the Complaint?

 8        A.   Yeah.  Yes.

 9        Q.   Approximately how many pages is it?

10        A.   I don't remember.  I believe it's multiple

11   pages.

12        Q.   More than five?

13        A.   I don't remember.

14        Q.   You don't remember?

15        A.   No, I don't remember.

16        Q.   You don't remember if it was more than three

17   pages?

18        A.   I think I answered that.

19        Q.   No, you haven't.

20        A.   I don't remember.

21        Q.   You said you didn't remember if it was more than

22   five pages.  I asked you a different question.

23        I said, "Was it more than three pages?"

24        A.   I don't remember.

25        Q.   Okay.  When did you review the Complaint?
```

Page 27

```
 1        A.   I think this weekend, Sunday.

 2        Q.   Sunday.

 3        And you don't remember approximately how long it was?

 4        A.   No.

 5        Q.   Okay.  Have you reviewed any of the -- any of

 6   the discovery in that case?

 7             MR. KRON:  Objection.  Vague and ambiguous.

 8   What do you mean by "Discovery"?

 9     BY MR. KAZEROUNIAN:

10        Q.   Written discovery.

11             MR. KRON:  Objection.  Calls for a legal

12   conclusion by a lay witness.

13        The written discovery is not available to Class

14   Members to review, and he's not a party to this case, so

15   he has not received any discovery.

16     BY MR. KAZEROUNIAN:

17        Q.   It's a "Yes" or "No" question.

18        A.   No.

19        Q.   Okay.  Have you reviewed any deposition

20   transcripts as it relates to this case?

21             MR. KRON:  Same objections.

22             THE WITNESS:  No.

23     BY MR. KAZEROUNIAN:

24        Q.   Okay.  What about any of the confirmatory

25   written discovery?
```

```
 1                 MR. KRON:   Same objections again.

 2                 THE WITNESS:   No.

 3        BY MR. KAZEROUNIAN:

 4           Q.    What about the confirmatory deposition

 5     transcript?

 6                 MR. KRON:   Same objections.

 7                 THE WITNESS:   No.

 8        BY MR. KAZEROUNIAN:

 9           Q.    Have you ever requested it from Class counsel

10     any of the discovery?

11           A.    No.

12           Q.    What is your occupation?

13           A.    Business owner.

14           Q.    What kind of business do you own?

15           A.    Construction.

16           Q.    How many businesses do you own?

17           A.    One.

18           Q.    What is the name of your business?

19           A.    West Coast Commercial Contractors, Inc.

20           Q.    That's the one you set up in 2008?

21           A.    Correct.

22           Q.    Do you have any numbers that are related to West

23     Coast apart from the cell phone that you gave me already?

24                 MR. KRON:   Objection.   Vague and ambiguous as to

25     the definition of numbers.
```

Page 29

```
1       BY MR. KAZEROUNIAN:

2            Q.    Telephone numbers.

3            A.    For me personally?

4            Q.    That's not what I asked.

5            I said what telephone numbers do you have that are

6       associated with West Coast aside from the cell phone

7       number that you already said is under that name?

8            A.    I have probably eight phone numbers.

9            Q.    Eight phone numbers?

10           A.    Seven or eight.

11           Q.    Any of them cellphones?

12           A.    They are all -- No.

13           I have -- I think I have five cellphones and two

14      landlines.

15           Q.    Can you give me the two landlines first, please?

16           A.    (949)495-7444.

17           Fax number, (949)495-7484.

18           Q.    Do you know the five cells?

19           A.    You know, I don't.

20           Q.    If I leave a blank in the deposition transcript,

21      can you fill them in, please?

22           A.    If I get the transcript before I leave.

23           Q.    I'll try to make sure of that.

24           Do you have them on your cell phone by any chance?

25           A.    Don't know if I have them all.
```

Page 30

```
 1          You want the ones I do have?

 2      Q.   Please.

 3      A.   Okay.  Cheryl's, my wife, is (949)283-2213.

 4      Another one is where -- Did it go?

 5      (Indicating.)

 6          MR. KRON:  You don't have to announce who the

 7  name is though.

 8          THE WITNESS:  Okay.

 9      (909)208-3347.

10      (949)391-5850.

11      And then, of course, mine, (949)283-2214.

12      Q.   Okay.

13      A.   The other two I don't have in my phone.

14      Q.   Okay.  Well, I appreciate you getting those.

15      Now, so I'll leave a blank, with the help of the

16  court reporter, in the deposition transcript for those two

17  if you would fill them in when you get the transcript.

18  Okay?

19      A.   Okay.

20  (INFORMATION TO BE SUPPLIED:_____

21  _____

22  _____.)

23    BY MR. KRON:

24      Q.   Thank you.

25      How many residences do you own?
```

                                                    Page 31

```
 1              MR. KRON:  Objection.  Vague and ambiguous.
 2     Timeframe, are we talking about right this second?
 3        BY MR. KAZEROUNIAN:
 4          Q.   Right now.
 5          A.   One.
 6          Q.   Sorry?
 7          A.   One.
 8          Q.   Now.
 9          A.   How --
10          Q.   How many residences do you own now?
11              MS. STEPANYAN:  He said, "One."
12              THE WITNESS:  I said, "One."
13        BY MR. KAZEROUNIAN:
14          Q.   Oh, one.  I thought you said, "When."
15          A.   I'm sorry.
16          Q.   Who is the mortgage with, if you have one?
17          A.   Wells Fargo.
18          Q.   Have you ever had a mortgage with Chase?
19          A.   I don't remember.  I don't recall.
20          Q.   Now, the one residence that you are talking to
21     me about that you own at this time, is the 5 Marquesa,
22     Dana Point address?
23          A.   Correct.
24          Q.   How long have you lived there?
25          A.   Since 2001, April.
```

Page 32

```
 1        Q.   Did you get a mortgage with Wells Fargo for that

 2   address in 2001?

 3        A.   Yes.

 4        Q.   Has that ever changed?

 5        A.   No.

 6        Q.   Where did you live before that?

 7        A.   In Laguna Niguel.

 8        Q.   Do you know the address?

 9        A.   28112 Bedford, B-e-d-f-o-r-d, Drive, Laguna

10   Niguel 92677.

11        Q.   And who was the mortgage there with?

12        A.   I don't remember.

13        Q.   Do you know if it was Chase?

14        A.   I don't remember.

15        Q.   Since -- What period did you live at the Bedford

16   Drive address?

17        A.   1984 to 2001.

18        Q.   Between 1984 and the present day, have you ever

19   fallen behind on your mortgage?

20        A.   That's kind of vague.

21        Q.   Not really.

22             MR. KRON:   Which property?

23             MR. KAZEROUNIAN:   Any property.

24             THE WITNESS:   Yes.

25      BY MR. KAZEROUNIAN:
```

Veritext National Deposition & Litigation Services
866 299-5127

1          Q.    Which one?

2          A.    I think maybe both, but I'm not 100 percent

3    sure.

4          Q.    How long did you fall behind in the current

5    address?

6          A.    Current address?

7          The current address I fell behind several months.

8    How many months, I'm not 100 percent sure, but it might

9    have been three months.

10         Q.    And during what period?

11         A.    I'd be guessing.

12         Q.    Approximately.

13         A.    Probably three years ago, three or four years

14   ago.

15         Q.    So approximately three years ago on the current

16   address, you fell behind for approximately three months?

17         A.    That's my best estimate.

18         Q.    Okay.  That's fair enough.  I don't expect you

19   to have an exact memory of that.

20         And that was with Wells Fargo; correct?

21         A.    Correct.

22         Q.    What about the Bed- -- Was that -- Strike that.

23         Was that the only time you fell behind on the current

24   address?

25         A.    Yes.

                                            Page 34

1      Q.   Okay.  So going to the Bedford Drive address,

2   when did you fall behind on that?

3      A.   I have no clue on that one.  I couldn't even

4   venture to guess.  I think I'm guessing when I tell you

5   that I may have.

6      Q.   You may not have?

7      A.   I may not have.  I just don't remember.

8      Q.   Okay.  So going to the three months period that

9   you fell behind on your current address, did you get

10  telephone calls from Wells Fargo on that?

11     A.   I probably did, yes.

12     Q.   Do you know if you received a notice, if you

13  remember, of a class action called Malta versus Wells

14  Fargo?

15     A.   That doesn't sound familiar.

16          MR. KRON:  What was the name of that?

17          MR. KAZEROUNIAN:  Malta versus Wells Fargo.

18          MR. KRON:  M-a-l-t-a?

19          MR. KAZEROUNIAN:  Yeah.

20     Q.   Did you make a claim as -- to be part of a class

21  in Malta versus Wells Fargo?

22     A.   I don't know.  I don't recognize that name, so I

23  would say probably not.

24     Q.   Have you ever been part of -- Have you ever made

25  a claim to be part of a class action before?

Page 35

```
 1        A.   Not until this one.

 2        Q.   This is the first time ever?

 3        A.   Yes.

 4        Q.   So you've never been part of a TCPA class action

 5   as a class member before?

 6        A.   Prior to this?

 7        Q.   Yes.

 8        A.   Correct.

 9        Q.   Do you know what the TCPA stands for?

10        A.   No.

11             MR. KRON:  Are you sure you are not referring to

12   Mount, M-o-u-n-t, versus Wells Fargo?

13             MR. KAZEROUNIAN:  That is my case too, and I

14   wasn't referring to Mount.

15             MR. KRON:  Okay.

16             MR. KAZEROUNIAN:  Yeah.  That's a call recording

17   case, not a TCPA case.

18             MR. KRON:  Okay.

19     BY MR. KAZEROUNIAN:

20        Q.   Do you own any commercial properties?

21        A.   No.

22        Q.   Does your company own any real estate?

23        A.   No.

24        Q.   Do you own any real estate, apart from the real

25   estate that we've already talked about, at the current
```

Page 36

```
 1    time?

 2         A.   No.

 3         Q.   Apart from residential addresses, or -- Strike

 4    that.

 5         Apart from residential properties, have you owned any

 6    other property apart from your homes that you have lived

 7    in?

 8         A.   Yes.

 9         Q.   Which one?

10         A.   I own two.

11         Q.   Currently?

12         A.   No.

13         Q.   Previously?

14         A.   Correct.

15         Q.   Can you tell me when you owned them?

16         A.   Approximately 2005 to '08, '09 maybe.

17         Q.   You owned both at the same time?

18         A.   Correct.

19         Q.   What were they?

20         A.   One was a four-bedroom home, single-family home

21    in Lake Forest.

22         And one was a two-bedroom condominium in Dana Point.

23         Q.   Were they rental properties?

24         A.   Correct.

25         Q.   Who owned them?
```

Page 37

1        A.    I owned them.

2        Q.    Personally?

3        A.    Well, my wife and I owned them.

4        Q.    Okay.  So individually the both of you owned

5    them?

6        A.    Correct.

7        Q.    So let's go with the Lake Forest one first.

8    What was the address?

9        A.    I don't remember.

10        Q.    Do you remember the Dana Point address?

11        A.    Yes.  That one, 16H Corniche.

12        Q.    Can you spell that, please?

13        A.    C-o-r-n-i-c-h-e, Corniche, I don't know whether

14    it was Drive or whatever, and that's Dana Point 92629.

15        I can give you the street address.  I just don't know

16    the name -- I can give you the name of the street of the

17    other property, but I don't know the number.

18        Q.    No problem.  Yeah.

19        A.    Shawnee, S-h-a-w-n-e-e, Drive, and that's in

20    Lake Forest.

21        Q.    Okay.  Did you have mortgages on these homes?

22        A.    Yes.

23        Q.    Okay.  Who was the mortgage with Lake Forest

24    with?

25        A.    Bank of America primarily.

Page 38

1      Q.   And who was -- Did you have a second?

2      A.   There was a second, and I don't -- I don't

3  remember -- I don't remember -- recall.  It was like

4  initials, and I don't recall.

5      Q.   EMC, something like that?

6      A.   It wasn't EMC.  That was on Corniche.

7      Q.   But it wasn't Chase though; right?

8      A.   I -- No, I don't believe it was Chase.

9      Q.   Okay.  What about --

10      A.   Back in those days, one lender would sell to

11  another lender and then sell to another lender, and they

12  kept changing.

13      So I think at one point I had GreenPoint Mortgage and

14  from there, whatever one.

15      Q.   You are not aware of Chase buying any of these

16  notes as far as you're aware?

17      A.   I don't recall Chase, no.

18      Q.   What about Dana Point?

19      A.   Same with Dana Point.  It was Bank of America,

20  and I think it was GreenPoint.

21      GreenPoint sold it, and I know EMC took it over, but

22  I don't know if there was somebody in between.

23      Q.   Okay.  And so that we're adamantly clear, to the

24  best of your knowledge as you sit here today, of all the

25  properties that we discussed, you're not aware that Chase

Page 39

1    ever owned any of these mortgages at any point?

2        A.    I can't recall.

3        Q.    Okay.

4        A.    Honestly, I really can't recall.

5        As I said, they changed several times.

6        Q.    Okay.   So you don't know?

7        A.    Correct.

8        No.   I said I don't recall.   I said I don't recall.

9             MR. KAZEROUNIAN:   Can you mark that as

10   Exhibit 2, by the way, before we forget.

11        (Deposition Exhibit 2 was marked for identification

12   by the court reporter.)

13             MR. KAZEROUNIAN:   Can we take a five-minute

14   break?   Is that possible.

15             MR. KRON:   Sure.

16        (A discussion is held off the record.)

17             MR. KAZEROUNIAN:   Back on the record.

18        Q.    So did you ever receive calls from Chase?

19        A.    You know, I received a lot of calls from a lot

20   of different people.   I don't remember.   Back in those

21   days, I was falling behind on mortgage, and so -- other

22   bills, so I was getting a lot of calls from a lot of

23   people.

24        Q.    Did you ever fall behind on the Dana Point

25   address?

                                            Page 40

```
 1          A.   I thought I answered that.

 2          Q.   No.  We haven't been through that.

 3          A.   Then it's vague and ambiguous because which Dana

 4    Point address?

 5          Q.   Oh, the rental property.

 6          A.   I think I did, yes.

 7          Q.   When?

 8          A.   About that same time period.

 9          Q.   The three years ago, approximately?

10               MR. KRON:  Longer.

11               THE WITNESS:  Yeah.  No, it was longer before

12    then.

13          More like around 2008 to 2010, somewhere around

14    there.

15      BY MR. KAZEROUNIAN:

16          Q.   And how long did you fall behind on that?

17          A.   I don't recall.

18          The property went into short sale.

19          Q.   What about your Lake Forest rental property?

20          A.   Same.

21          Q.   That was a short sale too?

22          A.   Yes.

23          Q.   Were they both successful short sales?

24          A.   Yes.

25          Successful for who?
```

Page 41

1      Q.    I mean as a transaction.

2      A.    Yes.

3      Q.    Because not all short sales come to fruition.

4      A.    True.   That's true.

5      Q.    So in the same time period, between 2000 and

6   2010, did you ever receive calls from Chase?

7      A.    As I stated, I don't recall.  I got a lot of

8   phone calls from a lot of people.

9      Q.    In your applications to buy your rental

10   properties, did you put your cell phone number down?

11      A.    If it was on the form, I probably did.

12      Q.    That's not what I'm asking you.

13      A.    If it was on the form, I did.

14      Q.    Well, do you remember doing it?

15      A.    I have no clear recollection of doing it, no.

16      Q.    Do you remember ever giving the banks your

17   telephone number?

18      A.    Yes.

19      Q.    Okay.  So let's go with your current property,

20   the one on Marquesa, I think.

21       When you got your loan with your current provider,

22   loan mortgage provider, did you give your telephone number

23   to them?

24      A.    If it was on the form, I filled it out.

25      Q.    I'm asking from your memory.

                                        Page 42

```
 1          A.   I don't recall.

 2          Q.   You don't recall.

 3          But if it was on the form, you gave it to them?

 4          A.   Correct.

 5          Q.   And does that apply to the Lake Forest rental

 6     property?

 7          A.   I would say yes.

 8          Q.   Does that apply to the Dana Point rental

 9     property?

10          A.   I would say yes.

11          Q.   Does that apply to the Bedford Drive address?

12          A.   I would say yes.

13          Q.   If you put your cell phone down rather than your

14     home line, would your answer still be the same?

15          A.   Yes.

16          Q.   So that we have a clean record, you have no

17     recollection of specifically Chase calling you; correct?

18          A.   That's correct.

19          Q.   So if they did call you -- and that's an if --

20     you don't know how many times they called you; correct?

21          A.   Correct.

22          Q.   And you don't know whether they called you on

23     your landline or your cell phone; is that correct?

24          A.   That's correct.

25          Q.   When in 2008 did you set up your West Coast
```

Page 43

1   company?

2       A.   I think it was incorporated July of 2008.

3       Q.   Did you get calls after July of 2008 from banks

4   regarding your mortgages?

5       A.   I would be -- I would be saying -- Yes, I'm sure

6   I did.

7       Q.   Okay.  So if they did call you on that cell

8   phone after June of 2008, they would have been calling a

9   cell phone number related to your company; correct?

10      A.   No.

11      Q.   When did your phone get registered on your West

12  Coast address?

13      A.   Probably not until -- It's -- It's a little

14  convoluted because of some issues with a prior company,

15  but that cell phone number has always been my -- my

16  number.  It's been -- I made it a business number, and so

17  that the business paid for it, but it's always been my --

18  my name on that cell phone number.

19      Q.   So was it a business number before you

20  transferred it to West Coast?

21      A.   No.  It's always been my personal number under a

22  business account.

23      Q.   Okay.  So was it under a business account before

24  you transferred it to West Coast?

25      A.   I think I said that, yes.

                                              Page 44

1       Q.    Okay.  What business was that?

2       A.    Kron Interiors.

3       Q.    And how long was it under that business account,

4   under Kron Interiors?

5       A.    I'd be guessing.  Probably five years.

6       Prior to that, it was under Kron Interior Systems.

7       Q.    Okay.  Was there any time there was a lapse

8   between business accounts where it was just your

9   individual phone number, not associated with a business

10  account between Kron Interior Systems and the present day?

11      A.    I always considered it my personal account,

12  phone number.

13      Q.    Well, I'm not asking what you considered it.  I

14  want to know if it was under a business account or not.

15      A.    It was always under a business account.

16      Q.    Okay.  Have you ever made a claim against Chase

17  for telephone calls to you?

18      A.    No.

19      Q.    Have you ever considered it?

20      A.    No.

21      Q.    Before you received the postcard, did you ever

22  feel that you had been harmed by Chase in any way as it

23  relates to automatic calls?

24      MR. KRON:  Objection.  Calls for a legal

25  conclusion by a lay witness.

Page 45

```
 1              THE WITNESS:  Are you referring to Exhibit 2?
 2      BY MR. KAZEROUNIAN:
 3        Q.   No.  I'm just asking before you received that
 4   card, did you ever feel harmed by Chase in any way as it
 5   relates to automated telephone calls?
 6              MR. KRON:  Objection.  Lacks foundation.
 7   Objection.  Calls for a legal conclusion by a lay witness.
 8              THE WITNESS:  What card?
 9      BY MR. KAZEROUNIAN:
10        Q.   Exhibit 2.
11        A.   Thank you.
12        I did not.
13        Q.   What about, same question as it relates to
14   prerecorded voices.
15              MR. KRON:  Objection.  Calls for a legal
16   conclusion by a lay witness; and objection, lacks
17   foundation.
18              THE WITNESS:  Same answer.
19      BY MR. KAZEROUNIAN:
20        Q.   So yes -- So no; right?  "No" was the previous
21   answer?
22        A.   I did not --
23        Q.   Okay.
24        A.   -- I think was the previous answer.
25        Q.   Have you ever sued Chase at all ever, for
```

Page 46

1    anything?

2        A.   No.

3        Q.   Have you ever considered suing Chase for

4    anything?

5            MR. KRON:   Objection.   Incomplete hypothetical.

6    Calls for speculation.

7        Answer if you can.

8            THE WITNESS:   I am not in the business of suing

9    people, no.

10     BY MR. KAZEROUNIAN:

11       Q.   Okay.   With the exception of the other two

12   lawsuits that you mentioned where you were a plaintiff,

13   have you ever sued anybody else?

14       A.   Yes.

15       Q.   Who have you sued?

16       A.   I sued Wells Fargo.

17       I sued -- And this is all under the same lawsuit --

18   wells Fargo, Manny Alvarez Castillo, Arrow Liquor, Elias

19   Beltran, Eddie Ortega, Sergio Gonzalez.

20       Q.   This is all one lawsuit?

21       A.   One lawsuit.

22       Q.   Where was that filed?

23       A.   Here in Orange County Superior Court.

24       Q.   When?

25       A.   2008.

Page 47

1        Q.   For what?

2        A.   I'm sorry?

3        Q.   For what?

4        A.   For a laymen's term, theft.

5        In the case of Manny Alvarez, I sued -- and the other

6    individuals -- I sued for theft, breach of contract of

7    various -- various things.

8        Q.   Who was your attorney?

9        A.   Scott.  Scott Kron.

10       Q.   The gentleman sitting to your left?

11       A.   Correct.

12       Q.   Did this case go to trial or settle?

13       A.   Yes and no.

14       Q.   Okay.  So what was the resolution of this case?

15       A.   It was settled.

16       Q.   In its entirety?

17       A.   Yes.

18       Q.   Was it a confidential settlement?

19       A.   Yes.

20       Q.   Did they -- Did they counter sue you?

21            MR. KRON:  Objection.  Overbroad.  Vague and

22    ambiguous as to "They."

23      BY MR. KAZEROUNIAN:

24       Q.   Did any of the defendants file a counterclaim

25    against you?

                                            Page 48

```
 1         A.    Yes.

 2         Q.    Which ones?

 3         A.    I think Manny Alvarez.

 4         Q.    For what?

 5         A.    I'm not sure what -- what -- what their cause of

 6   action was.  I don't remember specifically what it was.

 7         Q.    When did the case settle?

 8         A.    Probably two years later, 2010.  20- -- maybe

 9   '09, '010.  Probably 2010.

10         Q.    So apart from -- They never took your deposition

11   in that case; correct?

12         A.    I don't think so.

13         Q.    Okay.  So apart from the three lawsuits that we

14   talked about, have you ever sued anybody else?

15         A.    Well, I did take a renter to small claims if

16   that counts.

17         Q.    Of course that counts.

18         A.    Some guy that wasn't paying me rent, so he moved

19   out, and I took him to small claims.

20         Q.    What was the name of that case?

21         A.    I don't remember his name.

22         Q.    Okay.

23         A.    But it was me versus him, I guess.

24         Q.    You just don't remember his name?

25         A.    I don't remember his name.
```

Page 49

1      Q.   What year was that?

2      A.   About 2010, I think.

3      Q.   Did you win?

4      A.   He never showed, so yes, by default.  I think I

5  would have won anyways, but he didn't show.

6      Q.   On which property?

7      A.   Shawnee, the Lake Forest property.

8      Q.   Okay.  So apart from the four lawsuits that we

9  talked about right now, are there any other lawsuits where

10  you were a plaintiff or the case started with you being a

11  plaintiff?

12      A.   I don't recall anymore.

13      Q.   Okay.  So when you received Exhibit 2, how did

14  you -- Did you receive Exhibit 2?

15      A.   Yes.

16      Q.   How did you receive it?

17      A.   In the mail, USPS.

18      Q.   And you believe you submitted a claim; correct?

19      A.   I'm sorry?

20      Q.   You testified earlier that you believe you

21  submitted a claim; is that correct?

22      A.   I know we -- I discussed it with my attorney.

23      Q.   Okay.  But did you submit a claim?

24      A.   That's my best answer for you on that one.  We

25  discussed it, and I think -- I think we did.  I don't

Page 50

```
 1    know.

 2          Q.   You don't know?

 3          A.   I don't know.  That's what I said.

 4          Q.   Okay.  Do you know what a claim is?

 5          A.   No, not really.

 6          Q.   Was it ever explained to you what a claim is?

 7          A.   In this case?

 8          Q.   Yeah.

 9          A.   Talking about in this case?

10          Q.   In this case.

11          A.   We discussed it, yes.

12          Q.   So what is it?

13          A.   I don't know.  I don't know the definition of

14    the claim in this case.

15          Q.   That is what I'm asking.

16          Was the definition of a claim ever explained to you?

17          A.   The definition of a claim, no.

18          Q.   Okay.  So you don't know as you sit here today

19    what a claim is?

20          A.   Correct.

21          Q.   Okay.  How long after receiving a card did you

22    take it to your attorney?

23          A.   Probably within a week, few days maybe.

24          Q.   Did you take it to him?

25          A.   I emailed it to him.
```

Page 51

```
 1          Q.    You emailed it to him?

 2          A.    (Witness nods head.)

 3               MR. KAZEROUNIAN:  I'd like to attach this as

 4     Exhibit 3.

 5          (Deposition Exhibit 3 was marked for identification

 6     by the court reporter.)

 7               THE WITNESS:  (Indicating.)

 8      BY MR. KAZEROUNIAN:

 9          Q.    Do you know what Exhibit 3 is?

10          A.    This is objections to proposed class action

11     settlement.

12          Q.    Okay.  And have you read this document before?

13          A.    I have looked over it, yes, and signed it.

14          Q.    So you agree with everything that's in this

15     objection?

16          A.    Correct.

17          Q.    Can you repeat that?

18          A.    I said, that's correct.

19          Q.    Okay.  So before you read this document and

20     signed off on it, what other document did you review in

21     order to come to these conclusions?

22               MR. KRON:  Objection.  Calls for a legal

23     conclusion by a lay witness.

24               THE WITNESS:  I believe we looked through just

25     the card, Exhibit 2.
```

Page 52

1     BY MR. KAZEROUNIAN:

2         Q.    Okay.   Nothing else?

3         A.    Not really, no.

4         Q.    Okay.   Do you know your duties as an objector to

5     a Class?

6              MR. KRON:   Okay.   Calls for a legal conclusion

7     by a lay witness.

8              THE WITNESS:   My duties, I don't understand the

9     question.

10    BY MR. KAZEROUNIAN:

11        Q.    Do you understand that you have certain duties

12    to a Class if you appear as an objector?

13        A.    I don't understand what you mean by that.

14        Q.    Well, if you are going to be a Class

15    representative and represent absent Class Members, you

16    have certain duties by law.

17        A.    Okay.   Well, that would probably fall under my

18    attorney's responsibilities.

19        Q.    Well, that is a matter of opinion, and I

20    disagree with you.

21        I'm asking you:   Do you know what those duties are?

22              MR. KRON:   Objection.   Calls for a legal

23    conclusion by a lay witness.

24              THE WITNESS:   Not right here, right now, no.

25    BY MR. KAZEROUNIAN:

Page 53

1          Q.   Were these duties ever explained to you by your

2     attorney?

3               MR. KRON:  Objection.  Calls for attorney-client

4     communication.

5          I instruct the witness not to testify.

6       BY MR. KAZEROUNIAN:

7          Q.   I'm not asking you to tell me any content of

8     communications.  I'm asking you:  Have you ever been

9     advised of your duties as an objector?

10              MR. KRON:  Objection to the extent the response

11    calls you to reveal attorney-client communication, I

12    instruct the witness not to answer.

13              MR. KAZEROUNIAN:  It's a "Yes" or "No" question.

14    I'm not asking for the contents of the communication.

15              MR. KRON:  Whether or not it was even discussed

16    is a communication expressed between an attorney and a

17    client.

18              MR. KAZEROUNIAN:  I completely disagree.  I want

19    to call Judge Skomal on this.  Can we get his number,

20    Judge Skomal, the magistrate.

21         Let's go off the record until we get him on the

22    phone.

23              MR. KRON:  Can you read the question back.

24         (The record is read by the reporter.)

25              MR. KRON:  Any communication between an attorney

                                              Page 54

```
 1   and a client is absolutely privileged.  There is no

 2   dispute there.

 3             MR. KAZEROUNIAN:  No.

 4             MR. KRON:  Even the subject of the communication

 5   is privileged.

 6             MR. KAZEROUNIAN:  That's not true.

 7             MR. KRON:  Well, then get the judge on the

 8   phone.  Let him answer then.

 9             MR. KAZEROUNIAN:  For example, your fee

10   agreement is not -- in a class action is not privileged.

11   I can ask your fee agreement, and I will.  I have case law

12   to prove it.

13             MR. KRON:  Go for it.

14             THE REPORTER:  Are we still on the record?

15             MR. KAZEROUNIAN:  Let's go off the record for

16   now.

17             THE REPORTER:  Counsel, do you agree to go off

18   the record?

19             MR. KRON:  Sure.

20        (A discussion is held off the record.)

21        (A recess is taken.)

22             MR. KAZEROUNIAN:  Back on the record.

23        Q.  Just to be clear, Mr. Kron, as you sit here

24   today, you do not know what you -- what duties you may

25   have to the Class, to the Class Members as an objector; is
```

                                            Page 55

1    that correct?

2         A.   Specifically, no, I don't.

3         Q.   Well, do you know generally?

4         A.   No, not really.

5         Q.   Okay.  Well, not really or you don't?

6         A.   Well, I don't even know how many there are.

7         Q.   That's not -- That's completely irrelevant to my

8    question.

9         A.   You asked me if I knew what my -- what my

10   obligation is; right?

11        Q.   Right.

12        A.   Well, is there one or is there multiple?

13        Q.   There is millions.

14        A.   Okay.  So you are asking me if I know them.  No,

15   I don't.

16        Q.   I didn't ask you any of them.

17        I asked, do you know what your duties are to them, if

18   there are any?

19        A.   No.

20        Q.   Thank you.

21        And when I asked you earlier whether you were ever

22   advised of any such duties, your attorney objected on

23   attorney-client privilege and instructed you not to

24   answer.

25        Are you following counsel's advice?

Page 56

1      A.   Yes.

2      Q.   Do you know whether -- Do you know whether or

3  not you have any fiduciary duties to the Class Members as

4  an objector?

5           MR. KRON:   Objection.   Calls for a legal

6  conclusion by a lay witness.

7           THE WITNESS:   If you mean fiduciary duties as

8  meaning that there is a time -- there are times -- there

9  is a timeline as to when you file a claim or an objection,

10  is that what you mean?

11    BY MR. KAZEROUNIAN:

12      Q.   No, I don't mean that.

13      A.   Okay.

14      Q.   Sorry.   Please finish.

15      A.   Then I need an explanation as to what fiduciary

16  duties you are referring to, what you mean by that.

17      Q.   Well, you don't even know if you have any

18  duties; correct?

19           MR. KRON:   Objection.   Calls for a legal

20  conclusion by a lay witness.

21           THE WITNESS:   I don't know how I can answer that

22  if you don't explain what fiduciary duties I have.

23    BY MR. KAZEROUNIAN:

24      Q.   No.   I'm asking you if you are aware of any

25  duties that you may have to the absent Class Members, and

                                        Page 57

```
 1    you answered no; is that correct?
 2              MR. KRON:  Objection.  Calls for a legal
 3    conclusion by a lay witness.
 4              THE WITNESS:  I didn't answer no.
 5        If I -- I need an explanation of what is a fiduciary
 6    duty.
 7      BY MR. KAZEROUNIAN:
 8        Q.   No.  I'm going one step back.
 9        First of all, I asked you:  Are you aware of any
10    duties that you may have to the absent Class Members, and
11    you answered "No"; is that accurate?
12        A.   I'm unaware of any, yes.
13        Q.   Okay.  Are you aware of any fiduciary duties to
14    the absent Class Members?
15              MR. KRON:  Objection.  Calls for a legal
16    conclusion by a lay witness.
17              THE WITNESS:  At this time, no.
18      BY MR. KAZEROUNIAN:
19        Q.   Have you ever been sued for a fiduciary --
20    breach of a fiduciary before?
21        A.   No.
22        Q.   Never?
23              MR. KRON:  Objection.  Calls for a legal
24    conclusion by a lay witness.
25              THE WITNESS:  Not to my knowledge.
```

Page 58

1      BY MR. KAZEROUNIAN:

2          Q.   You do know you are under penalty of perjury?

3          A.   I'm sorry.  You are right.

4      My corporation was, yes, and I was included, yes.

5          Q.   Individually; correct?

6          A.   Yes.

7          Q.   Okay.  Do you want to expand on that?  Tell me

8      what lawsuit that was.

9          A.   That was Southwest Carpenters Trust.

10         Q.   I think there were actually two lawsuits,

11     weren't there?

12         A.   I think the same people.

13         Q.   But there were two different lawsuits; correct?

14         A.   Correct.

15         Q.   And is the first one Carpenters Southwest

16     Administrative Corp. versus Kron Interiors, Inc.; is that

17     correct?

18         A.   That's correct.

19         Q.   Was that in the Central District of California

20     in federal court?

21         A.   Yes.  If you say so.  I don't know exactly

22     where, but here -- I believe it was here.

23         Q.   And the second lawsuit was Carpenters Southwest

24     Administrative Corp. versus West Coast Commercial

25     Contractors; correct?

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          A.   Yes.
 2          Q.   That was also in the Central District of
 3   California in federal court?
 4          A.   That's correct.
 5          Q.   In federal court; correct?
 6          A.   Correct.
 7          Q.   How did those two cases end, if they ended?
 8          A.   Settlement.
 9          Q.   Were they confidential?
10          A.   Yes.
11          Q.   And who was your counsel?
12          A.   Scott Kron actually in the first lawsuit.  I had
13   a couple of counsels.
14          Q.   Who else?
15          A.   Steve -- and I don't remember his -- I don't
16   remember his name actually because he was involved for a
17   short period of time.
18          Q.   Okay.  Apart from Steve and your son, anybody
19   else?
20          A.   No.  None that I can think of.
21          Q.   Have you ever been convicted of a crime?
22          A.   Yes.
23          I'm sorry.
24              MR. KRON:   That's okay.
25          Objection.   Relevance.
```

Page 60

1      BY MR. KAZEROUNIAN:

2          Q.    What crime was that?

3                MR. KRON:    Do we really have to get into this?

4                MR. KAZEROUNIAN:    Absolutely.

5                MR. KRON:    Is it necessary?    This is absolutely

6      irrelevant.    It's -- It's harassing the witness.

7                MR. KAZEROUNIAN:    He's an objector in a class

8      action.

9                MR. KRON:    Again, what does this have to do with

10     objecting to a proposed class action settlement, whether

11     the objector has been convicted of a criminal offense or

12     not?

13               MR. KAZEROUNIAN:    It is wholeheartedly relevant

14     because if he's going to be representing --

15               MR. KRON:    Let's save that for the judge at the

16     end of this then.

17               MR. KAZEROUNIAN:    You are asking him to not

18     answer the question?

19               MR. KRON:    I'm objecting to that as being

20     completely irrelevant.    There is no likelihood of any

21     discoverable evidence from that whatsoever.

22               MR. KAZEROUNIAN:    Well, him being an objector

23     and representing Class Members is wholeheartedly his --

24     Are you instructing him not to answer the question?

25               MR. KRON:    I am not instructing.

Page 61

1                     MR. KAZEROUNIAN:  Are you -- You are not.  So

2       put out your objections, and then he has to answer the

3       question.  Relevance is not even an objection in a

4       deposition.

5                     MR. KRON:  I know that, sir, but you are

6       going --

7            (Simultaneous speaking.)

8                     THE REPORTER:  You are talking at the same time.

9                     MR. KRON:  You are going off topic.

10                    MR. KAZEROUNIAN:  No, I'm not.  No, I'm not.

11                    MR. KRON:  Go ahead and answer.

12                    THE WITNESS:  I won't answer that.

13         BY MR. KAZEROUNIAN:

14           Q.   You refuse to answer that question?

15           A.   I refuse to answer that.

16           Q.   On what grounds?

17           A.   It's irrelevant.

18           Q.   He's not instructed you to not answer the

19      question.

20           A.   I'm not answering it.  And I won't answer any

21      questions in that line of questioning.

22           Q.   Well, as an objector, I feel differently.  We'll

23      talk to the judge.

24                    MR. KRON:  Take it up with the judge.

25                    THE WITNESS:  That's fine.

                                                    Page  62

```
 1      BY MR. KAZEROUNIAN:
 2         Q.   Do you understand that there is potentially a
 3      conflict of interest in a class action realm when you are
 4      represented by family?
 5              MR. KRON:  Objection.  Calls for a legal
 6      conclusion by a lay witness.
 7              THE WITNESS:  No.
 8      BY MR. KAZEROUNIAN:
 9         Q.   You don't know that?
10              MR. KRON:  Counsel, you are welcome to bring a
11      motion to disqualify me as counsel if you think there is a
12      conflict of interest.
13              MR. KAZEROUNIAN:  That's not what I'm asking.
14              MR. KRON:  You asked him if he knows if there is
15      a conflict of interest.
16              MR. KAZEROUNIAN:  Are you going to obstruct my
17      entire deposition?
18              MR. KRON:  No.
19              MR. KAZEROUNIAN:  It's my deposition --
20              THE REPORTER:  You are talking at the same time.
21              MR. KAZEROUNIAN:  If you are instructing not to
22      answer, say so.  If you want to make an objection --
23              MR. KRON:  You --
24              MR. KAZEROUNIAN:  If you want to make an
25      objection, make it.
```

Page 63

1          MR. KRON:  Let the record reflect that the

2     deposition officer is raising his voice and yelling and

3     pointing at the deponent and yelling at me.

4          MR. KAZEROUNIAN:  I wasn't.  I was pointing at

5     you because you raised your voice at me first.

6          Let the record be clear, sir.  Now you are not going

7     obstruct this deposition anymore.

8          MR. KRON:  I object to your characterization of

9     obstruct this deposition.

10          MR. KAZEROUNIAN:  I have allowed you to have

11     some talking objections.  I'm not going to allow it

12     anymore.

13          MR. KRON:  Talkings objections?

14          MR. KAZEROUNIAN:  Are you are allowed to say is

15     the legal relevance of your objection.

16          MR. KRON:  Tell us on the record what speaking

17     objection did I make?

18          MR. KAZEROUNIAN:  I'm not going to go back.  The

19     record speaks for itself.

20          MR. KRON:  Thank you.  Thank you.

21          MR. KAZEROUNIAN:  You're gesturing.  Stop your

22     gesturing.

23          MR. KRON:  Gesturing to what?

24          MR. KAZEROUNIAN:  When I'm asking a question,

25     you are nodding or shaking your head, "No, no, no, no,

                                                  Page 64

1    no."

2             MR. KRON:  You are being ridiculous.  Stop.

3    Stop.  Stop.  Stop.

4             MR. KAZEROUNIAN:  You are being disingenuous.

5             MR. KRON:  No.

6             MR. KAZEROUNIAN:  Yes, you are.

7        Q.   Sir, I'm going to get back on the record and ask

8    you questions and demand you answer them.  If you refuse

9    them, we will go to the judge and --

10            MR. KRON:  Quit threatening with the judge.  Get

11   the judge on the phone.

12            MR. KAZEROUNIAN:  You are creating so many

13   issues.

14            MR. KRON:  No, I'm not.

15            MR. KAZEROUNIAN:  Judge Skomal's time is more

16   important than --

17            MR. KRON:  Quit threatening us with the

18   deposition.

19            THE WITNESS:  This deposition is over.  Okay.

20   I'm not going to sit here and listen to you yelling at my

21   counsel.  Okay.  Get the judge on the line right now.  If

22   you can't get him on the line, get out.

23            MS. STEPANYAN:  Can we have a five-minute break?

24            THE WITNESS:  If you can't get him on the line,

25   get out.

                                              Page 65

```
 1              MR. KRON:  We'll stay on the record.

 2              MS. STEPANYAN:  Are you refusing a five-minute

 3    break?

 4              MR. KRON:  You guys can take a break.

 5              THE REPORTER:  Are we off the record?

 6              MR. KRON:  No.

 7              MR. KAZEROUNIAN:  You want to keep it on the

 8    record while we take a break?

 9              THE WITNESS:  That's right.

10              MR. KAZEROUNIAN:  I'm not talking to you.

11              THE WITNESS:  I'm answering you.

12              MR. KAZEROUNIAN:  Stay on the record.

13       Just for the record, you're raising your voice, sir.

14    I ask you to stop abusing me.

15              THE REPORTER:  If they talk in the room, I will

16    report anything that is said in the room.

17              MR. KAZEROUNIAN:  Excuse me?

18              THE REPORTER:  If they talk in the room, I need

19    to report anything that is said.

20              MR. KAZEROUNIAN:  Yes, you do.

21       (Counsel for the plaintiffs and counsel for JPMorgan

22    leave and re-enter the deposition room.)

23              MR. KAZEROUNIAN:  We are going to try to call

24    Judge Skomal in his chambers.

25       This is Abbas Kazerounian.  I'm in a deposition with
```

Page 66

```
 1    Scott Kron, who represents an objector in a case called
 2    Connor versus Chase.
 3         And we're having a discovery dispute in a deposition.
 4    I was wondering if Judge Skomal is available to sort out
 5    the dispute.
 6              THE CLERK:  I'm not sure the judge is available
 7    right now.  He just stepped out.
 8         If you can give me a brief idea of what the dispute
 9    is, I will see if I can catch the judge.
10              MR. KAZEROUNIAN:  Absolutely.
11              THE CLERK:  This is the Connor matter.
12              MR. KAZEROUNIAN:  Connor versus JPMorgan.  It's
13    a case that Judge Skomal --
14              THE CLERK:  What is the case number?
15              MR. KAZEROUNIAN:  Case number is 1284 10 CV.
16    1284.
17              THE CLERK:  And who is opposing who right now?
18              MR. KAZEROUNIAN:  Okay.  Mr. Kron -- Kron is an
19    objector to the Class settlement that Judge Skomal
20    settled.
21              THE CLERK:  This is an objector discovery.
22              MR. KAZEROUNIAN:  Yes.
23              THE CLERK:  Were we aware of these depositions
24    were being taken?
25              MR. KAZEROUNIAN:  No.  Judge Skomal was not.
```

Page 67

```
 1              THE CLERK:  Okay.  So Judge Skomal wasn't aware
 2   these depositions were being taken, and this is about an
 3   objection to a settlement that's before the district
 4   judge?
 5              MR. KAZEROUNIAN:  Yes.
 6              THE CLERK:  Okay.  Hold on.
 7              MR. KAZEROUNIAN:  Thank you.
 8              THE CLERK:  I am trying to pull up the case.
 9        12 -- I'm sorry -- 10 CV.  Sorry.
10              MR. KAZEROUNIAN:  Yes.
11              THE CLERK:  10 CV 1284.  Connor.
12        And so there was a motion for continuance and
13   objection to proposed settlement.
14        One issue is this is a federal, and discovery is
15   over -- this isn't within the discovery realm, so I'm not
16   sure Judge Skomal is going to be inclined to necessarily
17   resolve this dispute anyway.
18        But who is deposing who specifically?
19              MR. KAZEROUNIAN:  Class counsel is deposing the
20   objector, Mr. Kron.
21              THE CLERK:  Okay.  And where is this deposition
22   happening?
23              MR. KAZEROUNIAN:  It's happening in Laguna Hills
24   at his counsel's office.
25              THE CLERK:  Laguna Hills is technically within
```

Page 68

```
 1    the Central District of California anyway.  I'm not sure

 2    he was subpoenaed for his deposition out of the Central

 3    District.  That is another issue about the discovery

 4    dispute, but continue on.

 5            MR. KAZEROUNIAN:  Okay.  So because he's an

 6    objector trying to represent absent Class Members, I asked

 7    the question whether he has a criminal record.

 8         He responded, "Yes."

 9         And I asked him what the nature of that crime was,

10    and he refuses -- Even though his counsel did not advise

11    him not to answer, he refuses to answer that question and

12    any more questions.

13         So he said unless the judge instructs him to answer

14    more questions or specifically that question, the --

15            THE CLERK:  He doesn't want to continue being

16    deposed regardless unless the judge says you must because

17    you asked him about his criminal background?

18            MR. KAZEROUNIAN:  Is that not the case anymore?

19            MR. KRON:  If you are going to keep your voice

20    down, and you are not going to point at the witness, we

21    are will continue the deposition as long as you stay on

22    things that are even arguably relevant to this case.

23         You're getting into -- And so the record is clear,

24    this is Scott Kron, K-r-o-n.  I'm legal counsel for the

25    objector, Stephen Kron -- and asking the objector's
```

Page 69

1   criminal background -- which is a matter of public record.

2   You can look at it yourself -- but it's not relevant to

3   his objections to the proposed class action settlement,

4   and it doesn't go to his ability to act as a

5   representative of Class Members objecting to the

6   settlement.

7       But that's not the only issue here too.  The

8   deposition officer is asking the deponent about conflicts

9   of interest being represented by his son.  I apologize for

10  the familial relationship, but my client happens to be my

11  father, and the deposition officer is asking questions of

12  the deponent as to whether a conflict of interest arises

13  because he's represented by his son.

14      And then also we're dealing with questions regarding

15  communications between -- between the deponent and his

16  counsel.

17          MR. KAZEROUNIAN:  Okay.  So the -- the issue I

18  asked him if he was aware that there may be a conflict of

19  interest.

20      He said, "No."

21      And there was no discovery dispute, so I don't know

22  what Mr. Kron is referring to.

23      The third issue he said he advised his client not to

24  answer the question, and I have not raised that before the

25  Court.  So again, I'm not sure what he's referring to.

Page 70

1          The only dispute that is before the -- Well, I asked

2     for it to be before the Court -- is the fact that I

3     believe that if someone is going to be -- going in to

4     represent Class Members, that his criminal record is

5     relevant, and we should be able to know about that.  So

6     that is the only dispute in question as far as I'm

7     concerned.

8               THE CLERK:  As an objector, what is the reason

9     for believing the criminal record is relevant?

10              MR. KAZEROUNIAN:  If he's going to be an

11    objector and going to be representing absent Class Members

12    as an objector and making representations to the Court and

13    representing these Class Members, criminal record is

14    always -- has always been relevant because we want to know

15    who we're dealing with and their credibility.  If they

16    have a crime for moral turpitude, I think that should be

17    counted by the district court judge.

18              THE CLERK:  Hold on.  Let me try to grab the

19    judge.

20              MR. KAZEROUNIAN:  Thank you.

21        Why don't we go off the record now.

22              THE REPORTER:  Do you agree?

23              MR. KRON:  No.  Stay on the record.

24              MR. KAZEROUNIAN:  Stay on the record.

25              MR. KRON:  Yes.

Page 71

1           (counsel and witness confer.)

2               THE CLERK:  (Inaudible.)

3               THE REPORTER:  I can't hear.

4               MR. KAZEROUNIAN:  I'm sorry.  Can you repeat

5       that?

6               THE CLERK:  Is the purpose of this deposition to

7       present, you know, at a final hearing whether or not, I

8       guess, plaintiff believes this is a fair

9       objection (inaudible).

10              THE REPORTER:  I can't understand.

11              MR. KAZEROUNIAN:  Madam Reporter, the question

12      is, is it for the purposes of us presenting -- making a

13      presentation at the final approval hearing saying that

14      it's not a valid objection.

15          The answer from class action counsel is yes, it is,

16      and that is the reason.

17              THE CLERK:  What is the basis of the objection?

18              MR. KAZEROUNIAN:  The basis of the objection --

19      I'll let Mr. Kron give the basis for his objection.

20              MR. KRON:  It's irrelevant, the questioning of

21      the deponent's criminal background.

22              THE CLERK:  (Inaudible.)

23              THE REPORTER:  I can't hear on the phone.

24              MR. KRON:  There were two objectors in Document

25      125.  There were two objectors, Stephen Kron and Cheryl

                                                    Page 72

```
 1    Kron.

 2        Cheryl Kron withdrew her objection because she was

 3    harassed and intimidated by the Class counsel serving

 4    Subpoenas, admittedly unnecessarily in the matter.

 5    Mrs. Kron is a victim of a home invasion some time back,

 6    and so because of the intimidation, she withdrew her

 7    objection, but Stephen Kron maintains his objection.

 8    That's why he's here submitting to a deposition today.

 9              THE CLERK:  After talking with Judge Skomal

10    about the status of the case and where it is in the

11    proceedings, he's declined to not get involved right now.

12    The Court was never notified of the deposition or that the

13    deposition is taking place in our district (inaudible).

14              MR. KAZEROUNIAN:  Okay.

15              THE CLERK:  That being said, you should continue

16    on the relevant matters that you guys have agreed to

17    appear. (Inaudible.)

18              THE REPORTER:  I can't understand.

19              THE CLERK:  But you handle how you want to

20    handle the actual fact that, Mr. Kron's prior objections.

21              MR. KAZEROUNIAN:  Okay.  Okay.  No problem.

22              THE CLERK:  Thank you.

23              THE REPORTER:  I couldn't hear very well on the

24    phone.

25              MR. KAZEROUNIAN:  I don't want to
```

Page 73

```
 1    mischaracterize, so correct me if I'm wrong.
 2        Judge Skomal, due to the procedural posture of the
 3    case, does not want to get involved in this, but advices
 4    that since we're all here, we carry on with the
 5    deposition.
 6            MR. KRON:  I also heard it was because it was
 7    being taken outside of the judicial district was the other
 8    grounds as well.
 9        But I would agree that we continue on with the
10    deposition.  They can reserve whatever they'd like for
11    later on.
12            MR. KAZEROUNIAN:  Just for clarification, that
13    was the clerk's opinion before she spoke to Judge Skomal
14    regarding the judicial district.
15        Do you agree with that?
16            MR. KRON:  That was the clerk's opinion it
17    sounded like to me.
18            MR. KAZEROUNIAN:  Okay.
19        Q.  So moving on, before receiving the claim, which
20    is Exhibit 2, did you review any documents concerning this
21    case of settlement?
22            MR. KRON:  Objection.  Asked and answered.
23        You can answer.
24            THE WITNESS:  I already answered that question.
25      BY MR. KAZEROUNIAN:
```

Page 74

```
1        Q.   Would you like to answer it again?

2        A.   No.

3        Q.   I don't think I asked you that question before.

4        A.   No.

5        Q.   You are refusing to answer that question?

6             MR. KRON:  Go ahead and answer.  That's fine.

7             THE WITNESS:  I don't recall.

8     BY MR. KAZEROUNIAN:

9        Q.   Okay.  Once you received the claim form, did you

10    ever review the Settlement Agreement?

11       A.   I don't recall.

12       Q.   Did you ever review the long form notice?

13       A.   I don't recall.

14       Q.   You already answered that.

15       Did you review any documents on the website for the

16    settlement?

17       A.   I don't recall.

18       Q.   Have you ever objected to any other class

19    action?

20       A.   I don't recall.

21       Q.   You don't recall ever being an objector to any

22    other Class settlement?

23       A.   I don't recall.

24       Q.   Do you know that you are under the penalty of

25    perjury?
```

Page 75

1        A.    I don't recall.

2        Q.    You don't recall that you are under the penalty

3    of perjury?

4        A.    That's correct.

5        Q.    Well, I'm going to tell you again you are under

6    the penalty of perjury right now.

7        A.    That's right.

8        Q.    So you do know that now?

9        A.    Yes.

10       Q.    Okay.  So have you ever objected to any other

11   class actions?

12       A.    I don't recall.

13       Q.    Okay.  Do you understand that you submitted an

14   objection to the Court to disapprove of this settlement?

15       A.    I don't recall.

16       Q.    Do you have an understanding of your objections?

17       A.    I don't recall.

18       Q.    You don't -- You don't recall whether you have

19   an understanding of your objections?

20       A.    I don't recall.

21       Q.    Okay.  Do you have a basic understanding of what

22   your objections are about?

23       A.    I don't recall.

24            MR. KRON:  Objection.  Objection.  Calls for a

25   legal conclusion by a lay witness.

                                              Page 76

```
 1     BY MR. KAZEROUNIAN:

 2        Q.   I'm going to object to that as being

 3   nonresponsive.

 4        That is a "Yes" or "No" question.

 5        A.   Are you the guy that sent that server to my

 6   house?

 7        Q.   No.

 8        A.   Your firm?

 9        Q.   No.

10        A.   Then who?

11        Q.   I ask the question here, sir, not you.  You

12   answer them.

13             MR. KRON:  (Indicating.)

14             THE WITNESS:  Co-counsel did?

15     BY MR. KAZEROUNIAN:

16        Q.   I don't answer the question.  You answer my

17   questions.

18        Do you realize that you filed a written objection?

19        A.   I don't recall.

20        Q.   Objection.  Nonresponsive.

21        That is a "Yes" or "No" question.

22             MR. KRON:  Objection.  The document speaks for

23   itself.

24     BY MR. KAZEROUNIAN:

25        Q.   Do you realize that?
```

Page 77

```
 1        A.   I don't recall.

 2        Q.   Same objection.

 3        Are you refusing to answer the question?

 4        A.   I don't recall.

 5        Q.   Objection.   Nonresponsive.

 6        Are you refusing to answer any of my questions?

 7        A.   I don't recall.

 8        Q.   Are you intending to answer all questions "I

 9   don't recall"?

10        A.   I don't recall.

11             MR. KRON:   Let me go speak with my client real

12   quick.   Take two seconds.

13             THE REPORTER:   Off the record?

14             MR. KRON:   Hold on a second.   I just want to

15   note that we don't need any comments from the deposition

16   officer.

17             THE REPORTER:   Are we off the record, counsel?

18             MR. KAZEROUNIAN:   If he wants to be.

19             MR. KRON:   We can stay on the record.

20        (Counsel and the deponent leave the deposition room.)

21             THE REPORTER:   We're still on the record.

22             MR. KAZEROUNIAN:   No problem.

23        (Counsel and the deponent re-enter the deposition

24   room.)

25             MR. KRON:   Could you read the last question
```

Page 78

```
 1    back, last substantive question.

 2          (The record is read by the reporter.)

 3              THE WITNESS:  No.

 4      BY MR. KAZEROUNIAN:

 5          Q.   Let me ask another question.

 6          Do you understand that you filed a written objection

 7    to this -- to the settlement agreement --

 8          A.   Yes.

 9          Q.   -- in this case?

10          A.   Yes.

11          Q.   Okay.  Do you understand -- Do you have a

12    general understanding of your objections?

13          A.   A general understanding.

14          Q.   Okay.  Can you tell me what they are?

15          A.   There were several.

16          Q.   Okay.  Can you tell them to me?

17          A.   One that I recall is the objection is in general

18    terms that very few claimants filed --

19          Q.   Okay.

20          A.   -- as opposed to the number of claimants

21    considered.

22          Q.   Okay.

23          A.   Another was that the law firm -- law firms,

24    whatever the case may be, filed their motion for attorney

25    fees after the date of filing claim, so I didn't have
```

                                                    Page 79

1    proper information to file -- in filing my claim.

2        Q.    Okay.

3        A.    And the other one was a release -- time period

4    release, it was overbroad --

5        Q.    Okay.

6        A.    -- as I recall.

7        Q.    All right.  So let's go with the first one.

8        You received notice of this lawsuit in the

9    settlement; correct?

10            MR. KRON:  Objection.  Asked and answered.

11            THE WITNESS:  Asked and answered.

12            MR. KRON:  Go ahead and answer anyway.

13            THE WITNESS:  Yes.

14     BY MR. KAZEROUNIAN:

15        Q.    Okay.  I think in your objection you also were

16    not happy with the notice.

17        What kind of notice would you have liked that would

18    have been better than the one that was given here?

19            MR. KRON:  Objection.  Calls for a legal

20    conclusion by a lay witness.  Document -- The objection

21    document, Document 125 on the docket speaks for itself.

22            THE WITNESS:  That's my answer.  The document

23    speaks for itself.

24     BY MR. KAZEROUNIAN:

25        Q.    Right.  But the document doesn't say what you

Page 80

```
 1    would have preferred if you are objecting to this.

 2         I'm asking you what would your preference have been

 3    to get better notice?

 4              MR. KRON:  If you know how to give better

 5    notice.

 6              THE WITNESS:  I don't know how better notices

 7    are given.

 8      BY MR. KAZEROUNIAN:

 9       Q.   Okay.  But you are not happy with direct mail

10    notice, like getting a postcard in the mail?

11       A.   A Subpoena where the server is banging on my

12    garage door probably would have been more appropriate.

13       Q.   So you want everybody to have been subpoenaed;

14    is that what you are suggesting?

15       A.   If you say so.

16       Q.   That is what you said.  I want to clarify

17    your --

18       A.   That is what you said.

19       Q.   No, it's not.

20         I asked if direct mail notice was not sufficient for

21    you; is that accurate?

22              MR. KRON:  Objection.  Misstates the objector's

23    objections.

24              MR. KAZEROUNIAN:  What were your objections?

25    Sorry.
```

Page 81

```
 1                    MR. KRON:  Objection.  Document 125, which is

 2      attached to this transcript as Exhibit 3, speaks for

 3      itself.

 4        BY MR. KAZEROUNIAN:

 5          Q.   Okay.  My response to that was:  I have your

 6      objection, but you don't have a remedy.  So in order as

 7      Class counsel for me to take what you are telling me

 8      onboard, I want to know what you would have preferred.

 9                    MR. KRON:  Objection.  Exhibit 3 to this

10      transcript speaks for itself.

11                    THE WITNESS:  That would be up to my attorney to

12      decide.

13        BY MR. KAZEROUNIAN:

14          Q.   Not you?

15          A.   Answered -- I answered your question.

16          Q.   So it's not up to you.  It's up to your

17      attorney?  Is that what you are suggesting?

18          A.   That's what I said.

19          Q.   Please stop directing the witness.

20          A.   That is what I said.

21          Q.   Okay.  Now, you said very few claimants filed.

22      Do you know how many people actually -- how many

23      people filed for you to object on those grounds?

24          A.   In general terms?

25          Q.   In general terms.
```

Page 82

```
 1        A.    Less than 10 percent.

 2        Q.    Okay.  Roughly, how many percent?

 3        A.    I think that objection said 9 percent.

 4        Q.    Okay.  So you think that's not satisfactory;

 5   correct?

 6        A.    That's correct.

 7        Q.    What would you have preferred it to be for it to

 8   be satisfactory?

 9        A.    100 percent.

10        Q.    Okay.  Now, you said that your other objection

11   was that the law firms for other attorney fee's petition

12   was after the claim period; is that correct?

13        A.    That's my understanding.

14        Q.    Have you -- Did you ever read the attorney's

15   fees petition that was filed in this case?

16        A.    I may have.  I don't know.  I read a number of

17   documents as I told you before.

18        Q.    Okay.  If you have read it, does your opinion

19   change of whether you would have made a claim or not?

20              MR. KRON:  Objection.  Incomplete hypothetical.

21              THE WITNESS:  I don't understand your question.

22     BY MR. KAZEROUNIAN:

23        Q.    Okay.  If you had received the fee petition that

24   was filed the Court before the claims period, my question

25   to you is:  Would you have filed your claim or not?
```

Page 83

1                MR. KRON:  Objection.  Calls for speculation.

2      Incomplete hypothetical.

3                THE WITNESS:  I --

4                MR. KRON:  And it calls for a subjective

5      opinion, not objective.

6                THE WITNESS:  I don't know.

7        BY MR. KAZEROUNIAN:

8           Q.   You don't know.  Okay.

9           But you don't know if you actually have read the fee

10     petition; correct?

11               MR. KRON:  Objection.  Asked and answered.

12               THE WITNESS:  I think I answered that I read

13     numerous documents; and if that was part of it, it was

14     part of it.  I don't recall --

15       BY MR. KAZEROUNIAN:

16          Q.   As you sit --

17          A.   -- specifically.

18          Q.   Sorry.

19          As you sit here today, you don't know?

20          A.   I said I don't recall specifically.

21          Q.   Okay.  So if I asked you -- If I asked you how

22     much attorney's fees the Class counsel are asking for

23     today, would you know?

24          A.   Exactly, no.

25          Q.   Okay.  Do you know generally?

                                                    Page 84

```
 1        A.   My understanding, I think if I remember
 2   correctly, it was like $3 million or something close to
 3   that.
 4        Q.   That is your memory?
 5        A.   I think so, yeah.
 6        Q.   Do you understand the difference between Group 1
 7   and Group 2 of claimants in this case?
 8             MR. KRON:  Objection.  Calls for a legal
 9   conclusion by a lay witness.
10        If you can answer.
11             THE WITNESS:  I don't know the difference
12   between Group 1 and Group 2 other than I believe I fall
13   under Group 2.
14     BY MR. KAZEROUNIAN:
15        Q.   That is correct.
16        Do you know that the claimants in Group 1 are getting
17   exactly the same amount of money as Group 2 under the
18   Settlement Agreement?
19             MR. KRON:  Objection.  Calls for speculation.
20   Objection.  Calls for legal conclusion by a lay witness.
21             MS. STEPANYAN:  Counsel, what is the legal
22   conclusion that he's calling for?
23             MR. KRON:  I'm not going to engage in arguing
24   objections.
25        You can answer if you know.
```

Page 85

```
 1                    MR. KAZEROUNIAN:  That's fine.

 2           I agree with you though.

 3                    THE WITNESS:  Can you repeat your question?

 4      BY MR. KAZEROUNIAN:

 5           Q.   Sure.

 6           Do you understand that the claimants in Group 1 and

 7      the claimants in Group 2 get exactly the same recovery?

 8                    MR. KRON:  Objection.  Calls for a legal

 9      conclusion by a lay witness.

10                    THE WITNESS:  I don't know.

11      BY MR. KAZEROUNIAN:

12           Q.   You don't know that?

13           A.   (Witness shakes head.)

14           Q.   Okay.

15           A.   As I sit right here right now, I don't know

16      that.

17           Q.   In your objection you suggest that the -- that

18      the notice that went to Group 2 should have been regiven

19      to Group 1.

20                    MR. KRON:  Objection.  Lacks foundation.  Facts

21      not in evidence.  You are saying that --

22                    MR. KAZEROUNIAN:  That was a statement.  It

23      wasn't a question.

24                    MR. KRON:  Don't answer a statement.

25      BY MR. KAZEROUNIAN:
```

Page 86

```
 1          Q.   Okay.   So you make that suggestion.

 2       Is that correct?

 3            MR. KRON:   Objection.   Document 125, which is

 4    Exhibit 3 to this transcript, speaks for itself.

 5            THE WITNESS:   I don't understand your question.

 6       BY MR. KAZEROUNIAN:

 7       Q.   Okay.   In your objection you state the Group 2

 8    should have got -- sorry -- Group 1 should have got the

 9    notice that Group 2 got; is that correct?

10       A.   That's what it says in my objection.

11       Q.   What do you base that on?

12            MR. KRON:   Objection.   Calls for a legal

13    conclusion by a lay witness.

14            THE WITNESS:   I base it on fairness.

15       BY MR. KAZEROUNIAN:

16       Q.   Okay.   So if I told you that Group 1 did get

17    notice, and they are getting exactly the same amount of

18    money as Group 2, does that change your mind about being

19    fair?

20            MR. KRON:   Objection.   Facts not in evidence.

21    Incomplete hypothetical.   Calls for speculation, and calls

22    for an answer to the subjective opinion rather than

23    objective.

24            THE WITNESS:   No.

25       BY MR. KAZEROUNIAN:
```

Page 87

```
 1          Q.   It wouldn't change your mind?

 2          A.   No.

 3          Q.   Thank you.  Why?

 4               MR. KRON:  Objection.  Calls for subjective

 5     opinion.

 6               THE WITNESS:  Because.

 7       BY MR. KAZEROUNIAN:

 8          Q.   Just because?

 9          A.   Just because.

10          Q.   Dot, dot, dot, no other reasoning after

11     "Because"?

12               MR. KRON:  Objection.  Argumentative.

13          Is that a question?

14               MR. KAZEROUNIAN:  Yes, it is.

15          Q.   Is there any other reason apart from the word

16     "Because"?

17          A.   No.

18          Q.   Okay.  You claim in your objection that Group 1

19     members should have been afforded additional time to opt

20     out or object; is that correct?

21               MR. KRON:  Objection.  Document speaks for

22     itself.

23               THE WITNESS:  If that's what it says in the

24     document.

25       BY MR. KAZEROUNIAN:
```

Page 88

```
 1            Q.   If that's what it says, why do you believe that?

 2                 MR. KRON:  Objection.  Vague and ambiguous.

 3      Confusing.  Calls for a subjective opinion.

 4                 THE WITNESS:  I really don't understand your

 5      question.

 6        BY MR. KAZEROUNIAN:

 7            Q.   Okay.  So you are telling the document speaks

 8      for itself.

 9            In the document you say that Group 1 should have been

10      given additional time to opt out or object.  My question

11      is:  Why?

12                 MR. KRON:  Objection.  Calls for a legal

13      conclusion by a lay witness.

14                 THE WITNESS:  I don't have the legal knowledge

15      to be able to answer that question.

16        BY MR. KAZEROUNIAN:

17            Q.   But you approved the document though; right?

18            A.   Yes.

19            Q.   So you signed it without -- without having a

20      legal knowledge or any understanding of why you are

21      objecting to that?

22                 MR. KRON:  Objection.  Calls for speculation.

23      Facts not in evidence.

24                 THE WITNESS:  That's what the attorneys for.  On

25      advice of attorney.
```

Veritext National Deposition & Litigation Services
866 299-5127

1      BY MR. KAZEROUNIAN:

2          Q.    You didn't yourself understand it; correct?

3                MR. KRON:   Objection.   Calls for a legal

4      conclusion by a lay witness.

5                THE WITNESS:   As thoroughly as maybe you do, no.

6      BY MR. KAZEROUNIAN:

7          Q.    Do you have any understanding?

8          A.    Yes.

9          Q.    What understanding do you have?

10         A.    That Group 1 and Group 2 should have been

11     noticed the same time fairly.

12         Q.    The same time fairly?

13         A.    Yeah.

14         Q.    Okay.   And my question to you is:   Why?   If you

15     know.   If you don't know, just say you don't know.

16         A.    Okay.   I don't know.

17         Q.    Okay.   Do you know that there was a fee petition

18     filed in this case twice?

19         A.    I'm not aware of twice, no.

20         Q.    Okay.   So you don't know the first fee petition

21     was filed way in advance of you ever receiving your claim

22     form in the mail; correct?

23                MR. KRON:   Objection.   Calls for speculation.

24     Facts not in evidence.   Asked and answered.   The witness

25     already testified he didn't know anything about a second

                                              Page 90

```
 1    fee petition.
 2              THE WITNESS:  I'm unaware of a second fee
 3    petition.
 4      BY MR. KAZEROUNIAN:
 5         Q.   So you're only aware of one fee petition?
 6         A.   Correct.
 7         Q.   The first one?
 8              MR. KRON:  Objection.  Confusing.  Vague and
 9    ambiguous --
10              THE WITNESS:  Yeah.
11              MR. KRON:  -- as to the first one.
12              MR. KAZEROUNIAN:  Well, no.  The deponent just
13    responded, "I'm not aware of the second -- second fee
14    petition"; correct?
15              MR. KRON:  Objection.  Lacks foundation.  Vague
16    and ambiguous, confusing.
17         Maybe if you identified the dates in which these
18    petitions are filed, that might get you the answer you are
19    looking for.
20              THE WITNESS:  I think you characterize it as a
21    second.
22      BY MR. KAZEROUNIAN:
23         Q.   I don't think I did.  Do you want to read back
24    the testimony?
25         A.   Sure.
```

Page 91

```
 1              MR. KAZEROUNIAN:  Okay.  Can you read back maybe
 2    a page -- I don't know where -- I believe he said he
 3    referenced a second fee petition.
 4              THE WITNESS:  No.  Where you referenced
 5    the second fee petition.
 6              MR. KAZEROUNIAN:  After you did.  I could be
 7    wrong.  That's why we are reading it back.
 8              MR. KRON:  Where are we going?  He testified he
 9    didn't know about multiple fee petitions.  He testified
10    earlier that part of his objection is that the fee
11    petition was filed five days after the claims deadline.
12        To the extent that there is other fee petitions that
13    predate that, ask him questions about that, but he already
14    testified he doesn't know about multiple fee petitions.
15    BY MR. KAZEROUNIAN:
16        Q.  Is that accurate?
17        A.  That's accurate.
18        Q.  Okay.  So you stand by that testimony, I guess?
19              MR. KRON:  No.  It's not testimony.  It's -- We
20    can go back and let the record reflect --
21    BY MR. KAZEROUNIAN:
22        Q.  I want to ask you a question.
23        A.  I believe that's what I testified to.  I said
24    that I'm aware of a fee motion five days after the claim
25    deadline.
```

Page 92

1            You brought up -- You asked me if I was aware of one

2      that was prior to that.

3            And I said I didn't know of any other ones.

4            Q.   Okay.  I think there is a disagreement on how I

5      asked that question, but let's go with that.

6            So you are unaware of a previous fee petition?

7            A.   I think I have already answered you.

8            Q.   Okay.  Now, if I told you that the fees being

9      requested in the first fee petition and the second fee

10     petition only differed by $125,000, would your objection

11     change?

12           A.   No.

13           Q.   Do you have a reasoning for that?

14                MR. KRON:  Objection.  Calls for subjective

15     opinion.  Calls for a legal conclusion by a lay witness.

16                THE WITNESS:  No.

17      BY MR. KAZEROUNIAN:

18           Q.   Okay.  Now, in your objection in Exhibit 3,

19      you -- I think you stated earlier you believe the release

20      is too broad; is that correct?

21           A.   That's correct.

22           Q.   And your main issue with it is it has no time

23      period?

24           A.   That's correct.

25           Q.   Okay.  If I told you it had a definite end

                                                  Page 93

1    period, would that change your mind --

2          A.    No.

3          Q.    -- on your objection?

4          A.    No.

5          Q.    So even if it had a finite time period on the

6    release, your objection still -- would still stand;

7    correct?

8          A.    Correct.

9          Q.    Okay.

10              MR. KRON:   Assumes facts not in evidence.  Lacks

11    foundation.

12      BY MR. KAZEROUNIAN:

13          Q.    In your objection you believe that the Class --

14    the Class recovery is approximately eight-and-a-half

15    million and not $11 million; is that correct?

16          A.    Repeat your question.

17          Q.    Sure.  In your objection you value the Class

18    settlement as only being worth $8,468,609 and not

19    $11 million; is that correct?

20          A.    I don't understand your question.

21          Q.    Okay.  Well, there is ambiguity about what the

22    settlement in this case is worth.

23              You in your objection are proposing the notion that

24    the settlement is worth about eight-and-a-half million

25    dollars, and I gave you the exact number a couple seconds

Page 94

1   ago; is that correct?

2        A.   I think the fee settlement is more like

3   11,000 -- 11 million.

4        Q.   You think -- Sorry.  Say that again, please?

5        A.   That the total settlement will be more like

6   almost $12 million.

7        Q.   Oh, okay.  Now, in your objection you say the

8   Class counsel should only apply for -- You say the Class

9   counsel should only get 20 percent in fees; is that

10  correct?

11            MR. KRON:  Objection.  Document speaks for

12  itself.

13            THE WITNESS:  Yes.

14     BY MR. KAZEROUNIAN:

15        Q.   What do you base that on?

16            MR. KRON:  Objection.  Calls for a legal

17  conclusion by a lay witness.

18            THE WITNESS:  I think that's fair.

19     BY MR. KAZEROUNIAN:

20        Q.   You think that's fair.

21        Do you -- Do you believe that -- Strike that.

22        If I told you that the prevailing law in this

23  district is 25 percent, would that change your mind?

24            MR. KRON:  Objection.  Calls for subjective

25  opinion.  Incomplete hypothetical.  Calls for a legal

Page 95

1    conclusion by a lay witness.

2           THE WITNESS:  No.

3    BY MR. KAZEROUNIAN:

4       Q.   It wouldn't change your mind?

5       A.   No.

6       Q.   Okay.  So if the law was 25 percent, you would

7    still think that's unfair?

8           MR. KRON:  Objection.  Lacks foundation.  Facts

9    not in evidence.  Calls for a legal conclusion by a lay

10   witness.  Calls for a subjective opinion, and it's

11   irrelevant.

12          THE WITNESS:  If you are asking me my opinion,

13   you are right.  I think it's -- I think 20 percent is

14   fair.

15       If it's the law, it's the law.

16   BY MR. KAZEROUNIAN:

17       Q.   Okay.  If it's the law, would that change your

18   mind on bringing your objection on the fairness of the

19   attorney's fees?

20          MR. KRON:  Objection.  Facts not in evidence.

21       And I don't know of any law that sets forth what

22   fairness of fees are.  It varies between districts.  It

23   varies between the Courts, state or federal court, and

24   calls for a legal conclusion from a lay witness.

25          MR. KAZEROUNIAN:  Well, I mean, I don't want to

Page 96

```
 1    bring up law with your deponent.  Since we are talking

 2    between counsel, the Ninth Circuit benchmark is

 3    25 percent.  That is pretty much the law, but let's leave

 4    it at that.

 5         Q.   So if it is the law -- and you don't have to

 6    take my word for it -- but if it was, would you still

 7    believe it's unfair?

 8              MR. KRON:  Objection.  Calls for a legal

 9    conclusion by a lay witness.  Lacks foundation.  Facts not

10    in evidence.  Calls for subjective opinion.

11              THE WITNESS:  I don't understand what your point

12    is.

13      BY MR. KAZEROUNIAN:

14         Q.   Well, the point is that you believe that

15    20 percent is fair attorney's fees, not 25?

16              MR. KRON:  Objection.  Misstates the objector's

17    objection.

18              MR. KAZEROUNIAN:  Well, I mean, I don't want to

19    misstate it.  I think it says -- and I'm reading from

20    page 3 of Exhibit 3, lines 21 to 22.  It says, "Based on

21    actual Class recovery, a 20% fee award (the percentage

22    Class Counsel requests) is $1,693,721."

23         Actually doesn't say that.  You are right.

24              MR. KRON:  Did you get that on the record?

25              THE REPORTER:  Yes.
```

                                              Page 97

1          MR. KRON:  Thanks.

2          MR. KAZEROUNIAN:  Oh, okay.  I'm sorry.  What it

3    does say, going up to line 17, basically this, "Class

4    Counsel's fee award should not be based on the total

5    Settlement Fund Amount ($11,665,592), which includes

6    notice and claims administration costs, and incentive

7    payments.  Instead, Class Counsel's fee award should be

8    based on the total amount recovered for Class Members

9    ($8,468,609).  Based on actual Class recovery, a 20% fee

10   award (the percentage Class Counsel requests) is

11   1,693,721."

12        What the objection is saying is that we should be

13   only awarded 20 percent of the $8 million figure; is that

14   correct.

15          MR. KRON:  Objection.  Document speaks for

16   itself.

17          MR. KAZEROUNIAN:  I was actually correct, not

18   incorrect.

19          THE WITNESS:  Okay.  Reading what you read,

20   settlement then is what you just said is 11 million,

21   almost $12 million.

22     BY MR. KAZEROUNIAN:

23        Q.   Okay.

24        A.   And the 20 percent should be off -- The actual

25   settlement to the Class, and that's the 8 million.

Page 98

```
 1        Q.   Okay.  We're talking about the percentages right

 2    now.

 3        My question to you is:  If I told you the law is

 4    25 percent, would your -- would your objection that --

 5    would your statement that 20 percent is fair change and

 6    would you agree that 25 percent is fair?

 7             MR. KRON:  Objection.  Calls for a legal

 8    conclusion by a lay witness.  It lacks foundation.  Facts

 9    not in evidence.  Calls for subjective opinion.

10             THE WITNESS:  I really don't know how to answer

11    that question.

12        20 percent is my personal opinion.

13    BY MR. KAZEROUNIAN:

14        Q.   Okay.  That's what I wanted to hear.  Thank you.

15        So just -- Earlier you said you believe the

16    settlement is worth over $11 million, and now what do you

17    believe is the settlement amount in this case?

18        A.   I believe the settlement amount is what the

19    defendants would be paying, the total of what they would

20    be paying.

21        Q.   What do you believe that is?

22        A.   The 11 -- 11.6 million.

23        Q.   Okay.  Now, in your objection you claim that the

24    Cy Pres component is -- C-y P-r-e-s.

25             Cy Pres component is inappropriate.
```

Page 99

1        Do you stand by that?

2        A.   I don't fully understand what that means, so

3   you'll have to explain that.

4        Q.   Okay.  Cy Pres is basically if there is money

5   left over usually, it goes to some kind of charity.

6   That's very laymen's terms, and it has some caveats and

7   provisoes to that.  That is the general understanding of

8   it.

9        Now, do you believe that -- You don't agree with that

10  component of the Settlement Agreement; correct?

11       A.   I think it's inappropriate.

12       Q.   But why?

13            MR. KRON:  Objection.  Document speaks for

14  itself.

15            THE WITNESS:  Because that's my personal

16  opinion.

17    BY MR. KAZEROUNIAN:

18       Q.   Okay.  Well, let me explain something to you.

19       In the Settlement Agreement the Cy Pres -- Actually,

20  strike that.  I'm not going to go there.

21       Apart from the two lawsuits that we talked about

22  earlier, have you ever been sued in any other lawsuits?

23       A.   Yeah.  I think there was one that we just

24  settled.  It was for what the heck was that for?  I think

25  it was like a loan.

1          Q.   So you were the defendant?

2          A.   Yes.

3          Q.   What was -- What was the name of the lawsuit?

4    Who sued you?

5          A.   I don't know.  I don't remember.

6          Q.   You don't know who sued you?

7          A.   It was a collection agency, and I don't

8    remember.

9          Q.   For what kind of debt?

10         A.   It was a personal loan, I believe.

11         Q.   Who was your attorney?

12         A.   Scott.

13         Q.   Kron?

14         A.   Scott Kron.

15         Q.   When did it get resolved?

16         A.   This year, 2014.

17         Q.   You don't remember the collection agency?  Was

18   it in Superior Court in Orange County?

19         A.   I don't know.  I don't remember.

20         Q.   How much were you being sued for?

21         A.   I think the total was $4,000, I think.

22         Q.   Did it have any relation to real property?

23         A.   I really don't recall what it was in relation

24   to.

25         Q.   Any other lawsuits where you were the defendant?

Page 101

1          A.    None that I can recall right now.

2          Q.    Okay.  This loan that you were sued for, did it

3    settle confidentially?

4          A.    Yes.

5          (Counsel and witness confer.)

6                THE WITNESS:  No.  No, it was not.

7                MR. KRON:  If it helps get to the end gate, the

8    case is CACH, LLC versus Stephen Alexander Kron, and it

9    was a business line of credit that they were seeking --

10   they were moving on a personal guaranty on.  The amount

11   sought in the Complaint was $8,000.  It was settled for

12   $1,500.

13               MR. KAZEROUNIAN:  Was it with Mandarich?

14               MR. KRON:  I believe so.

15               THE WITNESS:  I thought they settled for 1,000.

16               MR. KRON:  Maybe it was 1,000.

17               MR. KAZEROUNIAN:  If it's not --

18               THE WITNESS:  You brought it up, so --

19               MR. KAZEROUNIAN:  I didn't ask what it settled

20   for.

21               THE WITNESS:  Must not be important.

22     BY MR. KAZEROUNIAN:

23         Q.    Something you said you didn't -- In your line of

24   you-don't-recall answers, I asked you if you ever objected

25   to a Class settlement before.

                                          Page 102

```
 1          Do you have a recollection now?
 2          A.   I don't know.  I don't recall if I filed --
 3     actually filed an objection.
 4          I know -- I know I have gotten another card, like
 5     what -- your firm or whatever firm sent it to -- sent me.
 6          Q.   In what case?  Was it the Mount case?
 7          A.   That name doesn't sound familiar.
 8          Q.   Mount, M-o-u-n-t.
 9          A.   Is there another name associated with it?
10          Q.   Hoffman.  Wells Fargo?
11          A.   Wells Fargo possibly.
12          Q.   Okay.  And you don't know if you objected?
13          A.   I don't know if an objection has been filed or
14     not, but I think we discussed it.
15          Q.   Okay.
16          A.   I just don't remember.  There is a lot of stuff
17     been going on with my business and -- and other things,
18     so --
19          Q.   Okay.  So there may be an objection out there,
20     but you don't know whether it was or not?
21          A.   I don't know whether it's been filed or not.
22     That's correct.
23          Q.   Have you decided to file an objection in the
24     other case?
25          A.   I think we were discussing about filing one in
```

Page 103

```
 1    that case, but I don't know if it's been filed yet.
 2         Q.   Okay.  So was that the final decision to file an
 3    objection?
 4         A.   I don't know if we actually came to a final
 5    decision, but I think it was leaning that way.
 6         Q.   Okay.  Do you know what kind of case that is?
 7         A.   Offhand, no, I don't.
 8         Q.   Was it to do with telephone calls?
 9         A.   As I said, I don't know what exactly what it was
10    right now.
11         Q.   Okay.  Any other cases?
12         A.   I don't recall anything right now.
13              MR. KAZEROUNIAN:  May I have five minutes,
14    please, off the record?
15              MR. KRON:  Yes.
16         (A recess is taken.)
17              MR. KAZEROUNIAN:  Back on the record.
18         I don't have any further questions, but I believe
19    Chase counsel does.
20
21                         -EXAMINATION-
22
23      BY MS. STEPANYAN:
24         Q.   My name is Julieta Stepanyan.  I represent
25    Chase.  I believe plaintiffs' counsel explained that
```

Page 104

```
 1    earlier.  I just have a couple quick questions.
 2         You said earlier that when Chase -- plaintiffs'
 3    counsel asked you if you understand the lawsuit, you said
 4    that you understand that Chase violated some laws; is that
 5    correct?
 6         A.   That's my general understanding, yes.
 7         Q.   Do you know what these laws are?
 8         A.   I don't know specifically, but generally that
 9    they involved phone calls --
10         Q.   Okay.
11         A.    -- computerized phone calls.
12         Q.   Do you know -- Do you know that Chase actually
13    violated these laws?
14         A.   I don't.
15         I guess I should amend my answer to allegedly.
16              MR. KRON:  It's okay.  You're privileged in this
17    situation.
18              THE WITNESS:  Okay.  Good.  I don't want to be
19    sued.
20              MS. STEPANYAN:  No more questions.
21              MR. KAZEROUNIAN:  Okay.  Can we put a
22    stipulation down because of the expedited nature of when
23    our reply brief is due -- our opposition brief is due.
24         Can we stipulate that we get an expedited transcript
25    to Mr. Kron's office.
```

                                              Page 105

1        How quickly can you do it?

2            THE REPORTER:  Do you want to go off the record?

3            MR. KAZEROUNIAN:  Yes.

4        (A discussion is held off the record.)

5            MR. KAZEROUNIAN:  Back on the record.

6        The court reporter has kindly said she can get an

7    expedited copy to Mr. Kron's office by tomorrow.

8        Mr. Kron, the deponent, will be given an opportunity

9    to make any changes, should he see a need fit before the

10   November 5th time period that he gave us earlier in the

11   deposition.

12       Mr. Kron's counsel, Scott Kron, will keep custody of

13   the original transcript and make it available for future

14   hearings and trial.

15       If the original is lost or misplaced, a certified

16   copy can be used in its place.

17       And if Mr. Kron, the deponent, does not advise us of

18   any changes or we don't hear of any changes before

19   November 5th, we will presume none were made.

20           MS. STEPANYAN:  Is there any way we can do that

21   earlier because our response is due November 4th?

22           MR. KAZEROUNIAN:  Can we have it by -- We'll get

23   it to you tomorrow, the 28th.  Can you get it to us by the

24   1st or the 2nd?

25       (Counsel and witness confer.)

                                          Page 106

```
 1              THE WITNESS:  I should advise you that I am
 2    having oral surgery tomorrow afternoon, and I will be
 3    taking Valium and some pain medication over the next
 4    couple of days as needed.
 5              MR. KAZEROUNIAN:  Okay.
 6              THE WITNESS:  So I'm going to try to make myself
 7    available to try and get it done by the 1st or 2nd.
 8              MR. KAZEROUNIAN:  Thank you.
 9              MR. KRON:  I won't be available to meet and
10    consult with my client on any potential changes until
11    November 3rd; otherwise, I'm booked business-wise the rest
12    of this week, and the weekends I don't work, and I have
13    personal obligations on the weekends.
14              MR. KAZEROUNIAN:  Can you get it to us by
15    lunchtime on the 3rd?
16              MR. KRON:  Yes.  I can certainly tell you
17    whether or not any changes will be made by lunchtime on
18    the 3rd; and if there are any changes, I'm going to have
19    to write those up on the sheet that she gives us and send
20    those out.
21              MR. KAZEROUNIAN:  Okay.
22              MR. KRON:  I will do my best to have those
23    complete that day as well.
24              MR. KAZEROUNIAN:  Okay.  Nothing else to add to
25    the stipulation.
```

Page 107

1           MR. KRON:  So stipulated.

2           MS. STEPANYAN:  So stipulated.

3           THE REPORTER:  Do you need a copy as well?

4           MS. STEPANYAN:  Yes, please.

5           THE REPORTER:  When do you need your copy by?

6           MS. STEPANYAN:  Tomorrow.

7           THE REPORTER:  Thank you.

8       Off the record.

9

10      (TIME NOTED: 12:07 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 108

1        I, STEPHEN ALEXANDER KRON, do hereby declare under

2    penalty of perjury that I have read the foregoing

3    transcript; that I have made any corrections as appear

4    noted, in ink, initialed by me, or attached hereto; that

5    my testimony as contained herein, as corrected, is true

6    and correct.

7

8        EXECUTED this _____day of _____, 2014,

9        at_____, _____.

10                    (City)          (State)

11

12

13

14

15        _____

16                STEPHEN ALEXANDER KRON

17                VOLUME I

18

19

20

21

22

23

24

25

Page 109

WORD INDEX

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 28, 2014

Gail E. Kennamer, CSR 4583

Page 110